| | | |
|---|---|---|
| Black Political Empowerment Project, POWER Interfaith, Make the Road Pennsylvania, OnePA Activists United, New PA Project Education Fund, Casa San José, Pittsburgh United, League of Women Voters of Pennsylvania, and Common Cause Pennsylvania, | : : : : : : : : : | |
| Petitioners | : | |
| | : | |
| v. | : | No. 283 M.D. 2024 |
| | : | ARGUED: August 1, 2024 |
| Al Schmidt, in his official capacity as Secretary of the Commonwealth, Philadelphia County Board of Elections, and Allegheny County Board of Elections, | : : : : : | |
| Respondents | : | |

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLY MICHAEL H. WOJCIK, Judge
HONORABLE ELLEN CEISLER, Judge
HONORABLE MATTHEW S. WOLF, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE CEISLER                                                FILED:  August 30, 2024

In this original jurisdiction matter, we are asked to determine whether two provisions of the Pennsylvania Election Code (Election Code)[1] that require electors of the Commonwealth of Pennsylvania (Commonwealth) to date the declaration of

---

[1] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600-3591.

the elector printed on the second, or outer, envelope of absentee and mail-in ballots violate the free and equal elections clause of article I, section 5 of the Pennsylvania Constitution, Pa. Const. art. I, § 5.[2] *See* Sections 1306 and 1306-D of the Election Code,[3] 25 P.S. §§ 3146.6(a) and 3150.16(a) (dating provisions). The dating provisions and other statutory phrases within them have been the subject of numerous lawsuits since the 2019 inception of Act 77. Nevertheless, despite various state and federal jurists' *suggestions* regarding the potential viability of a challenge to the dating provisions under the free and equal elections clause in prior case law over the past four years, the present challenge is the first of its kind.

　　For the reasons that follow, we conclude:

1.　　The fundamental right to vote guaranteed by our Constitution is at issue. For this reason, a strict scrutiny standard of review applies to the dating provisions' restriction on that right. Under this standard of review, the government bears the heavy burden of proving that the law in question is narrowly tailored to serve a compelling government

---

[2] The free and equal elections clause provides: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. I, § 5.

[3] Section 1306 was added to the Election Code by the Act of March 6, 1951, P.L. 3, and thereafter amended by the Act of October 31, 2019, P.L. 552, No. 77 (Act 77 or Act 77 of 2019). Section 1306 relates to voting by absentee electors and provides, in relevant part, that an absentee "elector shall . . . fill out, date and sign the declaration printed on" the second, or outer, envelope "on which is printed the form of declaration of the elector," among other things. *See* 25 P.S. § 3146.6(a).

Section 1306-D was added to the Election Code by Act 77, relates to voting by mail-in electors, and similarly provides, in relevant part, that a mail-in "elector shall . . . fill out, date and sign the declaration printed on" the second, or outer, envelope "on which is printed the form of declaration of the elector," among other things. *See* 25 P.S. § 3150.16(a).

interest and where the governmental fails to satisfy its burden, the law or its application is unconstitutional.

As has been determined in prior litigation, the date on the outer mail-in ballot envelopes is not used to determine the timeliness of a ballot, a voter's qualifications/eligibility to vote, or fraud. Therefore, the dating provisions serve no compelling government interest. The refusal to count undated or incorrectly dated but timely mail ballots submitted by otherwise eligible voters because of meaningless and inconsequential paperwork errors violates the fundamental right to vote recognized in the free and equal elections clause.

2. The Petition for Review states a viable claim under the free and equal elections clause of the Pennsylvania Constitution.

3. Petitioners have standing to bring this action as they have interest in the outcome of the litigation that is substantial, direct, and immediate. Petitioners' additional expenditures and diversion of resources to educate electors concerning adherence to the Election Code constitutes a substantial interest. The Secretary's guidance regarding an unsettled legal question shares a causal connection with the alleged harm, namely Petitioners' inability to educate electors effectively, and that connection is neither remote nor speculative.

3

4. This Court has subject matter jurisdiction over this matter because Respondents Al Schmidt, in his official capacity as Secretary of the Commonwealth, is an indispensable party to this lawsuit, and the Philadelphia County and Allegheny County Boards of Elections are proper parties in this action. The remaining 65 county boards are not indispensable parties to this action.

5. The relief Petitioners seek does not implicate Act 77's nonseverability provision. Petitioners seek a declaration that **enforcement** of the dating provisions in a manner that excludes undated and incorrectly dated, but timely received, mail-in ballots from qualified voters is unconstitutional under the free and equal elections clause. Petitioners are not asking the Court to rewrite, amend, or strike any portion of Act 77.

In support of these conclusions, the Court submits the following:

## I. <u>BACKGROUND & PROCEDURAL HISTORY</u>

On May 28, 2024, the Black Political Empowerment Project, POWER Interfaith, Make the Road Pennsylvania, OnePA Activists United, New PA Project Education Fund, Casa San José, Pittsburgh United, the League of Women Voters of Pennsylvania, and Common Cause Pennsylvania (collectively, Petitioners) filed a Petition for Review Addressed to the Court's Original Jurisdiction (Petition for Review) seeking declaratory and injunctive relief against Al Schmidt, in his official capacity as Secretary of the Commonwealth (Secretary), the Philadelphia County Board of Elections (Philadelphia County BOE), and the Allegheny County Board of Elections (Allegheny County BOE) (collectively, Philadelphia and Allegheny

4

County BOEs). Specifically, Petitioners seek a declaration under the Declaratory Judgments Act (DJA)[4] that continued enforcement of the dating provisions to reject undated and incorrectly dated, but timely submitted, absentee and mail-in ballots of eligible voters is an unconstitutional interference with the exercise of the right to suffrage in violation of the free and equal elections clause of the Pennsylvania Constitution. (Petition for Review (PFR) ¶¶ 81-85 (Count I); 92 & Wherefore Clause ¶¶ (a)-(b).) Petitioners also seek, *inter alia*, preliminary and permanent injunctive relief, enjoining further enforcement of the dating provisions to reject such ballots in the November 5, 2024 General Election and all future elections. (PFR ¶ 92 & Wherefore Clause ¶¶ (c)-(e).) According to Petitioners, since the Pennsylvania Supreme Court's decision in *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023) (*Ball*), the Secretary, the 67 county boards of elections, and the federal courts have all confirmed the dating provisions serve no purpose, are meaningless, and have been inconsistently and arbitrarily applied. Petitioners therefore alternatively request that the dating provisions be reinterpreted and applied as "directory," rather than "mandatory," such that Respondents cannot use noncompliance with those provisions to disenfranchise eligible voters in violation of their fundamental right to vote. (PFR ¶¶ 86-91 (Count II).)

On May 29, 2024, Petitioners also filed an Application for Special Relief in the Nature of a Preliminary Injunction (Preliminary Injunction Application) pursuant to Pennsylvania Rule of Appellate Procedure 1532(a), Pa.R.A.P. 1532(a) (relating to special relief), and a supporting memorandum of law, asking this Court for similar relief to that requested in the Petition for Review.

---

[4] 42 Pa.C.S. §§ 7531-7541.

5

The Republican National Committee (RNC) and the Republican Party of Pennsylvania (RPP) (collectively, Republican Party Intervenors) have filed Preliminary Objections (POs) and an application for summary relief and supporting memorandum of law, seeking dismissal of the Petition for Review for lack of standing, legal insufficiency of a pleading (demurrer), lack of subject matter jurisdiction, failure to join indispensable parties, and failure to state a claim under the free and equal elections clause. Petitioners also filed an application for summary relief, asserting they are entitled to the declaratory and injunctive relief requested in the Petition for Review. Notably, the Secretary, and the Democratic National Committee (DNC) and the Pennsylvania Democratic Party (PDP) (collectively, Democratic Party Intervenors), **support** Petitioners' position in this case, whereas the Philadelphia and Allegheny County BOEs take no position on the cross-applications for summary relief or any of the procedural objections. All parties have submitted extensive briefs in support of their respective positions.

Before reaching the parties' arguments on the issues presented by the Petition for Review, however, and for purposes of transparency and providing the utmost clarity to the citizens of this Commonwealth given the fundamental right to vote at issue in this case, we first briefly explain the procedural history of the matter, as previously set forth in this Court's July 18, 2024 intervention opinion in *Black Political Empowerment Project v. Schmidt* (Pa. Cmwlth., No. 283 M.D. 2024, filed July 18, 2024) (Ceisler, J.) (single-Judge op.) (*BPEP I*), slip op. at 3-7, and supplemented by succeeding events, followed by the overarching principles of law guiding us in this case.

On May 31, 2024, the Court scheduled a status conference for June 10, 2024, via WebEx videoconferencing (WebEx), for the purpose of discussing filing

6

deadlines and dates for scheduling oral argument, among other things. Prior to the conference, then-proposed Republican Party and Democratic Party Intervenors each sought to intervene in this case, and by June 10, 2024 Order, the Court permitted those organizations to participate in the conference.

The Court issued another Order on June 10 (Scheduling Order) following the status conference, granting Republican Party and Democratic Party Intervenors' respective unopposed requests to intervene as parties in this matter.[5] The Court's Scheduling Order additionally noted the parties' agreement that there are no outstanding questions of fact, nor factual stipulations required in this case; that this matter involves purely legal questions; and that disposing of the matter via cross-applications for summary relief was the most expeditious means of resolving the legal issues in dispute. Petitioners also agreed to convert their Preliminary Injunction Application to an application for summary relief to expedite the final resolution of this case and ensure there is sufficient time for any appeals to be filed and decided by our Supreme Court under the very tight time constraints imposed by the impending General Election scheduled for November 5, 2024. The Court therefore set an expedited briefing schedule for the cross-applications for summary relief and supporting/opposing briefs; reply briefs were not permitted. The Court indicated that upon completion of the briefing on the cross-applications for summary

---

[5] The Court's Order directed the Prothonotary to docket Republican Party Intervenors' POs attached to their intervention application. However, the Court did not order separate briefing on the POs, but instead permitted Republican Party Intervenors to address the claims raised in their POs in their respective application for summary relief and supporting brief, which they have done.

Democratic Party Intervenors did not attach a pleading to their intervention application; however, they indicated that they adopted Petitioners' Petition for Review in full. *See* Pennsylvania Rule of Civil Procedure 2328(a), Pa.R.Civ.P. 2328(a); *see also* Democratic Party Intervenors' Application (Appl.) to Intervene at 2.

7

relief, the Court would issue a separate order regarding either the submission of the case on briefs and/or the scheduling of oral argument.

On June 11, 2024, Westmoreland County Commissioner Doug Chew (Commissioner Chew) sought to intervene in his official capacity as a member of the Westmoreland County Board of Elections (Westmoreland County BOE), which only Petitioners and the Secretary opposed.[6] The Court held an intervention hearing via WebEx on July 8, 2024,[7] and subsequently denied Commissioner's Chew's intervention application by Order on July 9, 2024,[8] and indicated an opinion would follow. *See Black Pol. Empowerment Proj. v. Schmidt* (Pa. Cmwlth., No. 283 M.D. 2024, filed July 9, 2024) (Ceisler, J.) (single-Judge ord.). On July 18, 2024, the Court issued a Memorandum Opinion explaining its reasoning for its July 9, 2024 Order.[9] On July 23, 2024, Commissioner Chew sought reargument before the Court

---

[6] All other parties were considered to be unopposed to Commissioner Chew's intervention, per this Court's June 12, 2024 Order.

[7] On June 24, 2024, the Court scheduled the intervention hearing for July 3, 2024, and directed that witness and exhibit lists be filed by noon on July 1, 2024, which the parties filed on that date. On July 1, 2024, the Court rescheduled the hearing to July 8, 2024.

[8] The Court's July 9, 2024 Order also finally disposed of numerous outstanding applications filed by Commissioner Chew related to his intervention, which the Court had previously held in abeyance pending disposition of his application to intervene. *See Black Pol. Empowerment Proj. v. Schmidt* (Pa. Cmwlth., No. 283 M.D. 2024, filed July 9, 2024) (Ceisler, J.) (single-Judge ord.), slip op. at 2, ¶¶ 2-3. Because the Court already dealt with those applications, we need not discuss them further in this opinion.

[9] In its Memorandum Opinion on intervention, the Court explained that Commissioner Chew failed to demonstrate a legally enforceable interest under Pennsylvania Rule of Civil Procedure 2327(4), Pa.R.Civ.P. 2327(4), as he is not aggrieved by the underlying challenge to the dating provisions either by virtue of his status as an elected Westmoreland County BOE member, his duties under the Election Code, or any potential liability he may face because of his counting or not counting undated or incorrectly dated absentee and mail-in ballots in accordance with the law. *See Black Pol. Empowerment Proj. v. Schmidt* (Pa. Cmwlth., No. 283 M.D. 2024, filed July 18, 2024) (Ceisler, J.) (single-Judge op.) (*BPEP I*), slip op. at 25-52. The Court further determined that Commissioner Chew's intervention also was not proper under Rule 2327(3), as his interests are already adequately represented by Republican Party Intervenors, and his intervention would unduly delay swift resolution of the matter. *BPEP I*, slip op. at 25, 52-54 & n.31.

en banc in relation to the Court's July 9, 2024 Order and July 18, 2024 Memorandum Opinion, which the Court denied by Order of July 24, 2024.

In the interim, and pursuant to this Court's June 10 Scheduling Order, on June 24, 2024, Petitioners and Republican Party Intervenors filed their cross-applications for summary relief and supporting briefs. The Secretary and Democratic Party Intervenors filed briefs in support of Petitioners' application for summary relief. The Philadelphia and Allegheny County BOEs filed a Statement, indicating they take no position on the cross-applications but also highlighting, among other things, the lack of any meaningful purpose served by the dating provisions.[10] On July 8, 2024, Republican Party Intervenors filed a response and memorandum in opposition to Petitioners' application for summary relief. The Philadelphia and Allegheny County BOEs filed a Supplemental Statement of Position regarding the cross-applications. The Secretary and Democratic Party Intervenors filed responses, and Petitioners filed an answer and memorandum of law, in opposition to Republican Party Intervenors' application for summary relief.[11]

By Order of July 11, 2024, the Court scheduled oral argument on the POs and the parties' cross-applications for August 1, 2024, before a special en banc panel of this Court,[12] following which the Court indicated it would take the matter under

---

[10] The Republican Leader of the Pennsylvania House of Representatives, Bryan Cutler; President Pro Tempore of the Pennsylvania State Senate, Kim Ward; and Majority Leader of the Pennsylvania Senate, Joe Pittman (collectively, *Amici* Republican Leaders), filed an *Amici Curiae* Brief in Support of Republican Party Intervenors.

[11] Although the Court denied Commissioner Chew's intervention application on July 9, 2024, it nevertheless directed the Prothonotary to docket Commissioner Chew's Brief in Response to Summary Relief Applications as an *Amicus Curiae* Brief. *See* Pa.R.A.P. 531.

[12] Commissioner Chew also filed an Application to Present Oral Argument as *Amicus Curiae* on July 16, 2024. *See* Pa.R.A.P. 531(c). Republican Party Intervenors filed a letter, concurring in the application so long as granting it did not reduce their argument time. The Court directed answers to the application by July 18, 2024 Order. Republican Party Intervenors then **(Footnote continued on next page…)**

advisement and issue a decision as quickly as possible. The Court having heard the parties' respective arguments on the legal issues and reviewed the comprehensive filings, the matter is now ready for disposition.

## II. OVERARCHING ELECTION LAW PRINCIPLES

Initially, we observe that this case touches upon the important constitutional principle enshrined in the free and equal elections clause of article I, section 5 of the Pennsylvania Constitution that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. I, § 5. Our Supreme Court has recognized that "[t]he broad text of this specific provision mandates clearly and unambiguously, and in the broadest possible terms, that **all** elections conducted in this Commonwealth must be free and equal. Stated another way, this clause was specifically intended to equalize the power of voters in our Commonwealth's election process." *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 356 (Pa. 2020) (quoting *League of Women Voters v. Cmwlth.*, 178 A.3d 737, 804, 812 (Pa. 2018) (emphasis in original) (brackets & internal quotations omitted)). Additionally, the Supreme Court has "observed that the purpose and objective of the Election Code, which contains Act 77, is '[t]o obtain freedom of choice, a fair election[,] and an honest election return[.]'" *Id.* (quoting

---

filed an answer repeating their position on the application, and Petitioners and the Secretary filed answers opposing the application. The Secretary also filed an Application for Additional Argument Time and Division of Time on July 22, 2024, requesting, *inter* alia, 90 minutes for oral argument. Democratic Party Intervenors concurred in the Secretary's application.

By Order of July 24, 2024, the Court granted Commissioner Chew's application, granted the Secretary's application in part to the extent it sought 90 minutes for oral argument, and otherwise denied the Secretary's application. The Court allotted 90 minutes for oral argument on the cross-applications for summary relief and POs, and directed that Petitioners, the Secretary, and Democratic Party Intervenors would proceed first, followed by Republican Party Intervenors and Commissioner Chew. The Philadelphia and Allegheny County BOEs indicated they did not intend to present argument and would cede their time to the Secretary.

*Perles v. Hoffman*, 213 A.2d 781, 783 (Pa. 1965)). "To that end, the Election Code should be liberally construed so as not to deprive, *inter alia*, electors of their right to elect a candidate of their choice." *Id.* (citing *Perles*, 213 A.2d at 784).

In considering election-related matters generally, including where the fundamental right to vote is at stake, "we are mindful of the 'longstanding and overriding policy in this Commonwealth to protect the elective franchise.'" *Pa. Democratic Party*, 238 A.3d at 360-61 (quoting *Shambach v. Bickhart*, 845 A.2d 793, 798 (Pa. 2004)). Further, "it is well[ ]settled that, 'although election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote.'" *Id.* at 361 (quoting *Shambach*, 845 A.2d at 798). "'[O]ur goal must be to enfranchise and not to disenfranchise [the electorate].'" *Id.* (quoting *In re Luzerne Cnty. Return Bd.*, 290 A.2d 108, 109 (Pa. 1972)). Our Supreme Court has indeed recognized that "[t]he disfranchisement of even one person validly exercising his right to vote is **an extremely serious matter**." *Perles v. Cnty. Return Bd. of Northumberland Cnty.*, 202 A.2d 538, 540 (Pa. 1964) (emphasis added).

As far as rejecting ballots based on minor irregularities is concerned, our Supreme Court has cautioned that such power "must be exercised **very sparingly** and with the idea in mind that either an individual voter or a group of voters are not to be disfranchised at an election **except for compelling reasons**." *Appeal of Gallagher*, 41 A.2d 630, 632-33 (Pa. 1945) (emphasis added) (further observing that "[m]arking a ballot in voting is a matter not of precision engineering but of unmistakable registration of the voter's will in substantial conformity to statutory requirements"). Further, **"[e]very rationalization within the realm of common sense should aim at saving [a] ballot rather than voiding it[,]"** *Appeal of Norwood*, 116 A.2d 552, 554-55 (Pa. 1955) (emphasis added), and, therefore,

11

"[t]echnicalities should not be used to make the right of the voter insecure[,]" *Appeal of James*, 105 A.2d 64, 65-66 (Pa. 1954) (further providing that "[w]here the elective franchise is regulated by statute, the regulation should, when and where possible, be so construed as to insure rather than defeat the exercise of the right of suffrage").

Considering these bedrock principles of election law in Pennsylvania, we turn to the undisputed factual averments of the Petition for Review, as supplemented by the Preliminary Injunction Application.

## III. PETITION FOR REVIEW & PRELIMINARY INJUNCTION APPLICATION

In the Petition for Review, Petitioners set forth their concern that Pennsylvania election officials, including the Secretary and officials at the Philadelphia and Allegheny BOEs, "have arbitrarily disqualified thousands of plainly eligible voters' timely-submitted mail-in ballots in every primary and general election since 2020 merely because the voters neglected to write a date, or wrote an 'incorrect' date, on the ballot[ ]return envelope." (PFR ¶ 1.) Petitioners assert that the refusal to count undated or incorrectly dated but timely mail ballots[13] submitted by otherwise eligible voters because of "an inconsequential paperwork error" violates the fundamental right to vote recognized in the free and equal elections clause. (*Id.* ¶¶ 1, 3 (citing, *inter alia*, *Ball*, 289 A.3d 1).)

According to Petitioners, nearly 10,000 voters were disenfranchised in the 2022 General Election and "thousands" more voters were disenfranchised in the 2024 Presidential Primary Election. (PFR ¶¶ 4 (listing disenfranchised voters' names from various counties, including Allegheny, Philadelphia, Montgomery, York, Bucks, Chester, Berks, and Dauphin Counties), 55-57 (observing that mail

---

[13] The terms "mail ballots" or "mail/mail-in voter" used by Petitioners encompasses both absentee and mail-in ballots/voters. (*See* PFR ¶ 55, n.6.)

12

voting has been a boon for voter participation in Pennsylvania and that approximately 2.7 million people voted by mail in 2024 Presidential Primary Election), 58 (noting "[o]n information and belief," that thousands of timely received mail ballots were rejected in the 2024 Presidential Primary Election), 59 (noting that over 10,000 timely absentee/mail-in ballots were rejected in 2022, and that nearly 7,000 were initially rejected in 2023), 75-76; Exhibit (Ex.) 1 (Declaration (Decl.) of A. Shapell).) Petitioners claim that without declaratory and injunctive relief from this Court, Petitioners,[14] Petitioners' members, and thousands of qualified Pennsylvania voters will suffer the irreparable harm of having their timely-submitted mail ballots rejected in this year's election and at every election thereafter. (*Id.* ¶ 5.) Further, Petitioners point out that multiple state and federal courts[15] have recently found that the dating provisions' requirement that voters handwrite the date on mail ballot return envelopes is meaningless, as it neither establishes voter eligibility nor

---

[14] Petitioners bring this matter as "nonpartisan organizations dedicated to promoting American democracy and the participation of Pennsylvania voters in our shared civic enterprise" and "to ensure that their members, the people they serve, and other qualified Pennsylvania voters do not again lose their constitutional right to vote based on a meaningless requirement." (Petition for Review (PFR) ¶ 2.) Descriptions of each Petitioner organization can be found on pages 4-33 of the Petition for Review.

[15] Petitioners highlight the myriad litigation that has ensued over the dating provisions since 2020, which provisions have to date withstood challenges in court based on state law statutory interpretation and the federal Civil Rights Act of 1964's Materiality Provision set forth in 52 U.S.C. § 10101(a)(2)(B). (*See* PFR ¶ 60 (citing *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020) (*In re Canvass*), *cert. denied*, 141 S.Ct. 1451 (2021); *Ritter v. Lehigh Cnty. Bd. of Elections*, 272 A.3d 989 (Pa. Cmwlth.) (Table), *appeal denied*, 271 A.3d 1285 (Pa. 2022); *Migliori v. Cohen*, 36 F.4th 153 (3d Cir.), *vacated as moot*, 143 S.Ct. 297 (2022); and *Pa. State Conf. of the NAACP v. Schmidt*, 703 F. Supp. 3d 632 (W.D. Pa. 2023), 2023 WL 8091601 (*NAACP II*), *rev'd & remanded*, *Pa. State Conf. of NAACP Branches v. Sec'y*, 97 F.4th 120 (3d Cir. 2024) (No. 23-3166) (*NAACP III*); *Chapman v. Berks Cnty. Bd. of Elections* (Pa. Cmwlth., No. 355 M.D. 2022, filed Aug. 19, 2022) (Cohn Jubelirer, P.J.) (single-Judge op.) (*Berks Cnty.*), 2022 WL 4100998; *McCormick v. Chapman* (Pa. Cmwlth., No. 286 M.D. 2022, filed June 2, 2022) (Cohn Jubelirer, P.J.) (single-Judge op.), 2022 WL 2900112; and *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023) (*Ball*)).)

timely ballot receipt. (*Id.* ¶¶ 6, 51-54, 60, 67.) However, they highlight that no court has ever decided whether applying the dating provisions to disenfranchise voters violates their fundamental right to vote under the free and equal elections clause, "[u]ntil now." (*Id.* ¶¶ 6, 61-62.)

Regarding the Secretary specifically, Petitioners observe that the Election Code confers authority upon him to implement absentee and mail-in voting procedures in the Commonwealth. (PFR ¶¶ 37-38 (citing Sections 1303(b) and 1303-D(b) of the Election Code,[16] 25 P.S. §§ 3146.3(b), 3150.13(b) (requiring that absentee and mail-in ballots be on a form prescribed by the Secretary)), 39 (citing Sections 1304 and 1304-D,[17] 25 P.S. §§ 3146.4, 3150.14 (requiring that the form of declaration on absentee and mail-in ballots must be as prescribed by the Secretary)), 41 (citing Section 201(f) of the Election Code, 25 P.S. § 2621(f) (outlining Secretary's duties "[t]o receive from county boards of elections the returns of primaries and elections, to canvass and compute the votes cast for candidates and upon questions as required by the provisions of this act; to proclaim the results of such primaries and elections, and to issue certificates of election to the successful candidates at such elections"))).) In this regard, Petitioners inform that, prior to the 2024 Presidential Primary Election, the Secretary redesigned the mail-in ballot return envelope to now include a field that pre-populated "20" at the beginning of the year on the outer return envelope; however, voters still made dating mistakes. (PFR ¶¶ 40, 74.)[18] They also point to prior guidance from the Secretary to the county

---

[16] Section 1303 was added by the Act of March 6, 1951, P.L. 3, and Section 1303-D was added by Act 77.

[17] Section 1304 was added by the Act of March 6, 1951, P.L. 3, and Section 1304-D was added by Act 77.

[18] *See* Pa. Dep't of State Newsroom, Shapiro Administration Introduces Redesigned Mail Ballot Materials to Give Voters Clearer Instructions, Decrease Number of Rejected Ballots, and **(Footnote continued on next page…)**

boards of elections regarding undated and incorrectly dated mail ballots. (*Id.* ¶ 42 (citing Secretary's and his predecessors' November 3, 2022 guidance[19] to segregate and exclude from tabulation undated/incorrectly dated mail ballots and April 3, 2023 guidance[20] to set aside and not count undated ballots and to set aside and segregate incorrectly dated ballots).) They further note that following the Third Circuit's decision in *Pennsylvania State Conference of NAACP Branches v. Secretary*, 97 F.4th 120 (3d Cir. 2024) (No. 23-3166) (*NAACP III*),[21] the Department of State (Department) continues to instruct counties not to count mail ballots arriving in

_____

Ensure Every Legal Vote is Counted, Nov. 29, 2023, *available at* https://www.pa.gov/en/agencies/dos/newsroom/shapiro-administration-introduces-redesigned-mail-ballot-materials-to-give-voters-clearer-instructions-decrease-number-of-rejected-ballots-and-ensure-every-legal-vote-is-counted.html (last visited Aug. 22, 2024) (indicating that "[v]oters can expect to see mail-in ballots that incorporate the following requirements, based on counties' current best practices: . . . A  pre-filled "20" at the beginning of the year on the outer envelope to alert voters to write the current date, not their birthdate, in that field. . . .").

[19] *See* PFR ¶ 42; Pa. Dep't of State, Guidance on Undated and Incorrectly Dated Mail-in and Absentee Ballot Envelopes Based on the Pennsylvania Supreme Court's Order in *Ball v. Chapman*, issued November 1, 2022, at 1, *available at* https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-elections/directives-and-guidance/archived/2022-11-03-Guidance-UndatedBallot.pdf (last visited Aug. 22, 2024) (directing that absentee and mail-in ballots determined to be undated or incorrectly dated should be coded as "CANC – NO SIGNATURE" within the SURE System and "segregated from other ballots").

[20] *See* PFR ¶ 42; Pa. Dep't of State, Guidance Concerning Civilian Absentee and Mail-in Bllot Procedures, Updated: April 3, 2023, at 6, *available at* https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-elections/directives-and-guidance/2023-04-03-DOS-Guidance-Civilian-Absentee-Mail-In-Ballot-Procedures-v3.pdf (last visited Aug. 22, 2024) (providing that "[a] ballot-return envelope with a declaration that is not . . . dated is not sufficient and must be set aside, declared void, and may not be counted" and that "any declarations that are undated or that contain a date deemed by the county board of elections to be incorrect should be set aside and segregated").

[21] On March 27, 2024, the United States Court of Appeals for the Third Circuit, in a 2-1 decision, reversed the United States District Court for the Western District of Pennsylvania's November 21, 2023 order in *NAACP II*; held that the federal Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B), only applies when the state is determining who may vote and, thus, does not apply to rules, like the dating provisions, that govern how a qualified voter must cast his/her ballot; and remanded for consideration of the equal protection claim.

15

undated or incorrectly dated declaration envelopes. (*Id.* ¶¶ 43 (citing an April 19, 2024 email from Deputy Secretary Jonathan Marks stating the Department's view that certain handwritten dates can reasonably be interpreted as the date in which the voter completed the declaration, but noting that the Department has not otherwise modified its prior guidance), 68-69; Ex. 13 (4/19/2024 Marks Email).) Petitioners also highlight evidence adduced in prior litigation over the dating provisions regarding the age of voters whose ballots had no date, (PFR ¶ 63) (citing *Ritter v. Lehigh Cnty. Bd. of Elections*, 272 A.3d 989 (Pa. Cmwlth.) (Table), *appeal denied*, 271 A.3d 1285 (Pa. 2022), and observing evidence in that case established that nearly three-quarters of the 257 timely-received, but undated, mail ballots at issue were those of voters 65 years of age or older and that 15 voters were older than 90); inconsistencies across the Commonwealth in how voters have been treated with respect to the rejection and/or counting of undated and incorrectly dated mail ballots, (*id.* ¶ 64(a)-(f) (citing *NAACP II* Court's observations regarding inconsistencies in voter treatment based on the evidence adduced in that case)); and the rejection of thousands of timely received mail ballots based on simple voter errors and partial omissions related to the ballot declaration, (*id.* ¶ 65(a)-(c) (including examples from *NAACP II*)).

As for the Philadelphia and Allegheny County BOEs, Petitioners observe that they are responsible for administering elections in their respective counties, and ensuring that elections are honestly, efficiently, and uniformly conducted. (PFR ¶ 44(a)-(i) (delineating responsibilities of county boards of elections under Section 302 of the Election Code, 25 P.S. § 2542, with respect to absentee and mail-in ballots).) Petitioners claim that, as of the date of the Petition for Review, the county boards of elections have recorded their receipt of 714,315 mail ballots in the

16

Statewide Uniform Registry of Electors (SURE) System[22] for the 2024 Presidential Primary Election, representing more than 37% of all ballots cast in that election. (PFR ¶ 70.) However, pursuant to the Secretary's guidance, no county boards canvassed any undated or incorrectly dated mail ballots; thus, "thousands" have been set aside and segregated, and not counted. (*Id.* ¶¶ 71-72, 73 (citing Decl. of A. Shapell, ¶ 12(b), and noting more than 4,000 ballots were marked as cancelled in the SURE System based on failure to write a date or wrong date written).) Petitioners identify several disenfranchised individuals whose votes were not counted in the 2024 Presidential Primary Election because of dating errors, (*see* PFR ¶ 76(a)-(k) (declarations of voters from various Pennsylvania counties)),[23] and claim that voters will continue to be disenfranchised by the Philadelphia and Allegheny County BOEs, and the other 65 county boards of elections, based on the Secretary's

_____

[22] Our Supreme Court recently described the SURE System, in part, as follows:

> SURE is an acronym for the "Statewide Uniform Registry of Electors." 25 Pa.C.S. § 1222. This registry is a "single, uniform integrated computer system" maintained by the . . . Department . . . [,] which is " a database of all registered electors in this Commonwealth." *Id.* § 1222(c)(1). The database contains individual information for each registered elector collected during the voter registration process, *i.e.*, the elector's name, address, party affiliation, the last four digits of their Social Security number, their driver's license or state ID number if they have such documentation, and their signature. [*McLinko v. Dep't of State*, 279 A.3d 539, 575 (Pa. 2022).]

*In re Doyle*, 304 A.3d 1091, 1096 n.3 (Pa. 2023).

[23] These individuals include: Otis Keasley (Allegheny County) (PFR ¶ 76(a) & Ex. 2 (Keasley Decl.)); Joanne Sowell (Allegheny County) (PFR ¶ 76(b) & Ex. 3 (Sowell Decl.)); Eugene Ivory (Philadelphia County) (PFR ¶ 76(c) & Ex. 4 (Ivory Decl.)); Bruce Wiley (Philadelphia County) (PFR ¶ 76(d) & Ex. 5 (Wiley Decl.)); Stephen Arbour (Montgomery County) (PFR ¶ 76(e) & Ex. 6 (Arbour Decl.)); Kenneth Hickman (York County) (PFR ¶ 76(f) & Ex. 7 (Hickman Decl.)); Janet Novick (Bucks County) (PFR ¶ 76(g) & Ex. 8 (Novick Decl.)); Joseph Sommar (Chester County) (PFR ¶ 76(h) & Ex. 9 (Sommar Decl.)); Phyllis Sprague (Bucks County) (PFR ¶ 76(i) & Ex. 10 (Sprague Decl.)); Mary Stout (Berks County) (PFR ¶ 76(j) & Ex. 11 (Stout Decl.)); and Lorine Walker (Dauphin County) (PFR ¶ 76(k) & Ex. 12 (Walker Decl.)).

17

guidance, in the upcoming November 2024 General Election and beyond, absent the requested declaration from this Court. (PFR ¶¶ 77, 78 (noting those voters impacted are disproportionately senior citizens), 79-80 (asserting the Pennsylvania Constitution requires that ballots with missing or incorrect dates be counted and that the disenfranchisement of voters constitutes irreparable harm for which there is no adequate remedy at law and for which court intervention is required).) Petitioners therefore seek the above-described declaration under the DJA and preliminary and permanent injunctive relief enjoining further enforcement of the Election Code's dating provisions beginning with the November 5, 2024 General Election.

As noted above, this Court's June 10, 2024 Scheduling Order reflects Petitioners' agreement to convert their Preliminary Injunction Application to an application for summary relief, the underlying facts of which are the same as those set forth in the Petition for Review. The Court therefore dispenses with a detailed summary of the Preliminary Injunction Application and notes only the following from that Application. In seeking preliminary injunctive relief, Petitioners add that the timeliness of mail ballots is established through the county boards' scanning of a unique barcode on the ballots' outer envelopes. (Prelim. Inj. Appl. (PI Appl.) ¶¶ 1, 5 (citing *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020) (*In re Canvass*), for the proposition that dating provisions therefore are "unnecessary" with respect to determining timeliness).) Relevantly, with respect to their legal argument they are likely to succeed on the merits of their claims, Petitioners argue for the first time that strict scrutiny should be applied here, because the fundamental right to vote guaranteed by our Constitution is at issue, and that under such analysis, the government bears the burden of proving that the dating provisions serve a compelling government interest,

18

which it cannot meet here. (PI Appl. ¶¶ 12-15; Memo. of Law at 11-18 (further asserting that the dating provisions cannot survive **any** level of scrutiny, because they serve no purpose).)

The Court additionally observes that, since the Petition for Review was filed, some facts averred therein have changed. Specifically, on July 1, 2024, the Secretary issued a new Directive to all county boards, directing them to, *inter alia*, preprint the full year (2024) in the date field of absentee and mail-in ballots' declarations on the outer return envelopes, effective immediately for all elections taking place following issuance of the Directive. (*See* Repub. Party Intervenors' July 10, 2024 Notice of Suppl. Auth., Attach. (Pa. Dep't of State, Directive Concerning the Form of Absentee & Mail-in Ballot Materials, dated July 1, 2024, at 7-8 & App. E).)[24] In their Notice of Supplemental Authority, Republican Party Intervenors relevantly opine that the Secretary's July 1, 2024 Directive eliminates the risk of a voter writing an incomplete or inaccurate year on a mail ballot's declaration. (*Id.* at 2.)

With the above undisputed facts in mind, we turn to the parties' arguments on the cross-applications and procedural objections.

## IV. PETITIONERS' APPLICATION FOR SUMMARY RELIEF

As mentioned above, the Secretary and Democratic Party Intervenors support and join in Petitioners' application for summary relief, and their arguments largely overlap with each other. As such, the below summary of the arguments includes those of Petitioners, the Secretary, and Democratic Party Intervenors, unless otherwise noted.

---

[24] The Department's July 1, 2024 Directive can also be found at: https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-elections/directives-and-guidance/2024-Directive-Absentee-Mail-in-Ballot-Materials-v2.0.pdf (last visited Aug. 22, 2024).

In their application for summary relief, Petitioners argue that their right to relief on Count I of the Petition for Review is clear, as the right to vote has been historically regarded as fundamental in Pennsylvania and is vigorously protected by the clear, unambiguous, and broad text, as well as the history, of the free and equal elections clause. (Pet'rs' Memo. of Law in Supp. of Appl. for Summ. Relief (ASR) at 16-20; Sec'y's Br. in Supp. of Pet'rs' ASR at 13-16; Br. of Dem. Party Intervenors in Supp. of Pet'rs' ASR at 4-8 (citing *Pa. Democratic Party*, 238 A.3d 345 (Pa. 2020), *League of Women Voters v. Cmwlth.*, 178 A.3d 737 (Pa. 2018), and *Winston v. Moore*, 91 A. 520, 523 (Pa. 1914) (explaining that elections are "free and equal" for constitutional purposes when, *inter alia*, "when they are public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him")).) Because the fundamental right to vote is at issue, Petitioners contend, and Democratic Party Intervenors agree, that a strict scrutiny standard of review applies to the dating provisions' restriction on that right, under which the government bears the heavy burden of proving that the law in question is narrowly tailored to serve a compelling government interest; and where the governmental fails to satisfy its burden, the law or its application is unconstitutional. (Pet'rs' Memo. of Law at 18-20 (citing *Petition of Berg*, 712 A.2d 340 (Pa. Cmwlth. 1998), *Applewhite v. Cmwlth.* (Pa. Cmwlth., No. 330 M.D. 2012, filed Jan. 17, 2014) (McGinley, J.) (single-Judge op.), 2014 WL 184988); Br. of Dem. Party Intervenors at 17-20.) According to Petitioners, applying the dating provisions to exclude undated or incorrectly dated mail ballots

restricts the right to have one's vote counted to only those voters who correctly handwrite the date on their mail ballot envelope declaration, thus denying the right to vote to all duly qualified, registered electors. (*Id.* at 19-20.)

Petitioners repeat their claims that the dating provisions serve no purpose based on the prior litigation that has extensively shown that the date is not used to determine the timeliness of a ballot, a voter's qualifications/eligibility to vote, or fraud; therefore, they assert, the dating provisions serve no compelling government interest. (Pet'rs' Memo. of Law at 21-22, 24 (citing *NAACP* cases); Sec'y's Br. at 21-28; Br. of Dem. Party Intervenors at 8-10.) Petitioners add that none of the post-hoc justifications contemplated in *In re Canvass* in 2020, prior to further exploration of the dating provisions by multiple courts, withstands scrutiny. (Pet'rs' Memo. of Law at 22-26.) According to Petitioners, the Election Code itself establishes that the date is irrelevant, as timely submission of a ballot is evaluated based on when a county board receives it, i.e., by 8:00 p.m. on Election Day, and the county boards' timestamping and scanning procedures reflect this fact. (*Id.* at 22-24 (citing *NAACP* cases); Sec'y's Br. at 21-22; Br. of Dem. Party Intervenors at 9 (citing Sections 1306(c) and 1306-D(c) of the Election Code, 25 P.S. §§ 3146.6(c) (providing 8:00 p.m. deadline for absentee ballots), 3150.16(c) (providing same 8:00 p.m. deadline for mail-in ballots); and Sections 1309(b)(5) and 1307-D(b)(5) of the Election Code,[25] 25 P.S. §§ 3146.9(b)(5) (requiring that county boards "shall maintain a record of . . . [t]he date on which the electors' completed absentee ballot is received by the county board"), 3150.17(b)(5) (requiring that county boards "shall maintain a record of . . . [t]he date on which the elector's completed mail-in ballot is received by the county board").) There is also no danger of backdating, per Petitioners,

---

[25] Section 1309 was added to the Election Code by the Act of March 6, 1951, P.L. 3, and Section 1307-D was added to the Election Code by Act 77 of 2019.

because ballots received after 8:00 p.m. on Election Day are simply not counted. (Pet'rs' Memo. of Law at 24.) Further, the prior litigation established that the handwritten date plays no role in determining a voter's eligibility to vote. (*Id.*) Also, according to Petitioners, knowing when an elector executed a ballot via the handwritten date is not a legitimate purpose to support the dating provisions, as signing the ballot sufficiently demonstrates the voter's desire to cast the vote by mail in lieu of appearing in person; and pinpointing the precise day, minute, or hour, **when** a voter marked the ballot within any statutory timeframe is irrelevant and not contemplated by the Election Code. (*Id.* at 25-26.)[26] Petitioners and Democratic Party Intervenors also submit that the dating provisions cannot survive any other level of scrutiny, including intermediate scrutiny or rational basis review. (*Id.* at 26-27; Br. of Dem. Party Intervenors at 22; *see also* Sec'y's Br. at 28-32 (arguing that declaration dates are a vestige of different voting rules),[27] 33-35 (further asserting

---

[26] Democratic Party Intervenors also appear to argue that Republican Party Intervenors are collaterally estopped from arguing the dating provisions serve any purpose, citing *NAACP III* in support of their argument. (*See* Br. of Dem. Party Intervenors in Supp. of Pet'rs' ASR at 11-13.) Because of our ultimate conclusion in this case, we need not address this argument further.

[27] The Secretary describes the history of absentee ballots, various amendments to the Election Code, and the fact that county boards never had to assess whether the affidavit and jurat accompanying such ballots was "sufficient" based on any date requirement. (*See* Sec'y's Br. at 28-32 & Exs. 1-5.) He informs that, in 1941, the General Assembly added a requirement that county boards set aside absentee ballots bearing a postmark later than the date of the particular election. (*Id.* at 30.) However, the written date requirement for absentee ballots (requiring that a voter's jurat "shall be . . . dated") was not added to the Election Code until 1945, and it was not until 1963 that the affidavit and jurat requirement for such ballots was replaced by the single declaration that is still used today. (*Id.* at 30-31.) Thereafter, in 1968, the General Assembly finally aligned the deadline for absentee voters to complete their ballots and for county boards to receive those ballots, after which the General Assembly removed the requirement that county boards set aside ballots based on the date on the declaration. (*Id.* at 31-32.) The Secretary submits that when the General Assembly enacted Act 77 of 2019, "it adopted wholesale the pre[]existing text and procedures for absentee voting," which had been materially unchanged since 1968, and simply added the mail-in ballot portion of the Act into the existing canvassing procedures for **(Footnote continued on next page…)**

that requiring elections officials to review declarations impedes effective election administration).)

Finally, Petitioners argue that they are entitled to a permanent injunction, claiming it is necessary to avoid the injury of disenfranchisement to their members that cannot be compensated by damages. (Pet'rs' Memo. of Law at 28.) Petitioners also assert that they, as organizations, are irreparably harmed by the unconstitutional enforcement of a statute that forces them to divert and waste resources they need to carry out their missions of educating and mobilizing Pennsylvania voters. (*Id.* at 29-30.) Petitioners emphasize that each of the Petitioner organizations conduct activities and initiatives core to their substantive missions that do not otherwise involve helping people mitigate the consequences of not complying with the dating provisions. (*Id.*) They further argue that greater injury would result from denying the injunction than from granting it, as refusing to enforce a rule that has no purpose harms no one and certainly does not harm elections officials who are tasked with administering elections moving forward. (*Id.* at 30-31 (citing Exs. 14-22 (Decls. of Pet'rs' Dirs.).) For all these reasons, Petitioners assert that their request for summary and injunctive relief should be granted.

Republican Party Intervenors respond that Petitioners cannot establish a clear right to relief because they rely solely on the facts set forth in their Petition for Review and Preliminary Injunction Application, and ignore the other facts asserted

---

absentee ballots. (*Id.*) According to the Secretary, this history shows that the declaration date is among the "vestiges remaining in the Election Code" of prior voting rules, which has no relationship to protecting free, honest, and fair elections. (*Id.* at 28, 32 (quoting *In re Nov. 3, 2020 Gen. Election*, 240 A.3d 591, 610 n.24 (Pa. 2020), and further noting that while the date requirement remains, the requirement to set aside ballots based on the date has not existed since 1968).)

by the Secretary and the Philadelphia and Allegheny County BOEs in their filings.[28] (Repub. Party Intervenors' Resp. in Opp'n to Pet'rs' ASR at 3-5.) Further, according to Republican Party Intervenors, Petitioners' right to relief is not clear based on the asserted procedural objections, discussed below; alternatively, as to the merits, Republican Party Intervenors assert that the Supreme Court's decisions in *Pennsylvania Democratic Party* and *Ball* are controlling here and do not establish a free and equal elections clause claim. (*Id.* at 6-11.) Republican Party Intervenors also deny that strict scrutiny applies here, submit that invalidating the dating provisions would on its own violate the free and equal elections clause, and assert that Act 77's nonseverability provision would apply if the dating provisions are ruled unconstitutional. (*Id.* at 12-13.) Republican Party Intervenors also assert in their memorandum of law in opposition to Petitioners' application[29] that Petitioners cannot satisfy their burden to show that greater injury will result from refusing rather than granting the requested permanent injunction, because any harm from denying an injunction is outweighed by the irreparable harm that will be caused to the Commonwealth, Pennsylvania voters, and Republican Party Intervenors on the eve of the 2024 General Election. (*Id.* at 54-58 (noting in this regard that granting an injunction will cause chaos and confusion, erode public confidence, and harm

---

[28] Because the parties agreed that there are no factual issues in this case, that no stipulations of fact were required, and that this matter involves only legal issues, the Court will not discuss the additional facts asserted by the Secretary and the Philadelphia and Allegheny BOEs in their filings for purposes of disposition of the cross-applications. (*See* Cmwlth. Ct. Sched. Ord. dated June 10, 2024.) Suffice it to say, however, that such facts, even if considered, would militate against granting Republican Party Intervenors' application for summary relief.

[29] Republican Party Intervenors' memorandum of law in opposition to Petitioners' application for summary relief repeats essentially the same arguments raised in Republican Party Intervenors' cross-application for summary relief. Accordingly, we do not address those arguments in full here but will do so below when discussing Republican Party Intervenors' cross-application.

Republican Party Intervenors' efforts to train and educate various individuals regarding the dating provisions).)

## V. REPUBLICAN PARTY INTERVENORS' POs & APPLICATION FOR SUMMARY RELIEF[30]

### A. *Procedural Objections*

In their application for summary relief, Republican Party Intervenors assert that the Petition for Review suffers from at least five defects, each of which independently warrants dismissal of the Petition. First, they assert that Petitioners lack standing to sue the Secretary because his guidance regarding the dating provisions is not legally binding or enforceable against the county boards of elections, there is no causal connection between the guidance and Petitioners' alleged harm of county boards declining to count mail ballots that fail to comply with the dating provisions, and enjoining such guidance would not redress Petitioners' alleged harm. (Repub. Party Intervenors' ASR ¶ 20; Memo. of Law at 4 (citing *Repub. Nat'l Comm. v. Chapman* (Pa. Cmwlth., No. 447 M.D. 2022, filed Mar. 23, 2023) (Ceisler, J.) (single-Judge op.) (*RNC II*), slip op. at 20), 9, 11-15, 18.)[31] Republican Party Intervenors also highlight that the Petition for Review only

---

[30] Republican Party Intervenors' arguments on the POs are subsumed within their application for summary relief. Accordingly, to the extent possible, we combine Republican Party Intervenors' arguments on the POs with their arguments on the procedural objections asserted in their application for summary relief.

[31] Republican Party Intervenors appear to incorporate their first and second POs into this one procedural defect. Specifically, in their first PO, Republican Party Intervenors argue that Petitioners lack standing to bring their pre-enforcement claim under the DJA with respect to the Election Code's dating provisions, which claim they assert also runs afoul of binding Pennsylvania Supreme Court precedent in *Ball*, 289 A.3d 1, and the Third Circuit's decision in *NAACP III*. (POs ¶¶ 25, 34-38 (citing, among other cases, *Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467 (Pa. 2021) (*Firearm Owners II*), for general and associational/organizational standing principles), 44-50.) In this regard, they assert that none of Petitioners are aggrieved, as they each **(Footnote continued on next page…)**

seeks relief against the Secretary with respect to his non-binding guidance, and not against the Philadelphia or Allegheny County BOEs, which are ultimately responsible for enforcement of the dating provisions. (Repub. Party Intervenors' Memo. of Law at 7-8 (citing PFR ¶ 92), 11-12.) According to Republican Party Intervenors, the 67 county boards are the entities that are bound to enforce the dating provisions under *Ball*, not the Secretary, and any relief ordered against the Secretary with respect to his non-binding guidance would therefore not result in enjoining "further enforcement" of those provisions or change the county boards' legal obligation to enforce the dating provisions. (*Id.* at 8, 12-13 (citing *RNC II*, slip op. at 20; *In re Canvass*, 241 A.3d at 1078 n.6; *Chapman v. Berks Cnty. Bd. of Elections* (Pa. Cmwlth., No. 355 M.D. 2022, filed Aug. 19, 2022) (Cohn Jubelirer, P.J.) (single-Judge op.) (*Berks Cnty.*), 2022 WL 4100998, at *10 (noting Secretary's admission to lacking authority to direct the county boards in their administration of elections, to follow the Secretary's guidance, or to comply with a court order)), 13-14 (citing *Ball v. Chapman*, 284 A.3d 1189, 1192 (Pa. 2022) (Nov. 1, 2022 Order) (observing the Supreme Court's November 1, 2022 Order did not require the Secretary to do anything, including rescind or modify the guidance challenged); and

_____

advance the same argument as to why they are harmed but have failed to identify any concrete, distinct, or particularized harm they have suffered because of Respondents following clear Pennsylvania law. (POs ¶¶ 39-40, 41(a)-(i) (observing each Petitioner asserts it is harmed because it will have to expend resources to educate voters regarding their compliance with the dating provisions and that such resources could be spent elsewhere), 42, 51-54.) In their second PO, Republican Party Intervenors assert that Petitioners have no redressable claims against the Secretary because his November 3, 2022 and April 3, 2023 guidance is not legally binding or enforceable upon the county boards of elections. (POs ¶¶ 55-69 (citing, *inter alia*, *RNC II*, *Berks Cnty.*, *Ball*, and *In re Canvass*).)

26

*Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467 (Pa. 2021) (*Firearm Owners II*)), 15 (citing *Chadwick v. Caulfield*, 834 A.2d 562 (Pa. Super. 2003)).)[32]

Second, Republican Party Intervenors claim that this Court lacks subject matter jurisdiction because the Secretary is not a proper or indispensable party to this lawsuit based on his non-binding and unenforceable guidance. (POs ¶¶ 70-86; Repub. Party Intervenors' ASR ¶ 21; Memo. of Law at 4 (citing *RNC II*, slip op. at 13-14, 18-28), 9-10, 15-18.) In this regard, they assert that this Court's prior, single-Judge opinion in *RNC II* is directly on point with the instant matter. (Repub. Party Intervenors' Memo. of Law at 17-19 (citing, *inter alia*, *RNC II*, slip op. at 8-28).) Third, again relying on *RNC II*, Republican Party Intervenors argue that this Court also lacks jurisdiction over the Philadelphia and Allegheny County BOEs because no relief is sought against them, and they are local agencies, not Commonwealth ones. (POs ¶¶ 87-97; Repub. Party Intervenors' ASR ¶ 22; Memo. of Law at 4-5 (citing *RNC II*, slip op. at 22-27), 10, 19-20.) Fourth, even if this Court has jurisdiction and relief was sought against the Philadelphia and Allegheny County BOEs, Republican Party Intervenors contend that the Petition for Review must be dismissed because Petitioners failed to join the other 65 county boards, which are indispensable parties to this case. (POs ¶¶ 98-110; Repub. Party Intervenors' ASR

---

[32] Republican Party Intervenors cite *Chadwick v. Caulfield*, 834 A.2d 562 (Pa. Super. 2003), for the proposition that redressability is a requirement of standing. However, *Chadwick* involved a husband's appeal from the denial of a petition for a writ of habeas corpus stemming from his confinement for civil contempt after he transferred marital assets overseas during his divorce proceedings. However, "redressability" was only mentioned once in the opinion in that case in the context of discussing the wife's standing under Article III of the United States Constitution, U.S. Const. art. III, in a **federal** court case involving the same parties. *Id.* at 570. As our Supreme Court recently observed in *Allegheny Reproductive Health Center v. Pennsylvania Department of Human Services*, 309 A.3d 808, 832 (Pa. 2024) (*Allegheny Reprod. III*), "the federal standing analysis 'does not control our resolution of the standing issue' because we are not bound by the dictates of Article III of the United States Constitution." Accordingly, we need not consider Republican Party Intervenors' redressability argument with respect to the Secretary's standing.

¶ 23; Memo. of Law at 5, 10, 21-24 (citing *Polydyne, Inc. v. City of Philadelphia*, 795 A.2d 495 (Pa. Cmwlth. 2002)).) In this regard, Republican Party Intervenors first contend that the county boards cannot be relieved of their duty to enforce the dating provisions via judicial order entered in a case that does not name them or seek "redress" against them, which deprives the Court of jurisdiction over this action. (Repub. Party Intervenors' Memo. of Law at 22-23 (further observing the Petition for Review references some of the 65 other county boards and their alleged inconsistent practices with respect to determining compliance with the dating provisions).) Second, they claim that even if an injunction is entered against the 2 named County BOEs, it would establish varying standards across the 67 counties, which would "potentially ensnare all 67 county boards of elections in an [e]qual [p]rotection violation." (*Id.* at 23 (citing *Bush v. Gore*, 531 U.S. 98 (2000)).) Stated differently, an injunction entered against the 2 named County BOEs requiring them to count noncompliant ballots would not affect the other 65 county boards' obligation **not to count** such ballots under the Election Code and *Ball*. (*Id.* at 23-24.)

Fifth, Republican Party Intervenors argue that the Petition for Review fails to state a violation of the free and equal elections clause, as the Supreme Court has already rejected similar arguments regarding the constitutionality of and the meaninglessness underlying the dating provisions in *Ball*. (POs ¶¶ 111-61; Repub. Party Intervenors' ASR ¶ 24; Memo. of Law at 10.) However, even if the constitutionality of the dating provisions is an open question, Republican Party Intervenors submit that the clause's text and history, and Supreme Court precedent regarding other ballot casting rules, foreclose the conclusion that the dating provisions are unconstitutional. (POs ¶¶ 111-61 (further noting that Petitioners'

28

argument that strict scrutiny applies is incorrect, and that even if the dating provisions are ruled unconstitutional, this Court must strike Act 77 in its entirety); Repub. Party Intervenors' ASR ¶ 24; Memo. of Law at 5, 10-11 (citing *Pa. Democratic Party*, 238 A.3d at 374), 24-58.)

For their part, Petitioners assert that none of the above procedural objections have merit. (Pet'rs' 6/24/2024 Memo. of Law at 32.) First, Petitioners deny that the relief they seek implicates Act 77's nonseverability provision. (*Id.*) Petitioners clarify that they seek a declaration that **enforcement** of the dating provisions in a manner that excludes undated and incorrectly dated, but timely received, mail ballots from qualified voters is unconstitutional under the free and equal elections clause; they are not asking the Court to rewrite, amend, or strike any portion of Act 77. (*Id.* at 32-33 (further clarifying that they seek to have the counties cease treating the immaterial handwritten date requirement as so significant that failure to comply results in loss of the franchise).) Petitioners assert that *Stilp v. Commonwealth*, 905 A.2d 918 (Pa. 2006), and *Pennsylvania Federation of Teachers v. School District of Philadelphia*, 484 A.2d 751 (Pa. 1984), are on point with respect to nonseverability. (*Id.* at 34-36.)

Petitioners also assert that all Respondents are proper parties in this case. (Pet'rs' 6/24/2024 Memo. of Law at 36-38.) First, the Secretary's duties under the Election Code, and particularly, his duty to determine and prescribe the form of absentee and mail-in ballots, and his guidance issued in relation thereto, makes him a proper party. (*Id.* at 36-37.) In this regard, Petitioners point out that in *Ball*, the Supreme Court noted that the issuance of such guidance was the basis for the RNC's petition concerning the dating provisions in that case. (*Id.* at 37.) Similarly, the county boards' duties under the Election Code with respect to administering

29

elections, and reviewing, processing, and canvassing absentee and mail-in ballots, as well as stamping them with the date of receipt, also makes them proper parties in this case. (*Id.* at 37.) Petitioners also clarify the obvious that they do not seek relief against any of the other 65 county boards. (*Id.* at 38 & n.12 (citing *City of Philadelphia v. Cmwlth.*, 838 A.2d 566 (Pa. 2003), and further opining that even if the dating provisions are ruled unconstitutional, other county boards not named here would be expected to follow that ruling, which does not necessarily make them indispensable parties).)

Republican Party Intervenors respond that Petitioners fail to address their own lack of standing, counter that the Court lacks jurisdiction as it relates to the Secretary and the other 65 county boards, address the Court's prior holding in *RNC II*, and provide any legal authority to establish why the 65 county boards are not indispensable parties to this action. (Repub. Party Intervenors' Resp. in Opp'n to Pet'rs' ASR at 6-10; Memo. in Opp'n to Pet'rs' ASR at 7-14 (repeating their theory that *RNC II* is indistinguishable from this case), 15-17.) As for the Secretary's guidance at issue in *Ball*, Republican Party Intervenors submit this is inconsequential because *Ball* involved the Supreme Court's exercise of its King's Bench powers, which are not constrained by any limitations on **this** Court's jurisdiction, like in *RNC II*; the guidance at issue in *Ball* created a "lack of clarity" regarding whether county boards had to enforce the dating provisions and threatened nonuniformity with respect to their enforcement in the 2022 General Election in light of the then-conflicting state and federal case law on the subject, which is now settled; and, finally, the *Ball* petitioners named all 67 county boards and, thus, secured a uniform order directing all of them to enforce the dating provisions, whereas, any ruling here

would not bind the other 65 county boards.  (Repub. Party Intervenors' Memo. in Opp'n to Pet'rs' ASR at 10-13.)

In the Secretary's view, this Court has jurisdiction because he is an indispensable party, where the specific claim and the relief sought implicate a right or interest of the Commonwealth party that is essential to the merits of the issue under review.  (Sec'y's Resp. to Repub. Party Intervenors' ASR at 31-32.)  The Secretary highlights that he is the chief election official in Pennsylvania with numerous responsibilities for administering Pennsylvania's elections, including prescribing the form of the declaration at issue, and that he is a regular party in declaratory judgment actions that raise what the Election Code, the Pennsylvania Constitution, or federal law requires in Pennsylvania as a statewide election practice. (*Id.* at 32-33.)  He also points out that he has changed his guidance regarding the mail ballot declaration twice in the past year, and that he "has an interest in the consequence of failing to satisfactorily complete the declaration he prescribes." (*Id.* at 33.)  Further, he claims resolution of the ultimate question in this case will determine which ballots shall be counted and included with the returns that are transmitted to him from the county boards on forms he prescribes.  (*Id.* at 33-34 (further asserting that counties' initial determinations on which mail ballots to canvass bear directly on whether the Secretary's performance of his own responsibilities complies with the law, and stating that the RNC, in *Ball*, also cited the Secretary's responsibilities in including the Secretary as a respondent in that case).)

The Secretary also agrees with Petitioners that granting their requested relief would not require invalidation of Act 77, and submits that doing so would directly implicate many of his duties in various Election Code sections that have been

31

amended by Act 77, including with respect to absentee and mail-in ballots. (Sec'y's Resp. to Repub. Party Intervenors' ASR at 35 (noting the Secretary has also been a respondent in prior efforts to invalidate Act 77).) He also claims that Republican Party Intervenors wrongly rely on this Court's unreported *RNC II* decision, which, although correctly decided, is readily distinguishable from this matter due to what was at issue in that case, i.e., notice and opportunity to cure procedures developed and implemented **by the county boards themselves**, and not any issue of which governing law required a **statewide** practice. (*Id.* at 35-37.) The Secretary further argues that the Court can proceed without the other counties, like the Supreme Court did in *In re Canvass*, in which only the Philadelphia and Allegheny County BOEs participated and the Court nevertheless dictated what the Election Code required of **all** county boards. (*Id.* at 38-39.) Moreover, contrary to Republican Party Intervenors' argument in this regard, any ruling by this Court that the dating provisions are unconstitutional would **remedy** inconsistencies that have resulted since *Ball*, and all counties would be required to follow it if it is precedential. (*Id.* at 39-40 (further opining that roping every county board into litigation involving a statewide issue would burden tax-strapped counties, many of whom are regularly inactive even if named as a party).)

Democratic Party Intervenors agree with Petitioners and the Secretary that the procedural objections are unavailing, adding that *Ball* contradicts Republican Party Intervenors' arguments regarding Petitioners' standing and the Secretary's indispensability and that Republican Party Intervenors conflate federal and state standing principles regarding "redressability," misstate the Secretary's responsibilities regarding the dating provisions, "misconceive[] the law regarding indispensability," incorrectly rely on this Court's unreported decision in *RNC II*,

which, as the Secretary pointed out, involved a different issue, and wrongly argue that the other 65 county boards are indispensable parties in light of their incidental interest in the dating provisions and limited role in following the law with respect to those provisions. (*See* Dem. Party Intervenors' Resp. in Opp'n to Repub. Party Intervenors' ASR at 31-42.) Moreover, Democratic Party Intervenors assert, the Secretary has always been a proper party in cases challenging the constitutionality of Act 77 and plays a critical role in enforcing, implementing, and administering the dating provisions. (*Id.* at 36-37.)

In their brief in opposition to Republican Party Intervenors' application for summary relief, Petitioners rejoin that Republican Party Intervenors' reliance on *RNC II* for the proposition that Petitioners lack standing to sue the Secretary is misplaced, as their argument is primarily premised on their claim that the Court lacks jurisdiction over the matter because the Secretary is not an indispensable party; however, the question of subject matter jurisdiction is not the same as standing of Petitioners. (Pet'rs' Memo. of Law in Opp'n to Repub. Party Intervenors' ASR at 41.) Petitioners also generally agree with the Secretary and Democratic Party Intervenors as to indispensability, *RNC II* being distinguishable, and nonapplicability of Act 77's nonseverability provision. (*Id.* at 42-55.)

The Philadelphia and Allegheny County BOEs have not directly addressed Republican Party Intervenors' procedural objections; rather, they only make arguments in favor of the merits of the Petition for Review and regarding their view that Act 77's nonseverability provision is inapplicable.

**B.** *Merits*

As to the merits, Republican Party Intervenors argue that they, not Petitioners, are entitled to summary relief, as "Petitioners invite the Court to do something

33

unprecedented in the Commonwealth's history: to wield the [free and equal elections clause] to strike down a neutral ballot-casting rule that governs how voters complete and cast their ballots." (Repub. Party Intervenors' Br. in Supp. of ASR at 24 (citation omitted).) They submit that elections need rules, and that the judiciary has no power to disregard such rules enacted by the General Assembly, rewrite them, or declare them unconstitutional simply because a voter failed to follow them and, therefore, had his or her ballot rejected. (*Id.* at 24-26 (further explaining it is the General Assembly that is tasked with effectuating the mandate that elections be free and equal).)

Republican Party Intervenors further highlight the well-established notions that statutes are presumptively constitutional and that a party seeking to strike down a statute as such bears a heavy burden. (*Id.* at 26.) Considering this standard, Republican Party Intervenors submit that Petitioners' free and equal elections clause challenge with respect to the duly enacted and longstanding dating provisions fails for several reasons. They repeat that the Supreme Court already rejected Petitioners' arguments in *Ball* and *Pennsylvania Democratic Party*. (Repub. Party Intervenors' ASR ¶ 11; Memo. of Law at 26, 28-31 (further disagreeing with Petitioners that *Ball* left the door open to a free and equal election clause challenge of this nature), 34-40.) Even if it is an open question, however, Petitioners' claim fails based on the clause's plain text and history and the controlling case law; moreover, according to Republican Party Intervenors, the Supreme Court has never invalidated a ballot-casting rule governing how voters complete and cast their ballots under the free and equal elections clause. (Repub. Party Intervenors' ASR ¶ 12; Memo. of Law at 27-34, 40.) The Supreme Court also has expressly upheld other ballot-casting requirements of Act 77, such as the declaration and ballot secrecy envelope rules

appearing in the same statutory sections, which Petitioners do not challenge here. (Repub. Party Intervenors' ASR ¶¶ 13-14; Memo. of Law at 34-37.) Republican Party Intervenors assert that, in any event, all voters in Pennsylvania can go to the polls and vote instead of complying with the dating provisions, and, alternatively, there is nothing difficult about signing and dating a document. (Memo. of Law at 35.)

Republican Party Intervenors further posit that the free and equal elections clause serves three purposes: (1) to prohibit arbitrary voter-qualification rules that disqualify classes of citizens from voting; (2) to prohibit intentional discrimination against voters based on social or economic status, geography of residence, or religious or political beliefs; and (3) to prohibit regulations that make it so difficult to vote as to amount to a denial of the franchise. (Memo. of Law at 32-33 (citing *League of Women Voters*, 178 A.3d at 807-10 (quoting *Winston*, 91 A. at 523)).) Unless a ballot-casting regulation imposes one of these "extreme burdens," Republican Party Intervenors opine that no constitutional right is denied, and the regulation therefore is not subject to judicial scrutiny. (*Id.* at 33.) Along these same lines, Republican Party Intervenors disagree with Petitioners' view that the fundamental right to vote triggers a strict scrutiny standard of review. (*Id.* at 41-43; *but see id.* at 45-54 (opining that under a federal balancing approach, the dating provisions are constitutional).) Alternatively, Republican Party Intervenors opine that the dating provisions easily survive rational basis review, repeating the state's "weighty interests" our Supreme Court asserted with respect to the dating provisions in *In re Canvass*. (*Id.* at 50-51 (observing the dating provisions provide proof of when an elector executed a ballot in full, ensuring voters contemplate their choice of candidate and reach considered decisions about their government/law, deterring

35

and detecting voter fraud,[33] and protecting the integrity and reliability of the process).) Specifically with respect to the interest of when a voter executed a ballot in full, Republican Party Intervenors concede that Pennsylvania elections officials are required to timestamp a ballot upon receiving it, and that county elections officials rely on that timestamped date when entering information into the SURE System. (Memo. of Law at 50.) However, Republican Party Intervenors submit that the handwritten date serves as an important backup in the event the SURE System malfunctioned for some reason. (*Id.*)

Republican Party Intervenors also point to other states' case law addressing similar free and equal elections clauses and construing the right to vote under the United States Constitution, which they assert forecloses Petitioners' claims. (Memo. of Law at 43-54.) They also claim that granting Petitioners' requested relief would "distort" state law and, thus, violate the various elections clauses of the United States Constitution.[34] (*Id.* at 27, 54.) Finally, Republican Party Intervenors repeat their

---

[33] Republican Party Intervenors contend the interest of detecting fraud is actual and not hypothetical, and they highlight a recent case involving election fraud in Pennsylvania in *Commonwealth v. Mihaliak*, CP-36-CR-0003315-2022 (Lanc. Cnty. CCP 2022), where the **only** evidence of the fraud there was the handwritten date of April 26, 2022, which was 12 days after the decedent (who purportedly filled out the mail ballot) had passed away. (Memo. of Law at 52 (noting Mihaliak pleaded guilty, was sentenced to probation, and was barred from voting for four years), & Ex. C (charging document in *Mihaliak*).) *See also Ball*, 289 A.3d at 14-15 (discussing the same case).

[34] The Elections Clause of Article I, Section 4, Clause 1 of the United States Constitution provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of ch[oo]sing Senators." U.S. Const. art. I, § 4, cl.1.

Republican Party Intervenors also cite Article II, Section 1, Clause 2 of the United States Constitution, which they refer to as the "Electors Clause." It provides, with respect to Presidential elections, as follows: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which **(Footnote continued on next page…)**

nonseverability arguments. (*Id.* at 27, 55-58 (opining, based on Act 77's legislative history, journal notes, and a colloquy between legislators, that the nonseverability clause was part of a political compromise in passing Act 77).)[35] For all these reasons, Republican Party Intervenors request that summary relief be entered in their favor and against Petitioners.

Petitioners' response to Republican Party Intervenors' application for summary relief can be boiled down to the following: *Ball* did not already decide the issue in this case, and Republican Party Intervenors misread *Pennsylvania Democratic Party*; they ignore controlling authority that requires that strict scrutiny be applied where the fundamental right to vote is at stake; their assertion that federal law controls in this case is wrong; their argument that invalidating the dating requirements would also violate the United States Constitution is "fanciful" and flies in the face of precedent rejecting such argument; they misread this Court's decision in *RNC II* as to the procedural objections; their argument that the other 65 county boards are indispensable fails because Petitioners do not seek any relief against those 65 county boards, and because such position is based on a flawed premise rejected in other case law; and Republican Party Intervenors ignore that **enforcement** of the dating provisions is at issue, not excision of those provisions from the Election

---

the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector."

[35] The Court observes that the legislators' colloquy quoted by Republican Party Intervenors relates primarily to Section 13 of Act 77's language imbuing the Supreme Court with exclusive jurisdiction over constitutional challenges to the enumerated statutory provisions in that section, including the dating provisions, within the first 180 days after Act 77's enactment. (Memo. of Law at 57-58.) If anything, the quoted colloquy leaves open the question of whether invalidating the enforcement of literally two words ("shall . . . date") of a nonseverable statutory provision requires invalidation of Act 77 as a whole.

Code—as such, the nonseverability provision is not triggered in this case. (Pet'rs' Memo. of Law in Opp'n at 2-5, 9-55.)

## VI.  PHILADELPHIA & ALLEGHENY COUNTY BOEs' STATEMENTS

The Philadelphia and Allegheny County BOEs take no position on the Petitioners' constitutional claims, do not dispute Petitioners' factual allegations in the Petition for Review, and do not seek summary relief.  (*See* Phila. & Allegheny Cnty. BOEs' Stmt. of Position on ASRs at 2; Suppl. Stmt. at 1.)  Instead, the Philadelphia and Allegheny County BOEs respond to highlight the lack of any meaningful purpose served by the dating provisions; the disparate impact enforcement of the dating provisions has had on elderly and disadvantaged voters (*see id.* at 1, 3 (providing statistics for Philadelphia County in the 2022 General Election)); the administrative burdens associated with enforcing those provisions; and the County BOEs' commitment to ensuring the integrity and fairness of elections in their respective counties.  The Philadelphia and Allegheny County BOEs add that they have complied with *Ball* and the dating provisions and will continue to do so and set aside and not count absentee and mail-in ballots that arrive in undated or misdated outer return envelopes absent an order from this Court or the Supreme Court directing that they handle the ballots a different way. (*Id.* at 5-6 (assuring they will continue good faith efforts to verify dates on ballots per *Ball*, despite their belief that the Supreme Court erred in its decision in that case).)  In their view, however, the dating provisions' "requirement to handwrite the date is merely a paperwork-related technicality that imposes a burden on voters' fundamental right to vote without offering any benefit to" these County BOEs in the administration of elections in the Commonwealth.  (*Id.* at 3.)  Further, they inform that counties must expend considerable time, labor, and resources to enforce the dating provisions by

38

hand, because their machines used for sorting mail ballots and identifying other defects (like lack of a secrecy envelope or a handwritten signature) cannot be configured to determine whether a handwritten date is "correct." (*Id.* at 4-5.)

In their Supplemental Statement filed in response to Republican Party Intervenors' nonseverability argument, the Philadelphia and Allegheny County BOEs submit that declining to enforce the meaningless dating provisions would **not** trigger the nonseverability provision or justify voiding the entirety of Act 77's no-excuse mail-in voting scheme. (Suppl. Stmt. at 1-9.) They opine that adopting Republican Party Intervenors' extraordinary argument in this regard would have "staggering and profound implications for the electoral process in Pennsylvania, needlessly disenfranchising thousands of Pennsylvania voters and sowing electoral chaos shortly before the 2024 General Election." (*Id.* at 1-2, 10-12.) They further assert that this Court's holding in *Bonner v. Chapman*, 298 A.3d 153, 168-69 (Pa. Cmwlth. 2023), confirms that the dating provisions need not be invalidated or stricken from Act 77 to effectuate Petitioners' requested relief, as the dating provisions will remain part of the Election Code after any ruling in this case and voters will continue to comply with those provisions. (*Id.* at 1-3.) Moreover, even if the nonseverability provision is triggered, it would not justify striking Act 77 in its entirety, as Pennsylvania statutes are presumed to be severable, and this Court has discretion to exercise its independent judgment on how to interpret and apply the severability provision. (*Id.* at 3.) For these reasons, Philadelphia and Allegheny County BOEs submit that "[t]his Court should decline [Republican Party Intervenors'] invitation to create mass election confusion and chaos shortly before a major [P]residential election." (*Id.* at 11-12.)

## VII. **DISCUSSION**[36]

### A. **Legal Principles for Declarative Relief, Summary Relief, & POs**

"Petitions for declaratory judgment are governed by the provisions of the DJA, which are broad in scope and are to be liberally construed and administered." *Bonner*, 298 A.3d at 160 (citing *Ronald H. Clark, Inc. v. Township of Hamilton*, 562 A.2d 965, 967 (Pa. Cmwlth. 1989)). "Requests for declaratory relief are intended to 'settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations.'" *Id.* (quoting 42 Pa.C.S. § 7541). Moreover, declaratory judgments are not obtainable as a matter of right. *Ronald H. Clark, Inc.*, 562 A.2d at 968-69. Rather, whether a court should exercise jurisdiction over a declaratory judgment proceeding is a matter of sound judicial discretion. *Id.* at 969.

Pennsylvania Rule of Appellate Procedure 1532(b) governs applications for summary relief and provides: "At any time after the filing of a petition for review in an . . . original jurisdiction matter, the court may on application enter judgment if the right of the applicant thereto is clear." Pa.R.A.P. 1532(b). "An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute." *Leach v. Cmwlth.*, 118 A.3d 1271, 1277 n.5 (Pa. Cmwlth. 2015) (en banc), *aff'd*, 141 A.3d 426 (Pa. 2016). "[I]n ruling on a motion for summary relief, the evidence must be viewed in the light most favorable to the non-moving party[,] and the court may enter judgment only if: (1) there are no genuine issues of material fact; and (2) the right to relief is clear as a matter of law." *MFW Wine Co., LLC v. Pa. Liquor Control Bd.*, 231 A.3d 50, 56 n.2 (Pa. Cmwlth.

---

[36] At oral argument in this matter, the Court observes that the parties focused their arguments on whether Petitioners have standing to maintain this action, the Secretary's and the other 65 county boards' indispensability, the proper level of scrutiny to be applied in considering the constitutionality of the dating provisions, and nonseverability.

2020) (Brobson, J.) (single-Judge op.) (quoting *Flagg v. Int'l Union, Sec., Police, Fire Pros. of Am., Loc. 506*, 146 A.3d 300, 305 (Pa. Cmwlth. 2016)). This right to relief "may be granted only in cases where the right is clear and free from doubt." *O'Rourke v. Pa. Dep't of Corr.*, 730 A.2d 1039, 1041 (Pa. Cmwlth. 1999).

To justify the award of a permanent injunction, the party seeking relief "must establish that his right to relief is clear, that an injunction is necessary to avoid an injury that cannot be compensated by damages, and that greater injury will result from refusing rather than granting the relief requested." *Kuznik v. Westmoreland Cnty. Bd. of Comm'rs*, 902 A.2d 476, 489 (Pa. 2006) (quoting *Harding v. Stickman*, 823 A.2d 1110, 1111 (Pa. Cmwlth. 2003)). "However, unlike a claim for a preliminary injunction, the party need not establish either irreparable harm or immediate relief[,] and a court 'may issue a final injunction if such relief is necessary to prevent a legal wrong for which there is no adequate redress at law.'" *Buffalo Township v. Jones*, 813 A.2d 659, 663 (Pa. 2002) (citation omitted).

Finally, in ruling on POs, the Court accepts as true all well-pleaded material allegations in the petition for review and any reasonable inferences that may be drawn from the averments. *Meier v. Maleski*, 648 A.2d 595, 600 (Pa. Cmwlth. 1994). This Court, however, is not bound by legal conclusions, unwarranted inferences from facts, argumentative allegations, or expressions of opinion encompassed in the petition for review. *Id.* The Court may sustain POs only when the law makes clear that the petitioner cannot succeed on the claim, and the Court must resolve any doubt in favor of the petitioner. *Id.* "[The Court] review[s] [POs] in the nature of a demurrer under the above guidelines and may sustain a demurrer only when a petitioner has failed to state a claim for which relief may be granted."

41

*Armstrong Cnty. Mem'l Hosp. v. Dep't of Pub. Welfare*, 67 A.3d 160, 170 (Pa. Cmwlth. 2013).

Thus, for Petitioners to prevail on their application for summary relief, they must establish that their right to relief, i.e., an order declaring that continued enforcement of the Election Code's dating provisions to reject undated or incorrectly dated, but timely received, absentee and mail-in ballots violates the free and equal elections clause and permanently enjoining their enforcement in future elections, is clear as a matter of law. *Flagg*, 146 A.3d at 305. In contrast, to prevail on their cross-application for summary relief and/or POs, Republican Party Intervenors must establish that the law will not permit Petitioners to recover on the Petition for Review and that their right to relief, i.e., dismissal of the Petition for Review, is clear as a matter of law. *Id.* Considering these standards, we begin with determining whether Republican Party Intervenors have met their burdens of proof on their claims that Petitioners lack standing and that this Court lacks jurisdiction based on the Secretary's and the Philadelphia and Allegheny County BOEs dispensability, and the other 65 county boards' indispensability to this action.

## B. **Procedural Objections**

### 1. *Lack of subject matter jurisdiction/indispensable parties*

Because they are jurisdictional, we will first address Republican Party Intervenors' procedural objections asserting lack of subject matter jurisdiction. Republican Party Intervenors argue that this Court lacks subject matter jurisdiction under Section 761(a)(1) of the Judicial Code, 42 Pa.C.S. § 761(a)(1), because the Secretary is not a proper or indispensable party to this matter based on his non-binding and unenforceable guidance. Second, they assert that in the absence of the Secretary, this Court also lacks jurisdiction over the Philadelphia and Allegheny

42

County BOEs, because no relief is sought against them, and they are local agencies, not Commonwealth ones; thus, they must be sued individually in the courts of common pleas. Republican Party Intervenors claim that these questions were already decided in *RNC II*.

*RNC II* involved a group of campaign committee and individual voter petitioners who filed suit against the then-Acting Secretary, the Director of the Pennsylvania Bureau of Election Services and Notaries (Director), and the 67 county boards of elections, challenging various county boards' use of notice and opportunity to cure procedures with respect to absentee and mail-in ballots that failed to comply with the Election Code's signature and ballot secrecy requirements. *See RNC II*, slip op. at 2-3, 13-15.[37] The petitioners sought both declaratory and injunctive relief enjoining the county boards from implementing such notice and cure procedures in apparent violation of the Election Code.

In considering POs raising lack of subject matter jurisdiction, the *RNC II* Court set forth the following jurisdictional principles governing its analysis of the Secretary's and Director's indispensability:

> [T]he Court "begin[s] with the undisputed basic principle that this Court, as any other court, must have subject matter jurisdiction over a controversy because, without it, any judgment rendered would be void." *Stedman v. Lancaster Cnty. Bd. of Comm'rs*, 221 A.3d 747, 755 (Pa. Cmwlth. 2019) (quoting *Patterson v. Shelton*, 175 A.3d 442, 449 (Pa. Cmwlth. 2017)). "Thus, 'whenever a court discovers that it lacks jurisdiction over the subject matter or a cause of action, it is compelled to dismiss the matter under all circumstances.'" *Id.* (quoting *Hughes v. Pa. State Police*, 619 A.2d 390, 393 (Pa. Cmwlth. 1992)). Our Supreme

---

[37] In *Republican National Committee v. Chapman* (Pa. Cmwlth., No. 447 M.D. 2022, filed Sept. 29, 2022) (Ceisler, J.) (single-Judge op.) (*RNC I*), *affirmed by equally divided court*, 284 A.3d 207 (Pa. 2022), this Court denied the petitioners' request for a preliminary injunction with respect to the county boards' notice and opportunity to cure procedures.

43

Court previously set forth the well[-]settled scope and standard of review regarding questions of subject matter jurisdiction as follows:

> Jurisdiction over the subject matter is conferred solely by the Constitution and laws of the Commonwealth. The test for whether a court has subject matter jurisdiction inquires into the competency of the court to determine controversies of the general class to which the case presented for consideration belongs. Thus, as a pure question of law, the standard of review in determining whether a court has subject matter jurisdiction is *de novo* and the scope of review is plenary. Whether a court has subject matter jurisdiction over an action is a fundamental issue of law which may be raised at any time in the course of the proceedings, including by a reviewing court *sua sponte*.

*Off*[.] *of Att'y Gen. ex rel. Corbett v. Locust Twp.*, 968 A.2d 1263, 1268-69 (Pa. 2009).

Relevant here, Section 761(a)(1) of the Judicial Code states that "[t]he Commonwealth Court shall have original jurisdiction of all civil actions or proceedings . . . (1) Against the Commonwealth government, including any officer thereof, acting in his official capacity . . . ." 42 Pa.C.S. § 761(a)(1). Section 102 of the Judicial Code defines the term "Commonwealth government" as follows:

> **"Commonwealth government."** The government of the Commonwealth, including the courts and other officers or agencies of the unified judicial system, the General Assembly and its officers and agencies, the Governor, and the departments, boards, commissions, authorities and officers and agencies of the Commonwealth, **but the term does not include any political subdivision, municipal or other local authority, or any officer or agency of any such political subdivision or local authority.**

42 Pa.C.S. § 102 (emphasis added). Although the Acting Secretary . . . [is] an "officer" of the Commonwealth, "this alone is not sufficient to establish jurisdiction." *Stedman*, 221 A.2d at 756 (quoting *Pa. Sch. Bds. Ass'n, Inc. v. Cmwlth. Ass'n of Sch. Admins.*, 696 A.2d 859, 867 (Pa. Cmwlth. 1997), and stating that "[t]he mere naming . . . of the Commonwealth or its officers in an action does not conclusively

44

establish this [C]ourt's jurisdiction, and [that] the joinder of such parties when they are only tangentially involved is improper").

Rather, "for this Court to have original jurisdiction over a suit against the Commonwealth and another, non-Commonwealth party, the Commonwealth or one of its officers must be an indispensable party to the action." *Stedman*, 221 A.3d at 757 (citations omitted). "A party is indispensable when 'his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights.'" *Stedman*, 221 A.3d at 757 (quoting *Rachel Carson Trails Conserv., Inc. v. Dep't of Conserv. & Nat. Res.*, 201 A.3d 273, 279 (Pa. Cmwlth. 2018)).[] "'Thus, the main inquiry for determining whether a party is indispensable involves whether justice can be accomplished in the absence of the party.'" *Stedman*, 221 A.3d at 758 (quoting *Rachel Carson Trails*, 201 A.3d at 279). In conducting this inquiry,[FN 32] "the nature of the particular claim and the type of relief sought should be considered." *Rachel Carson Trails*, 201 A.3d at 279. "A Commonwealth party may be declared an indispensable party when meaningful relief cannot conceivably be afforded without the Commonwealth party's direct involvement in the action." *Ballroom, LLC v. Cmwlth.*, 984 A.2d 582, 588 (Pa. Cmwlth. 2009). Importantly, "[]where a petitioner 'seeks absolutely no relief' from the Commonwealth party, and the Commonwealth party's involvement is only 'minimal,' we have held that it is not an indispensable party." *Stedman*, 221 A.3d at 758 (quoting *Rachel Carson Trails*, 201 A.3d at 280).

> [FN 32] This analysis requires an examination of the following four factors: (1) "[d]o absent parties have a right or interest related to the claim?"; (2) "[i]f so, what is the nature of that right or interest?"; (3) "[i]s that right or interest essential to the merits of the issue?"; and (4) "[c]an justice be afforded without violating the due process rights of absent parties?" *Rachel Carson Trails*[, 201 A.3d at 279].

*RNC II*, slip op. at 16-18 & n.32 (emphasis in original) (footnote omitted).

Relying on the above principles, the *RNC II* Court held that neither the Acting Secretary nor Director were indispensable parties. *See RNC II*, slip op. at 16-18, 22 (citing *Stedman*, 221 A.3d at 757). In so doing, and despite the petitioners' mention of the Acting Secretary's various guidance issued over the three years prior to the

45

*RNC II* Court's decision in their amended petition, the Court determined that the petitioners did not assert any real claims against, or request any relief with respect to, the Acting Secretary or Director[38] to make them indispensable. *Id.* at 18-22, 28. Specifically, the Court observed that the petitioners did not make any claims implicating the limited duties and responsibilities of the Acting Secretary under the Election Code identified in the amended petition. Rather, the petitioners merely took issue with the various guidance the Acting Secretary had issued in previous years in response to the then-developing case law in this area, which the Court found did not implicate what was truly at the heart of the case: ***some of the county boards' development and implementation of notice and opportunity to cure procedures.*** *Id.* at 20. The Court further determined that the Acting Secretary's general interests in election administration and enfranchisement of voters were not essential to a determination of whether some county boards were unlawfully using notice and cure procedures for defective mail ballots. *Id.* The Court also observed that the Acting Secretary had no control over county boards' administration of elections, and the prospect of the Secretary issuing more guidance in the future was too tangential and minimal of an involvement to make the Acting Secretary indispensable. *Id.* at 20-21 (further noting that the petitioners could conceivably obtain meaningful relief with respect to the county boards' purportedly unlawful actions without the Acting Secretary's involvement). Accordingly, the *RNC II* Court sustained the POs regarding lack of subject matter jurisdiction as it related to the Acting Secretary and Director and dismissed them from the action. *Id.* at 22.

---

[38] The petitioners in *RNC II* made no claims or sought any relief against Director in their amended petition. For that reason, the Court found she was not indispensable. *RNC II*, slip op. at 21.

46

*RNC II* is easily distinguished from this case. As it relates to the Secretary, we note that Petitioners named the Secretary in the instant matter, in his official capacity, as a Respondent based on his duties under the Election Code with respect to, *inter alia*, **the form of absentee and mail-in ballots <u>and</u> the form of those ballots' declarations**. Specifically, Petitioners observe that the Election Code confers authority upon the Secretary to implement absentee and mail-in voting procedures in the Commonwealth. (PFR ¶¶ 37-38 (citing Sections 1303(b) and 1303-D(b) of the Election Code, 25 P.S. §§ 3146.3(b), 3150.13(b) (requiring that absentee and mail-in ballots be **on a form prescribed by the Secretary**)), 39 (citing Sections 1304 and 1304-D, 25 P.S. §§ 3146.4, 3150.14 (requiring that the **form of declaration** on absentee and mail-in ballots **must be as prescribed by the Secretary**)), 41 (citing Section 201(f) of the Election Code, 25 P.S. § 2621(f) (outlining Secretary's duties to receive from county boards of elections the returns of primaries and elections, to canvass and compute the votes cast for candidates, to proclaim the results of such primaries and elections, and to issue certificates of election to successful candidates)).) Further, they make various allegations regarding the Secretary's generally inconsistent guidance issued in the aftermath of our Supreme Court's decision in *Ball* and the Third Circuit's decision in *NAACP III*; the redesignation of mail ballot materials in late 2023; and the Department's continued instruction, as recently as April 2024, to county boards not to count undated or incorrectly dated mail ballots, all of which have resulted in the continued disenfranchisement of voters over the dating provisions. (PFR ¶¶ 40, 42-43, 68-69, 74.) We also note the Secretary has again issued new guidance bearing directly on this matter just last month on July 1, 2024. Furthermore, unlike in *RNC II*, the Secretary, as the chief election official in Pennsylvania, also now supports

Petitioners' position in this litigation and joins in their request for relief with respect to the dating provisions, which was not the case regarding the notice and cure procedures at issue in *RNC II*. Finally, we observe that the Petition for Review specifically seeks relief against the Secretary. (*See generally* PFR, Wherefore Clause.) For all these reasons, we conclude that *RNC II* is not controlling as to the Secretary's indispensability here, and that the Secretary is in fact indispensable to this matter, as any declaration made in this case will certainly have an effect on his duties and responsibilities under the Election Code as they relate to his prescription of the form of absentee and mail-in ballots generally, and the form of the declarations thereon specifically. *See Stedman*, 221 A.3d at 757-58.

Returning to *RNC II*, the *RNC II* Court next determined that, in the absence of the two named Commonwealth respondents in the case, it lacked jurisdiction over the remaining 67 county board respondents because they are political subdivisions, and thus local agencies, which are excluded from the definition of "Commonwealth government" under Sections 102 and 761(a)(1) of the Judicial Code, for purposes of this Court's original jurisdiction. *See RNC II*, slip op. at 22-28 (citing, *inter alia*, *Finan v. Pike County Conservation District*, 209 A.3d 1108, 111 (Pa. Cmwlth. 2019), and *Blount v. Philadelphia Parking Authority*, 965 A.2d 226, 231-32 (Pa. 2009)). In so concluding, the Court explained the principles set forth in *Finan* and *Blount* for determining whether an entity is a local or Commonwealth agency for jurisdictional purposes, which governed its analysis as to the 67 county boards. *RNC II*, slip op. at 22-28. "When the enabling statute does not specify the court of original jurisdiction," such factors for consideration include: whether the entity operates on a statewide basis and whether it is predominantly controlled by the state, *see Finan*, 209 A.3d at 1111-12 (citations omitted); multiple other factors may also be

48

considered, including:  the entity's functions, reach of operations, and the degree of state control over finance and governance, *see Blount*, 965 A.2d at 229-34.  *RNC II*, slip op. at 22-24.

Having considered the above factors from *Finan* and *Blount*, the *RNC II* Court determined that the 67 county boards were local agencies, because various provisions of the Election Code indicated (but did not expressly state) the county boards were local agencies, and the legislative intent of those provisions reflected that the General Assembly imbued jurisdiction to administer and conduct elections solely within the confines of each of the respective counties of the Commonwealth to the county boards; the county boards are not controlled in any way by the Commonwealth because they are governed by county commissioners; and the county boards are funded by the county commissioners or other appropriating authorities of the county.  *See RNC II*, slip op. at 24-28 (concluding, based on the above, that "all signs point to the [c]ounty [b]oards falling under the designation of 'political subdivision,' suits against which are excluded from this Court's original jurisdiction under Section 761(a)(1) of the Judicial Code").  Therefore, the *RNC II* Court held that jurisdiction over the remaining county board respondents properly lay in the respective county courts of common pleas.  *Id.*

Here, the Philadelphia and Allegheny County BOEs are clearly local agencies, as this Court determined with respect to the 67 county board respondents in *RNC II*. However, because we have already concluded that the Secretary is part of the Commonwealth government and an indispensable party to this matter, thus establishing this Court's original jurisdiction under 42 Pa.C.S. § 761(a)(1), we also conclude we have jurisdiction over the Philadelphia and Allegheny BOEs in this case.  *See Stedman*, 221 A.3d at 757 (providing that "for this Court to have original

49

jurisdiction over a suit against the Commonwealth and another, non-Commonwealth party, the Commonwealth or one of its officers must be an indispensable party to the action"); *see also* PFR ¶ 44(a)-(i) (delineating responsibilities of county boards of elections under Section 302 of the Election Code, 25 P.S. § 2542, with respect to absentee and mail-in ballots). We need not belabor our conclusion on this point any further.

Having determined that the Secretary is indispensable, and that this Court has jurisdiction over both the Secretary and the Philadelphia and Allegheny County BOEs,[39] we will not dismiss the Petition for Review on these bases. We therefore turn to Republican Party Intervenors' argument that we lack jurisdiction due to Petitioners' failure to join the other 65 county boards.

> 2. *Lack of subject matter jurisdiction/failure to join indispensable parties*

Republican Party Intervenors argue that the Court lacks jurisdiction because Petitioners failed to join the other 65 county boards, which they claim are indispensable parties to this action. They assert that any order issued in this case

---

[39] We also reject Republican Party Intervenors' assertion that this Court lacks jurisdiction over the Philadelphia and Allegheny County BOEs because no relief is sought against them, notwithstanding that Petitioners' Prayer for Relief and Wherefore Clause fail to mention those BOEs. Clearly, the Petition for Review, summarized above in Section III of this opinion, extensively discusses these County BOEs and their duties under the Election Code with respect to absentee and mail-in ballots. As this Court recognized in *BPEP I*, "the relief requested in the Petition for Review implicates only **the Philadelphia and Allegheny County BOEs'** statutorily prescribed administrative and executive functions requiring **those BOEs, and not merely one of their members <u>or any of the other 65 county boards of elections</u>**, to count absentee and mail-in ballots in accordance with the law." *BPEP I*, slip op. at 52 (emphasis in original & added). This Court also recognized Petitioners' counsel's statements during the intervention hearing that Petitioners intentionally named, *inter alia*, the Philadelphia and Allegheny County BOEs, because those are the two counties where Petitioners "know" voters are being harmed by enforcement of the dating provisions. *Id.*, slip op. at 53. Accordingly, we read the Petition for Review as seeking relief against both the Secretary and the Philadelphia and Allegheny County BOEs.

50

against the 2 named County BOEs would not affect the other 65 county boards' obligation not to count undated and incorrectly dated mail ballots under the Election Code and *Ball*. Moreover, they claim that entering relief against only the 2 named County BOEs would establish varying standards across all 67 counties. In substance, Republican Party Intervenors cite only *Polydyne, Inc.*, 795 A.2d 495, for the standards to be applied regarding indispensability, and *Kerns v. Kane*, 69 A.2d 388, 393 (Pa. 1949), *Winston*, 91 A. at 524, and *Bush*, 531 U.S. at 106-07, as support for their argument that any order in this case would result in nonuniformity amongst the county boards.

As quoted above, "[a] party is indispensable when 'his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights.'" *Stedman*, 221 A.3d at 757 (quoting *Rachel Carson Trails*, 201 A.3d at 279). "A corollary of this principle is that a party against whom no redress is sought need not be joined." *Sprague v. Casey*, 550 A.2d 184, 189 (Pa. 1988). "[T]he main inquiry for determining whether a party is indispensable involves whether justice can be accomplished in the absence of the party.[]" *Stedman*, 221 A.3d at 758 (quoting *Rachel Carson Trails*, 201 A.3d at 279). In conducting this inquiry, "the nature of the particular claim and the type of relief sought should be considered." *Rachel Carson Trails*, 201 A.3d at 279, n.32.[40]

We also "note the general principle that, in an action for declaratory judgment, all persons having an interest that would be affected by the declaratory relief sought ordinarily must be made parties to the action." *City of Phila.*, 838 A.2d at 581-82.

---

[40] Whether a party is indispensable also is said to include an examination of whether the absent parties have a right or interest related to the claim; if so, the nature of the right or interest; whether that right or interest is essential to the merits of the issue; and whether justice can be afforded without violating the due process rights of absent parties. *Rachel Carson Trails*, 201 A.3d at 279. We implicitly consider these factors in our analysis below.

51

Section 7540(a) of the Judicial Code, which is part of the DJA, states that, "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." 42 Pa.C.S. § 7540(a). "While this provision is mandatory, it is subject to limiting principles." *Banfield v. Cortes*, 922 A.2d 36, 43-44 (Pa. Cmwlth. 2007).

Here, Petitioners are asking for a declaration that the dating provisions are unconstitutional under the free and equal elections clause, and they seek permanent injunctive relief to enjoin those provisions' prospective enforcement to prevent against further disenfranchisement of voters based on what they perceive to be a "meaningless" date requirement. *See BPEP I*, slip op. at 49. While all 67 county boards have an interest in this matter based on their duties and responsibilities to canvass and count absentee and mail-in ballots under the Election Code in accordance with Pennsylvania law, *see BPEP I*, slip op. at 50, 54 n.31 (quoting various Election Code provisions delineating powers and duties of all county boards regarding absentee and mail-in ballots), Petitioners do not seek redress from the other 65 county boards, but only from the 2 named County BOEs. *See BPEP I*, slip op. at 53 (recognizing Petitioners' counsel's statements during the intervention hearing that Petitioners intentionally named **only** the Philadelphia and Allegheny County BOEs, because those are the two counties where Petitioners "know" voters are being harmed by enforcement of the dating provisions). Further, while any decision in this case may tangentially affect the other 65 county boards' duties with respect to counting undated and incorrectly dated ballots, we do not believe that achieving justice is dependent upon the participation of all the county boards. *See City of Phila.*, 838 A.2d at 583-85 (stating that construing Section 7540(a) of the

52

DJA "in an overly literal manner in the context of constitutional challenges to legislative enactments" that may affect many people or entities "could sweep in [countless] parties and render the litigation unmanageable" and that "requiring the participation of all parties having an interest which could potentially be affected by the invalidation of a statute would be impractical"). Along those same lines, we note that **none of the 65 county boards**, save for Commissioner Chew (as a member of one county board), sought to intervene in this case, despite that they could have, which militates against finding that any of those county boards are indispensable to this case.

As for their equal protection concerns, Republican Party Intervenors do not develop their argument in this regard, as they only cite, without any substantive explanation, the above cases for the proposition set forth therein in passing that all laws regulating the holding of elections shall be uniform across the state. (*See* Repub. Party Intervenors' Memo. in Supp. of ASR at 21-42 & Memo. of Law in Opp'n at 15-17.) While we generally agree with this well-established principle of uniformity, it is also well known, and undisputed in this case, that all 67 county boards of this Commonwealth do not conduct elections in their respective counties with strict uniformity to each other county in all respects. *See generally RNC II* (involving **some** county boards' notice and opportunity to cure procedures with respect to absentee and mail-in ballots); *see also Pa. Democratic Party*, 238 A.3d at 382-83 (discussing *Repub. Party of Pa. v. Cortés*, 218 F. Supp. 3d 396, 409 (E.D. Pa. 2016) (in which the Eastern District Court of Pennsylvania considered the constitutionality of the Election Code's poll watcher residency requirement and explained that Pennsylvania's General Assembly enacted a county-based scheme to manage elections within the state, endeavored to allow county election officials to

53

oversee a manageable portion of the state in all aspects of the process, and ensured as much coherency in that patchwork system as possible)). In the absence of any other citation to binding authority stating that any order issued in this case, by an en banc panel of this Court, would have no effect as it relates to the other 65 county boards, we decline to hold that we lack jurisdiction on these bases.

Accordingly, because it is not clear and free from doubt that we lack original jurisdiction over this matter, we will not dismiss the Petition for Review on this basis. We next turn to Republican Party Intervenors' assertion that Petitioners lack standing.

### 3.    *Standing*

"Standing is a [threshold] justiciability concern, implicating a court's ability to adjudicate a matter." *Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467, 481 (Pa. 2021) (*Firearm Owners II*) (citations omitted). It "'stems from the principle that judicial intervention is appropriate only where the underlying controversy is real and concrete, rather than abstract,' and its touchstone is 'protect[ing] against improper plaintiffs.'" *Ball*, 289 A.3d at 18-19 (citations omitted). To establish standing, a plaintiff must show aggrievement, i.e., an interest in the outcome of the litigation that is substantial, direct, and immediate. *Id.* at 19; *see also Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 309 A.3d 808, 832 (Pa. 2024) (*Allegheny Reprod. III*).

> A party's interest is substantial when it surpasses the interest of all citizens in procuring obedience to the law; it is direct when the asserted violation shares a causal connection with the alleged harm; finally, a party's interest is immediate when the causal connection with the alleged harm is neither remote nor speculative.

*Firearm Owners II*, 261 A.3d at 481 (citations omitted). Further, "[g]enerally speaking, in our Commonwealth, standing is granted more liberally than in federal courts." *Allegheny Reprod. III*, 309 A.3d at 832.

Republican Party Intervenors argue that Petitioners lack standing to bring their claims in this case because none of them are aggrieved, and they each advance the same argument as to why they are harmed but have failed to identify any concrete harm they have suffered as a result of Respondents following the law on the counting or not counting of undated and incorrectly dated mail ballots. Republican Party Intervenors further assert that Petitioners' purported harm based on their expenditure of resources to educate voters regarding their compliance with the dating provisions and diversion of such resources that could be spent elsewhere is not enough to establish standing under *Ball*. Petitioners point out, however, that Republican Party Intervenors, in their application for summary relief, conflate their lack of standing arguments raised in their POs with their arguments on lack of standing/lack of subject matter jurisdiction with respect to the Secretary's non-binding and unenforceable guidance.[41] (*See* Pet'rs' Memo. of Law in Opp'n to Repub. Party Intervenors' ASR at 41; *see also* POs ¶¶ 25, 34-38, 44-50, 55-69 (citing, *inter alia*, *Ball* and *Firearm Owners II*), & Repub. Party Intervenors' ASR ¶ 20; Memo. of Law at 4 (citing, *inter alia*, *RNC II*).) We agree with Petitioners' assessment. However, notwithstanding this apparent deficiency, we nevertheless construe Republican Party Intervenors' standing arguments as being primarily based on *Ball* and will address them as such under that case, which is the most recent precedent addressing organizational standing in election matters. Moreover, we have already addressed this Court's jurisdiction above.

---

[41] *See Bisher v. Lehigh Valley Health Network, Inc.*, 265 A.3d 383, 403 (Pa. 2021) ("Pennsylvania . . . does not view standing as a jurisdictional question.").

In *Ball*, 289 A.3d 1,[42] our Supreme Court *sua sponte* addressed the issue of whether campaign arms of a major political party, including Republican Party Intervenors here plus the National Republican Congressional Committee (NRCC) (collectively, party petitioners), had standing in the context of a challenge to none other than the Election Code's dating provisions. In that case, the Supreme Court exercised its King's Bench Power to consider eight individual voters (voter petitioners) and the party petitioners' request for injunctive and declaratory relief concerning whether undated and incorrectly dated absentee and mail-in ballots should be included in the pre-canvass or canvass of votes for the November 8, 2022 General Election. *Ball*, 289 A.3d at 8, n.2. The then-Acting Secretary challenged

---

[42] For background purposes, we note that in *Ball*, the Supreme Court issued a per curiam Order on November 1, 2022, granting in part and denying in part the petitioners' request for injunctive and declaratory relief and ordering Pennsylvania county boards of elections to refrain from counting any absentee and mail-in ballots received for the November 8, 2022 General Election that were contained in undated or incorrectly dated outer envelopes; further noting the Court was evenly divided on the issue of whether failing to count such ballots violates 52 U.S.C. § 10101(a)(2)(B) (i.e., the federal Materiality Provision); further directing the county boards to segregate and preserve any ballots contained in undated or incorrectly dated outer envelopes; and dismissing the individual voter petitioners from the case for lack of standing. The Court noted that opinions would follow, and that Chief Justice Todd and Justices Donohue and Wecht would find a violation of federal law, while Justices Dougherty, Mundy, and Brobson would find no violation of federal law. *See Ball v. Chapman*, 284 A.3d 1189 (Pa. 2022) (per curiam).

On November 5, 2022, the Supreme Court issued a supplemental Order, clarifying that for purposes of the November 8, 2022 General Election, "incorrectly dated outer envelopes" are as follows: (1) mail-in ballot outer envelopes with dates that fall outside the date range of September 19, 2022, through November 8, 2022; and (2) absentee ballot outer envelopes with dates that fall outside the date range of August 30, 2022, through November 8, 2022 (citing Sections 1302.1-D (added by Act 77), 1305-D (added by Act 77), 1302.1 (added by the Act of August 13, 1963, P.L. 707, and amended by Act 77), and 1305 (added by the Act of March 6, 1951, P.L. 3, and amended by Act 77), 25 P.S. §§ 3150.12a, 3150.15, 3146.2a(a), 3146.5(a)). *See Ball v. Chapman* (Pa., No. 102 MM 2022, suppl. order issued Nov. 5, 2022) (per curiam). Notably, this Order was issued by the Court **unanimously**.

On February 23, 2023, the Court issued numerous opinions explaining the Court's rationale and/or agreement or disagreement with the Court's prior orders. *See Ball*, 289 A.3d 1.

the voter and party petitioners' standing, objected to their claim that the Election Code requires disqualification of undated and incorrectly dated absentee and mail-in ballots, and asserted that not counting such ballots violates federal law.  *Id.* at 8. For our purposes, we are only concerned with the party petitioners' standing.

The party petitioners advanced three theories of standing:  (1) they asserted that their organizations devote substantial time and resources to training election monitors, highlighted the lack of clarity created by the then-Acting Secretary's guidance and precedent of this Court regarding the meaning and application of the dating provisions, and argued that without such clarity, their training and monitoring activities would be rendered less effective, waste considerable resources, or require them to devote even more resources to such activities; (2) they contended that the lack of clarity regarding the dating provisions' meaning would affect resources and expenditures they devote to ensuring Republican candidates and their voters understand the rules of the election process; and (3) they claimed a concrete interest in winning elections, and that, if left uncorrected, the then-Acting Secretary's guidance would result in a plethora of non-compliant ballots being counted, which could alter the final vote tallies.  *Ball*, 289 A.3d at 13 (further noting the party petitioners pointed to evidence in *Migliori*, where the counting of non-compliant ballots decided the outcome of a race for a seat on a court of common pleas, and asserted "an interest in preserving 'the structure of the competitive environment' in which the election is to be run").  Conversely, the then-Acting Secretary argued that the party petitioners lacked standing because they were not aggrieved.  *Id.* at 13-14 (further asserting that "[a] professed interest in obedience to the law generally is not an interest that surpasses that of any other citizen or the public at large").

57

Agreeing with the then-Acting Secretary in that case that an organization's expenditure of resources alone ordinarily does not confer standing, the Supreme Court nevertheless noted that it was "unpersuaded that the instant dispute f[ell] within the category of 'general grievance[s] about the correctness of government conduct.'" *Id.* at 19. In so noting, and relevant here, the Court observed, as follows (with emphasis added):

> Had [the party petitioners] facially challenged an existing interpretation of settled law, or simply sought to compel the Commonwealth to act in a way that aligns with its mission or its investment of resources, that challenge would have been unlikely to succeed. **But the particular facts giving rise to this case are highly relevant, and they must guide our analysis.** The Commonwealth Court has issued contradictory interpretations as to the import of our 2020 ruling [in *In re Canvass*]. The [then-]Acting Secretary published unambiguous guidance that was consistent with one of these competing approaches and that was, in part, based upon a reading of recent federal decisions that had been vacated for mootness [in *NAACP*]. **Accordingly, [the party petitioners] could not have asserted an interest in adherence to the law, because the law was unclear with respect to which ballots should be discounted.**
>
> Under these circumstances, **we hold that [the party petitioners'] expenditure of resources to educate candidates, electors, and voting officials concerning adherence to the Election Code constitutes a substantial interest.** The alleged violation (the Secretary's guidance regarding an unsettled legal question) shares a causal connection with the alleged harm ([the party petitioners'] inability to educate candidates, electors, and voting officials effectively), and that connection is neither remote nor speculative. Accordingly, we hold that [the party petitioners] have standing.

*Ball*, 289 A.3d at 19-20.

As in *Ball*, the facts of this instant matter must guide our analysis, as this is not simply a case where Petitioners "facially challenge an existing interpretation of settled law, or simply [seek] to compel the Commonwealth to act in a way that aligns

with [their] mission[s] or investment of resources," which challenges the Supreme Court opined would be "unlikely to succeed." *Ball*, 289 A.3d at 19. Rather, Petitioners have raised an issue of first impression regarding whether the continued failure to count undated and incorrectly dated absentee and mail-in ballots in accordance with Pennsylvania law violates the free and equal elections clause of our state's charter, **which was not at issue in *Ball*.**

According to the Petition for Review, Petitioners bring this matter as "nonpartisan organizations dedicated to promoting American democracy and the participation of Pennsylvania voters in our shared civic enterprise" and "to ensure that their members, the people they serve, and other qualified Pennsylvania voters do not again lose their constitutional right to vote based on a meaningless requirement." (*See* PFR ¶ 2.) All Petitioners claim that the Secretary's various guidance regarding undated and incorrectly dated mail ballots, and the Philadelphia and Allegheny County BOEs' continued failure to count such ballots according to that guidance, directly affects their members, interferes with their ability to carry out their similar missions of increasing voter turnout and participation amongst marginalized and underserved communities of color and non-English speaking voters, and will require diversion of resources, including staff and volunteers, from their voter education and mobilization efforts in the upcoming General Election and future elections, as well as other initiatives,[43] because they will have to continue

---

[43] For example, Make the Road Pennsylvania has other initiatives that serve its mission, including its immigrant rights, education justice, housing justice, climate justice, and worker rights initiative. (PFR ¶ 17(e).) OnePA Activists United similarly conducts other civic engagement efforts, such as uniting the community against exploitative corporate landlords, labor law violators, and health-threatening industrial polluters, and transforming the narrative around community needs. (*Id.* ¶ 20(e).) Casa San José provides a variety of resources, including clinics, food pantries, summer camps, community meetings and "Know Your Rights" sessions, among other services. **(Footnote continued on next page…)**

educating voters on how to avoid disenfranchisement with respect to the dating provisions, as well as regarding any cure processes and provisional voting. (*See* PFR ¶¶ 8-10(a)-(e) (Black Political Empowerment Project); 11-13(a)-(d) (POWER Interfaith); 14-17(a)-(e) (Make the Road Pennsylvania); 18-20(a)-(e) (OnePA Activists United); 21-23(a)-(c) (New PA Project Education Fund); 24-26(a)-(e) (Casa San José); 27-30(a)-(d) (Pittsburgh United); 31-33(a)-(e) (League of Women Voters of Pennsylvania); and 34-36(a)-(d) (Common Cause Pennsylvania); *see also* (Pet'rs' Memo. of Law at 30-31 (citing Exs. 14-22 (Declarations of Petitioners' directors).)[44] Petitioners assert that most of these organizations have also previously had to assist and/or contact voters with respect to errors or omissions on their already-submitted mail ballot envelopes to avoid having their votes set aside. (*See generally id.*)

The undisputed facts of this case establish that, **since the Supreme Court issued its decision in *Ball* on February 8, 2023**, thousands of Pennsylvania voters continue to be disenfranchised by the Philadelphia and Allegheny County BOEs' rejection of their mail ballots, based on the Secretary's guidance, due to missing or incorrect dates on their mail ballot envelopes. (*See, e.g.*, PFR ¶¶ 71-72, 73 (citing

---

(*Id.* ¶ 24.) Pittsburgh United conducts a multitude of activities, including various clean water, worker, and affordable housing initiatives. (*Id.* ¶ 30(d).)

[44] *See* Pet'rs' Memo. of Law, Exs. 14 (5/24/2024 Decl. of Tim Stevens, Chairman & Chief Executive Officer (CEO) of The Black Political Empowerment Project), ¶¶ 3-11; 15 (5/28/2024 Decl. of Bishop Dwayne Royster, Executive Director of POWER Interfaith), ¶¶ 3-8; 16 (5/25/2024 Decl. of Diana Robinson, Co-Deputy Director of Make the Road Pennsylvania), ¶¶ 5-12; 17 (5/27/2024 Decl. of Steve Paul, Executive Director of OnePA Activists United), ¶¶ 5-22; 18 (Decl. of Kadida Kenner, CEO of New PA Project Education Fund), ¶¶ 4-20; 19 (5/27/2024 Decl. of Monica Ruiz, MSW, Executive Director of Casa San José), ¶¶ 4-19; 20 (5/27/2024 Decl. of Alex Wallach Hanson, Executive Director of Pittsburgh United), ¶¶ 4-17; 21 (5/24/2024 Decl. of Amy Widestrom, Executive Director of the League of Women Voters of Pennsylvania), ¶¶ 4-11; and 22 (5/24/2024 Decl. of Philip Hensley-Robin, Executive Director of Common Cause Pennsylvania), ¶¶ 4-11.

Ex. 1, Decl. of A. Shapell, ¶ 12(b), and noting that more than 6,000 ballots submitted in the November 2023 municipal election, and over 4,000 ballots in the April 2024 Presidential Primary Election, were marked as cancelled in the SURE System based on voters' failure to write a date or inclusion of the wrong date).) In this regard, the Secretary has issued new, and conflicting, guidance on at least three occasions since *Ball* "settled" the law surrounding the counting or not counting of undated and incorrectly dated absentee and mail-in ballots, and he concedes that he has changed his guidance regarding the mail ballot declaration **twice in the past year**. (*See* Sec'y's Resp. to Repub. Party Intervenors' ASR at 33.) Moreover, Petitioners point to evidence adduced in prior state and federal litigation showing that disenfranchisement based on the Secretary's various guidance has disproportionately affected senior citizens, that county boards continue to treat voters inconsistently with respect to their rejection and/or counting of undated or incorrectly dated mail ballots, and that **timely received** mail ballots have been rejected based on simple voter errors and partial omissions related to the ballot declaration. (PFR ¶¶ 63, 64(a)-(f), 65(a)-(c) (citing *Ritter* and *NAACP II*).) Petitioners also point to state and federal courts' determinations since *Ball* that the dating provisions are meaningless, as they neither establish eligibility nor timely ballot receipt. (*Id.* ¶¶ 6, 51-54, 60, 67.)

Based upon these undisputed facts and the continued lack of clarity concerning the county boards' application of the dating provisions to undated and incorrectly dated mail ballots in the aftermath of *Ball*, we hold that Petitioners' additional expenditures and diversion of resources to educate and assist voters concerning the dating provisions in the upcoming General Election and future elections constitutes a substantial interest. The alleged violation (i.e., the Secretary's

61

inconsistent guidance to county boards following *Ball* and the Philadelphia and Allegheny County BOEs' continued rejection of undated and incorrectly dated mail ballots pursuant to that guidance) shares a causal connection with the alleged harm (Petitioners' inability to effectively educate and assist voters regarding the dating provisions while incurring additional expenditures and having to divert resources from other initiatives), which is neither remote nor speculative. *See Ball*, 289 A.3d at 19-20; *Firearm Owners II*, 261 A.3d at 481. Furthermore, we conclude that a decision in this case will afford Petitioners, and, consequently, their members, "relief from uncertainty and insecurity with respect to rights, status, and other legal relations" as it relates to the dating provisions in the aftermath of *Ball*, which is "the core and remedial purpose behind the [DJA]. 42 Pa.[]C.S. § 7541(a)." *Firearm Owners Against Crime v. City of Harrisburg*, 218 A.3d 497 (Pa. Cmwlth. 2019), *aff'd*, *Firearm Owners II*.[45] Accordingly, because it is not clear and free from doubt that Petitioners do not have standing in this matter, we will not dismiss the Petition for Review on this basis.

### 4. *Failure to state a claim*

Republican Party Intervenors next argue that Petitioners' Petition for Review should be dismissed because they fail to state a claim under the free and equal elections clause. They assert that the Supreme Court already considered and rejected the same arguments in *Ball*. We disagree.

The precise issues, aside from standing, that were before the Supreme Court in *Ball* were whether **the Election Code** required disqualification of undated and incorrectly dated absentee and mail-in ballots and whether failing to count mail ballots that do not comply with the dating provisions would violate the federal

---

[45] We also reject Republican Party Intervenors' assertion that Petitioners lack standing based on *Firearm Owners II*, as that case was not an election matter.

Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B). Notably, the *Ball* Court **did not decide** the precise claim presented in this case of whether the dating provisions' continued enforcement to reject undated and incorrectly dated but timely received absentee and mail-in ballots violates the free and equal elections clause. The parties have not identified any other case in which any court has considered this issue. Accordingly, and for the additional reasons discussed above with respect to Petitioners' standing and below as to Count I of the Petition for Review, we conclude it is not clear and free from doubt that Petitioners have not stated a viable claim under the free and equal elections clause, and we therefore will not dismiss the Petition for Review on this basis.

Having disposed of the potential bars to relief, we turn to our consideration of the merits of Petitioners' claims.

### C. Petition for Review

#### 1. *Count I – Declaratory Judgment & Injunctive Relief*

In Count I of their Petition for Review, Petitioners present an as-applied challenge to the dating provisions and seek a declaration that Respondents' strict application of those provisions to reject timely submitted absentee and mail-in ballots based solely on voters' "inadvertent failure to add a meaningless, superfluous handwritten date next to their signature on the mail ballot [r]eturn [e]nvelope" is an unconstitutional interference with the exercise of the fundamental right to vote in violation of the free and equal elections clause. (PFR ¶¶ 82-84.) Petitioners also seek a permanent injunction barring further enforcement of the dating provisions, contending that continued enforcement of the dating provisions will result in the disenfranchisement of eligible Pennsylvania voters in the 2024 General Election and beyond, unless and until permanently enjoined by this Court. (*Id.* ¶ 85.)

We begin with the text of the dating provisions. Section 1306(a) of the Election Code, which was added to the statute in 1951 and thereafter amended by Act 77, relates to voting by absentee electors and provides, in relevant part, that an absentee "elector shall . . . fill out, **date** and sign the declaration printed on" the second, or outer, envelope "on which is printed the form of declaration of the elector," among other things. *See* 25 P.S. § 3146.6(a) (emphasis added). Section 1306-D(a) of the Election Code, which was added to the statute by Act 77, relates to voting by mail-in electors and similarly provides, in relevant part, that a mail-in "elector shall . . . fill out, **date** and sign the declaration printed on" the second, or outer, envelope "on which is printed the form of declaration of the elector," among other things. *See* 25 P.S. § 3150.16(a) (emphasis added).

As indicated above, the dating provisions and other statutory phrases within them have been the subject of lawsuits since Act 77's inception. In this regard, Republican Party Intervenors assert their right to relief is clear because our Supreme Court already rejected the same free and equal elections clause challenge Petitioners assert here in *Pennsylvania Democratic Party* and *Ball*. We briefly address this argument first before reaching Petitioners' constitutional claim.

Most recently for our purposes, in *Ball*, 289 A.3d 1, a majority of our Supreme Court weighed in on the interpretation of the dating provisions, recognizing that "an undeniable majority [of that Court] already ha[d] determined that the Election Code's command is unambiguous and mandatory, and that undated ballots would **not** be counted in the wake of *In re* [] *Canvass*."[46] *Ball*, 289 A.3d at 21-22 (noting

---

[46] In *In re Canvass*, 241 A.3d 1058, which involved five consolidated appeals, our Supreme Court addressed, in the context of the November 2020 General Election, whether the Election Code required county boards to disqualify mail-in or absentee ballots submitted by qualified electors who signed the declaration on their ballot's outer envelope but did not handwrite their name, **(Footnote continued on next page…)**

that "[f]our Justices [in *In re Canvass*] agreed that failure to comply with the date requirement would render a ballot invalid in any election after 2020") (emphasis in original). The *Ball* Court therefore reaffirmed the *In re Canvass* majority's conclusion as a matter of statutory interpretation of the Election Code. *Id.* at 22. As for incorrectly dated mail ballots, which *In re Canvass* did not address, the Court rejected other state and federal courts' interpretation[47] that any date is "sufficient," reasoning that "[i]mplicit in the Election Code's textual command . . . is the understanding that the 'date' refers to the day upon which an elector signs the declaration." *Id.* The Court determined, however, that how county boards verify the date an elector provides is the day upon which he or she completed the declaration was a question beyond its purview. *Id.* at 23. Further, having issued guidance for the November 8, 2022 General Election in its November 5, 2022 supplemental order,[48] the Court observed that "county boards of elections retain authority to evaluate the ballots that they receive in future elections—including those

---

address, and/or the date, where no fraud or irregularity was alleged. *See In re Canvass*, 241 A.3d at 1061-62. Ultimately, the Court concluded that the Election Code did not require county boards to disqualify signed but undated absentee or mail-in ballot declarations, reading the dating provisions' language as directory rather than mandatory. *Id.* at 1076-77, 1079 (noting the Court found that such defects, "while constituting technical violations of the Election Code, do not warrant the wholesale disenfranchisement of thousands of Pennsylvania voters" and that "[h]aving found no compelling reasons to do so, we decline to intercede in the counting of the votes at issue in these appeals").

[47] *See Berks Cnty.* (Pa. Cmwlth., No. 355 M.D. 2022, filed Aug. 19, 2022) (Cohn Jubelirer, P.J.) (single-Judge op.), 2022 WL 4100998, at *18 (observing that the dating provisions say "date" but that the statute "does not specify which date"); and *Migliori*, 36 F.4th at 163 (observing that the county board of elections "counted ballots with obviously incorrect dates"), *vacated as moot*, 143 S.Ct. 297 (2022).

[48] It also clarified that its November 5, 2022 supplemental order was intended to provide guidance and uniformity for the November 8, 2022 General Election, and that the date ranges included therein "were intended to capture the broadest discernible period of time within which an elector could have an absentee or mail-in ballot in hand, and thus could become able to 'fill out, date and sign' the declaration on the return envelope." *Ball*, 289 A.3d at 23.

65

that fall within the date ranges derived from statutes indicating when it is possible to send out mail-in and absentee ballots—for compliance with the Election Code." *Id.* This was the extent of the Supreme Court's interpretation of the dating provisions under state law in *Ball*.

With respect to whether the dating provisions violated the federal Materiality Provision, as to which the *Ball* Court was evenly divided[49] and regarding which it did not issue any order, we note, in relevant part, the Supreme Court's finding that "invalidating ballots received in return envelopes that do not comply with the [dating provisions] denies an individual the right of 'having such ballot counted and included in the appropriate totals of votes cast,' and therefore [] 'den[ies] the right of an individual to vote in any election.'" *Ball*, 289 A.3d at 25 (citing federal Materiality Provision). Further, recognizing that the interpretive rule against superfluities (i.e., that a statute should be read together so effect is given to all of its provisions and so none are rendered inoperative or superfluous) counseled against a reading of the Materiality Provision as including, in the term "voting,"[50] **all** steps involved in casting a ballot, which would render the Materiality Provision's term "other act requisite to voting" without meaning, the Court opined, as follows, in footnote 156:

> In the event that Congress' meaning in the phrase "other act requisite to voting" might be deemed ambiguous, we would reach the same result. In such a circumstance, **failure to comply with the [dating**

[49] Three Supreme Court Justices at the time joined Part III(C) of *Ball* regarding the Materiality Provision, including Justice Wecht, Chief Justice Todd, and Justice Donohue.

[50] For context, we note the Materiality Provision provides, in relevant part, that "[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to **voting**, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." *See* 52 U.S.C. § 10101(a)(2)(B) (emphasis added).

**provisions] would not compel the discarding of votes in light of the [f]ree and [e]qual [e]lections [c]lause, and our attendant jurisprudence that ambiguities are resolved in a way that will enfranchise, rather than disenfranchise, the electors of this Commonwealth.** *See* Pa. Const. art. I, § 5; [*Pa. Democratic Party*], 238 A.3d at 361.

*Ball*, 289 A.3d at 26-27, n.156 (emphasis added).

We have already stated in disposing of the procedural objections that the precise issues that were before the Court in *Ball* are not currently before this Court in the instant matter, and that the *Ball* Court did not decide whether continued enforcement of the dating provisions to disenfranchise voters violates the free and equal elections clause of the Pennsylvania Constitution. Nevertheless, the *Ball* Court recognized, albeit with respect to the federal Materiality Provision, that a free and equal elections clause challenge to the dating provisions may someday arise notwithstanding their unambiguous and mandatory command, as it has today under different circumstances. We therefore reject Republican Party Intervenors' contention that *Ball* settled the score regarding the free and equal elections clause issue Petitioners now raise.

As for *Pennsylvania Democratic Party*, 238 A.3d 345, which notably was issued mere weeks before a hotly contested Presidential election and amid the novel COVID-19 pandemic, we observe that our Supreme Court did not consider any issue regarding the Election Code's dating provisions specifically, let alone under the free and equal elections clause. Republican Party Intervenors nevertheless rely on that case for the proposition that the Supreme Court already rejected a challenge to the broader absentee and mail-in ballot declaration requirements, only one part of which is the dating provisions, under the free and equal elections clause, and assert that Petitioners' right to relief therefore is not clear as to this issue. They point

specifically to the Supreme Court's consideration of whether the Constitution's free and equal elections clause required that county boards implement notice and opportunity to cure procedures for mail ballots containing minor defects, which is just one of the discrete issues that was before the Court in that case. *See Pa. Democratic Party*, 238 A.3d at 372-74. However, as we have also already observed, notice and opportunity to cure procedures are **not** at issue in this case. We therefore find Republican Party Intervenors' reliance on *Pennsylvania Democratic Party* for the proposition that Petitioners' constitutional claim is foreclosed here to also be without merit. As such, we conclude that Republican Party Intervenors have not shown they are clearly entitled to the relief they seek as a matter of law on these bases.

Turning to Petitioners' constitutional claim regarding the dating provisions, we begin by noting that, in considering the constitutionality of a statute, "we are guided by the principle that 'acts passed by the General Assembly are strongly presumed to be constitutional.'" *Cmwlth. v. Neiman*, 84 A.3d 603, 611 (Pa. 2013) (quoting *Pa. State Ass'n of Jury Comm'rs v. Cmwlth.*, 64 A.3d 611, 618 (Pa. 2013)). Further, a statute is presumed to be valid and will be declared unconstitutional only if it is shown to be "clearly, palpably, and plainly [violative of] the Constitution." *Pa. Democratic Party*, 238 A.3d at 384 (quoting *West Mifflin Area Sch. Dist. v. Zahorchak*, 4 A.3d 1042, 1048 (Pa. 2010)). "While deference is generally due the legislature, we are mindful that the judiciary may not abdicate its responsibility to ensure that government functions within the bounds of constitutional prescription under the guise of its deference to a coequal branch of government." *Mixon v. Cmwlth.*, 759 A.2d 442, 447 (Pa. Cmwlth. 2000).

The free and equal elections clause is at the heart of this case, which provides that "[e]lections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. I, § 5; *Applewhite v. Cmwlth.*, 54 A.3d 1, 3 (Pa. 2012) (observing the free and equal elections clause is part of our Constitution's Declaration of Rights); *see also League of Women Voters*, 178 A.3d at 803 (emphasizing generally that "[a]lthough plenary, the General Assembly's police power is not absolute, as legislative power is subject to restrictions enumerated in the Constitution and to limitations inherent in the form of government chosen by the people of this Commonwealth[,]" and that article I, section 5 "is contained within the Pennsylvania Constitution's 'Declaration of Rights,' which . . . is an enumeration of the fundamental individual human rights possessed by the people of this Commonwealth that are specifically exempted from the powers of Commonwealth government to diminish" (citations omitted)).

In considering the language of the free and equal elections clause, our Supreme Court, in *League of Women Voters*, 178 A.3d at 804, observed that

> [t]he broad text of the first clause of this provision mandates clearly and unambiguously, and in the broadest possible terms, that **all** elections conducted in this Commonwealth must be "free and equal." In accordance with the plain and expansive sweep of the words "free and equal," we view them as indicative of the framers' intent that all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted to the voters of our Commonwealth, and, also, conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government. Thus, [a]rticle I, [s]ection 5 guarantees our citizens an equal right, on par with every other citizen, to elect their representatives. Stated another way, the actual and plain language of [s]ection 5 mandates that all voters have an equal opportunity to translate their votes into representation.

(Emphasis in original.) Furthermore, in recognizing that it "has infrequently relied on this provision to strike down acts of the legislature pertaining to the conduct of elections, the qualifications of voters to participate therein, or the creation of electoral districts, [the Supreme Court noted its] view as to what constraints [a]rticle I, [s]ection 5 places on the legislature in these areas has been consistent over the years." *League of Women Voters*, 178 A.3d at 809.

In describing such constraints, the Court first cited *Patterson v. Barlow*, 60 Pa. 54, 75 (1869),[51] for the proposition that "while our Constitution gives to the General Assembly the power to promulgate laws governing elections, those enactments are nonetheless subject to the requirements of the [f]ree and [e]qual [e]lections clause . . . , and hence may be invalidated by our Court 'in a case of plain, palpable[,] and clear abuse of the power which actually infringes the rights of the electors'"; therefore, "any legislative scheme which has the effect of impermissibly diluting the potency of an individual's vote for candidates for elective office relative to that of other voters will violate the guarantee of 'free and equal' elections afforded by [a]rticle I, [s]ection 5."[52] *League of Women Voters*, 178 A.3d at 809-10 (quoting *Patterson*, 60 Pa. at 75).

---

[51] The Supreme Court's decision in *Patterson v. Barlow*, 60 Pa. 54, 74-75 (1869), involved a challenge to an act of the legislature that established eligibility qualifications for electors to vote in all elections held in Philadelphia, and it specified the manner in which those elections were to be conducted.

[52] We observe that *League of Women Voters*, 178 A.3d 737, involved a constitutional challenge to Pennsylvania's 2011 congressional redistricting plan. The Supreme Court held that the plan was a partisan gerrymander "designed to dilute the votes of those who in prior elections voted for the party not in power in order to give the party in power a lasting electoral advantage." *See generally League of Women Voters*, 178 A.3d 737, and *League of Women Voters*, 181 A.3d 1083, 1084 (Pa. 2018) (per curiam op. & ord.) (adopting remedial congressional redistricting plan). Therefore, the Court held that the plan violated the free and equal elections clause because "a diluted vote is not an equal vote." 181 A.3d at 1084.

70

Next citing its decision in *Winston*, 91 A. 520, which involved an unsuccessful challenge under the free and equal elections clause to an act of the legislature that set standards regulating the nominations and elections for judges and elective offices in the City of Philadelphia, the Court noted it nevertheless prescribed in that case that elections shall be "free and equal" within the meaning of the Constitution

> when they are public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; **when the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial**; and when no constitutional right of the qualified elector is subverted or denied him.

*League of Women Voters*, 178 A.3d at 810 (quoting *Winston*, 91 A. at 523 (emphasis added));[53] *see also Banfield*, 922 A.2d at 48 (citing same standard); *Shankey v. Staisey*, 257 A.2d 897, 899 (Pa. 1969) (utilizing *Winston*'s interpretation of free and equal elections clause, Court rejected third-party candidates' claim that election statute wrongfully equated public petitions with secret ballots so as to deny ballots of people who voted for third-party candidates the same weight as the ballots of people who voted for major party candidates, because statute promoted equal elections by requiring all candidates to satisfy same condition of showing support by set number of people); *In re New Britain Borough Sch. Dist.*, 145 A. 597, 599-

---

[53] In *Winston*, the Supreme Court held that the Act of July 24, 1913, P.L. 1001, known as the Nonpartisan Ballot Law in question, when "[j]udged by these tests, . . . cannot be attacked successfully on the ground that it offends against the 'free and equal' clause of the bill of rights" as "[i]t denies no qualified voter the right to vote; it treats all voters alike; the primaries held under it are open and public to all those who are entitled to vote and take the trouble to exercise the right of franchise; and the inconveniences if any bear upon all in the same way under similar circumstances and are made necessary by limiting the number of names to be printed upon the official ballot, a right always recognized in our state and not very confidently disputed in the case at bar." *Winston*, 91 A. at 523.

600 (Pa. 1929) (relying on principles from *Winston* in striking down legislative act that created voting districts for elective office that, while valid legislation, had the inadvertent effect of depriving voters in new borough their right to vote for school directors); *De Walt v. Bartley*, 24 A. 185, 186 (Pa. 1892) (providing that "[t]he test is whether such legislation denies the franchise, or renders its exercise so difficult and inconvenient as to amount to a denial" and rejecting free and equal elections clause challenge to entirety of statute providing for, *inter alia*, secret ballots, because no voter was denied the exercise of the franchise). *But see Working Families Party v. Cmwlth.*, 209 A.3d 270, 271-72, 281-82 (Pa. 2019) (rejecting free and equal elections clause challenge to Election Code's anti-fusion provisions, i.e., provisions that prohibit the process by which two or more political organizations place the same candidate on the ballot in a general election for the same office, noting the appellants who challenged the provisions had the same right as every other voter, thus satisfying principles set forth in *Winston*); *In re Nom. Papers of Rogers*, 908 A.2d 948, 954-55 (Pa. Cmwlth. 2006) (finding that Supreme Court applied "gross abuse" standard in *Winston* to determine whether election statutes violate the free and equal elections clause, thereby giving substantial deference to the legislature's judgment, and applying such standard in rejecting free and equal elections clause challenge to minor party signature requirement of Election Code).

The parties to this litigation do not dispute that the fundamental right to vote guaranteed by our Constitution is at issue. *See Pa. Democratic Party*, 238 A.3d at 361 (employing a construction of the Election Code that "favors the fundamental right to vote and enfranchises, rather than disenfranchises, the electorate"); *Banfield v. Cortés*, 110 A.3d 155, 176 (Pa. 2015) (observing that "the right to vote is fundamental and 'pervasive of other basic civil and political rights'") (citing

*Bergdoll v. Kane*, 731 A.2d 1261, 1269 (Pa. 1999)); *In re Nader*, 858 A.2d 1167, 1181 (Pa. 2004) (holding that, "where the fundamental right to vote is at issue, a strong state interest must be demonstrated"); *see also Repub. Party of Pa.*, 218 F. Supp. 3d at 407 (observing that "[v]oting is a fundamental right"). They disagree, however, about the applicable level of judicial review to be applied in this case, and specifically, whether strict scrutiny or a lesser standard of judicial review applies based on the above principles.

Because we find it instructive, we briefly return to *Pennsylvania Democratic Party*, in which our Supreme Court considered, among other issues, whether Pennsylvania's poll watcher residency requirement, found in Section 417(b) of the Election Code, 25 P.S. § 2687(b) (requiring poll watchers to be qualified registered electors of the county in which the election district for which the watcher was appointed is located), violated state or federal constitutional rights. Although *Pennsylvania Democratic Party* is distinguishable from this case, because the Court there upheld the poll watcher residency requirement under a rational basis standard of review and a federal court's reasoning, concluding it imposed no burden on one's constitutional right to vote, the opinion is nevertheless instructive as to the proper standards to be considered, which guide our analysis here. *See Pa. Democratic Party*, 238 A.3d at 384-85:

> The "times, places and manner" of conducting elections generally falls to the states. [Article I, Section 4 of the United States Constitution,] U.S. Const. art. I, § 4 (providing that "the Times, Places and Manner of holding Elections . . . shall be prescribed in each State by the Legislature thereof"). Pennsylvania has enacted a comprehensive code of election laws pursuant to its authority to regulate its elections. The General Assembly, in enacting its comprehensive scheme, has required that any person serving as a poll watcher for a particular candidate or party be a resident of the county in which she serves in her position. 25 P.S. § 2687(b).

73

. . . .

> In analyzing whether a state election law violates the constitution, courts must first examine the extent to which a challenged regulation burdens one's constitutional rights. *Burdick v. Takushi*, 504 U.S. 428, 434 . . . (1992). Upon determining the extent to which rights are burdened, courts can then apply the appropriate level of scrutiny needed to examine the propriety of the regulation. *See id.* (indicating that "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment[, U.S. Const. amends. I, XVI,] rights").

> **Where a state election regulation imposes a "severe" burden on a plaintiff's right to vote, strict scrutiny applies and requires that the regulation is "narrowly drawn to advance a state interest of compelling importance."** *Id.* When a state election law imposes only "reasonable, nondiscriminatory restrictions," upon the constitutional rights of voters, an intermediate level of scrutiny applies, and "the State's important regulatory interests are generally sufficient to justify" the restrictions. *See* [*i*]*d.* (upholding Hawaii's ban on write-in voting in the primary where doing so places a minimal burden on one's voting right and supports the state's interest in supporting its ballot access scheme). Where, however, the law does not regulate a suspect classification (race, alienage, or national origin) or burden a fundamental constitutional right, **such as the right to vote,** the state need only provide a rational basis for its imposition. *See Donatelli* [*v. Mitchell*], 2 F.3d [508,] 510 & 515 [(3d Cir. 1993)].

*See id.* (emphasis added); *see also Appeal of Norwood*, 116 A.2d at 555 (providing that the power to throw out a ballot for minor irregularities must be exercised very sparingly and with the idea in mind that voters are not be disenfranchised at an election **except for compelling reasons**); *Petition of Berg*, 712 A.2d 340, 341-42 (Pa. Cmwlth. 1998) (setting forth the same standards); *Applewhite v. Cmwlth.* (Pa. Cmwlth., No. 330 M.D. 2012, filed Jan. 17, 2014) (McGinley, J.) (single-Judge op.), 2014 WL 184988, at *20-21 (analyzing former voter identification law under strict

74

scrutiny because its enforcement had the effect of disenfranchising electors through no fault of their own and infringing upon qualified electors' right to vote).

Petitioners claim that the dating provisions' continued enforcement to reject timely received mail ballots of qualified electors without dates or with incorrect dates disenfranchises the electorate to such a degree that the dating provisions should be ruled unconstitutional under a strict scrutiny level of review. In examining the constitutionality of the dating provisions under the above-described standards, we agree with Petitioners and find that the dating provisions impose a significant burden on one's constitutional right to vote, in that they restrict the right to have one's vote counted to only those voters who **correctly** handwrite the date on their mail ballots and effectively deny the right to all other qualified electors who seek to exercise the franchise by mail in a timely manner but make minor mistakes regarding the handwritten date on their mail ballots' declarations. Stated another way, the dating provisions make it so difficult for some voters to exercise the franchise that it effectively amounts to a denial of the franchise itself. *Winston*, 91 A. at 523; *De Walt*, 24 A. at 186. Accordingly, we conclude that strict scrutiny applies to the dating provisions' restriction on that fundamental right, and that under such standard, the government bears the heavy burden of proving that the law in question, i.e., the dating provisions, is "narrowly drawn to advance a state interest of compelling importance." *Pa. Democratic Party*, 238 A.3d at 385; *see also Appeal of Gallagher*, 41 A.2d at 632-33 (providing that the power to throw out ballots based on minor irregularities "must be exercised **very sparingly** and with the idea in mind that either an individual voter or a group of voters are not to be disfranchised at an election **except for compelling reasons**" (emphasis added)); *In re Nader*, 858 A.2d

75

at 1180 (recognizing that "where a precious freedom such as voting is involved, **a compelling state interest** must be demonstrated" (emphasis added)).

We also agree with Petitioners' assertion that the dating provisions cannot survive strict scrutiny, as they serve no compelling government interest. As has been determined in prior litigation involving the dating provisions, the date on the outer absentee and mail-in ballot envelopes is not used to determine the timeliness of a ballot, a voter's qualifications/eligibility to vote, or fraud. It is therefore apparent that the dating provisions are virtually meaningless and, thus, serve no compelling government interest. *See, e.g.*, *NAACP III*, 97 F.4th at 125, 127, 137 (recognizing that the dating provisions "serve[] little apparent purpose" because the date is "not used to confirm timely receipt of the ballot or to determine when the voter completed it[,]" as timeliness is instead "established both by a receipt stamp placed on the envelope by the county board and separately through scanning of the unique barcode on the envelope"; and the date does not determine voter qualifications); *see id.* at 140, 155 n.31 (Shwartz, C.J., dissenting) (observing, based on the evidence, that the date is also not used to detect fraud, and that no county board in *NAACP* identified any fraud concern due to an undated or incorrectly dated mail ballot declaration).

At the en banc oral argument before this Court, counsel for the Secretary confirmed that none of the county boards of elections use the handwritten date for any purpose, and he further relayed that the only reason the date is included on absentee and mail-in ballot envelope declarations is because such requirement is in the Election Code. Counsel for the Secretary also pointed out that the county boards are required by law to record when they receive absentee and mail-in ballots, and that they "certainly do." He also confirmed that county boards having to confirm whether dates are correct or incorrect burdens the county boards and results in

76

unequal treatment of mail ballots across the Commonwealth, as no two county boards approach this endeavor the same way, and, further, ensuring consistency across the boards is difficult. *See also infra* notes 56-59 (Voter Declarations of voters who timely applied for, received, and returned their mail ballots with signed declarations, but whose ballots were not counted due to issues with the dates; further showing disparities between how different counties treat mail ballots with date issues). Moreover, although they are not "the government" for purposes of strict scrutiny, Republican Party Intervenors are, notably, the only parties to this case that seek to have the dating provisions upheld under the Constitution;[54] however, they have not provided this Court with any compelling or otherwise legitimate reasons for doing so other than repeating the post hoc justifications mentioned in *In re Canvass*, discussed above. They have also conceded that Pennsylvania elections officials are required to timestamp a ballot upon receiving it, and that county elections officials rely on that timestamped date when entering information into the SURE System. (Repub. Party Intervenors' Memo. of Law at 50.) In the absence of any other compelling interest to support the dating provisions' restriction on the right to vote, coupled with the fact that the Secretary (i.e., the government) and, to an extent, the Philadelphia and Allegheny County BOEs actually support Petitioners' view in this case, Republican Party Intervenors cannot successfully defend against the dating provisions, which have the effect of disenfranchising those who fail to fully comply with their requirements at the expense of not having their votes counted. *See Applewhite*, slip op. at 20. Moreover, there has been no showing here

---

[54] In his *Amicus Curiae* brief, Commissioner Chew largely repeats Republican Party Intervenors' arguments as to the procedural objections and the merits of the constitutional claim presented in this case, including their arguments surrounding the salutary purpose of the dating provisions. We therefore dispense with summarizing his arguments for the sake of brevity, seeing as this opinion is already too long to begin with.

of any connection between the handwritten date requirement and maintaining the honesty and integrity of elections, where timestamps and barcodes are used to determine a mail ballot's timeliness. Accordingly, the burdens attendant to including a handwritten date on a mail ballot declaration are unnecessary and not narrowly tailored to serve any compelling government interest. *See id.* at 20-21.

With all of this said, it is important to clarify what we are and are not doing in this case. We are not asked to interpret the dating provisions' language under statutory construction principles, as our Supreme Court has already done so and found such language to be unambiguous and mandatory in *Ball*. Furthermore, we are not asked to declare the language unconstitutional on its face, but, rather, Petitioners instead ask whether **application** of the statutory language to reject qualified electors' timely received mail ballots that do not comply with a meaningless date requirement results in the unconstitutional infringement on electors' fundamental right to vote. In this regard, we recognize that "'the state may enact substantial regulation containing reasonable, non[]discriminatory restrictions to ensure honest and fair elections that proceed in an orderly and efficient manner'" and that "an orderly and efficient election process can be crucial to the protection of a voter's participation in that process." *Pa. Democratic Party*, 238 A.3d at 369-70 (quoting *Banfield*, 110 A.3d at 176-77) (further recognizing "the struggles of our most populous counties to avoid disenfranchising voters while processing the overwhelming number of pandemic-fueled mail-in ballot applications during the 2020 Primary demonstrates that orderly and efficient election processes are essential to safeguarding the right to vote"). However, we cannot countenance **any** law governing elections, determined to be mandatory or otherwise, that has the practical effect in its application of impermissibly infringing on certain individuals'

fundamental right to vote, **which is "pervasive of other basic civil and political rights,"** relative to that of other voters who may be able to exercise the franchise more easily in light of the free and equal elections clause's prescription guaranteeing **all citizens an equal right on par with every other citizen** to elect their representatives.[55] *See League of Women Voters*, 178 A.3d at 809-10; *Banfield*, 110 A.3d at 176 (emphasis added); *Patterson*, 60 Pa. at 75.

To look at a mail ballot that substantially follows the requirements of the Election Code, save for including a handwritten date on the outer envelope declaration, **and which also includes a barcode unique to that ballot as well as a timestamped date indicating its timely receipt by the voter's respective county board of elections by 8:00 p.m. on Election Day**, and say that such voter is not entitled to vote for whomever candidates he or she has chosen therein due to a minor irregularity thereon "is to negate the whole genius of our electoral machinery." *Appeal of James*, 105 A.2d at 66. Simply put, the "practical" regulation of requiring

---

[55] Indeed, despite repeating Republican Party Intervenors' arguments in favor of upholding the dating provisions almost to a tee, *Amici* Republican Leaders point out in their brief that the General Assembly has continued to propose, debate, and vote upon additional changes to the Election Code, including a series of revisions to the dating provisions. (*Amici* Repub. Leaders' Br. at 20.) However, *Amici* Republican Leaders couch these proposed amendments as revealing "a collective understanding that the dating requirement itself is constitutional and can only be modified or repealed by the General Assembly itself." (*Id.* at 20-22.) While not particularly relevant to the constitutional claim before us, we observe only that the proposed revisions are telling in their substance. (*Id.* at 20-21 (noting a 2021-2022 proposed amendment that would have provided, among other things, that a missing or inaccurate date on the declaration of the elector on the outer return envelope shall not be a fatal defect for the ballot; and highlighting three 2023-2024 proposed amendments, the first of which would provide that the failure to date an envelope shall not disqualify the ballot if the declaration is otherwise properly executed, the second of which would provide that having a missing or inaccurate date would not be a fatal defect, and the third of which would strike the date requirement entirely for mail-in ballots).) Moreover, *Amici* Republican Leaders, like Republican Party Intervenors, simply repeat the post hoc justifications identified in *In re Canvass* as the "important election administration purposes" for the dating provisions. (*Id.* at 22-25.)

voters to date their mail ballot declarations "obstructs and hampers the independent voter" and places voters on unequal playing fields where voters timely submit their mail ballots, but one voter may inadvertently include what has been coined an "incorrect" date,[56] or a birthdate,[57] or forgets to include the date altogether[58] or the

---

[56] *See* PFR ¶ 76(a) & Ex. 2 (Keasley Decl.), ¶¶ 9-13 (73-year-old United States Marine Corps. and Vietnam veteran, and Allegheny County voter, whose ballot for 2024 Primary Election was rejected and not counted due to **an incorrect date** on ballot declaration); PFR ¶ 76(b) & Ex. 3 (Sowell Decl.), ¶¶ 9-15 & Ex. A (76-year-old retired corporate seamstress and Allegheny County voter who received notice from Allegheny County BOE via 4/13/2024 email that her mail ballot for 2024 Primary Election was rejected due to **an incorrect date**, and due to her traveling on a cruise, she was unable to go to polling place fix her ballot); and PFR ¶ 76(c) & Ex. 4 (Ivory Decl.), ¶¶ 7-10 (74-year-old retired educator and Philadelphia County voter who received notice his mail ballot for 2024 Primary Election would be rejected due to **an incorrect date**)).

*See also* PFR ¶ 76(e) & Ex. 6 (Arbour Decl.), ¶¶ 9-14 & Ex. A (51-year-old chief technology officer for wealth management software company and Montgomery County voter who received notice from Montgomery County BOE that its sorting machine indicated his mail ballot for 2024 Primary Election included **an invalid date** (not between the date range of 4/5/2024 and 4/23/2024) on his return envelope and was unable to make it to polling place to fix ballot); PFR ¶ 76(f) & Ex. 7 (Hickman Decl.), ¶¶ 9-15 (89-year-old retired mechanical engineer and York County voter who submitted mail ballot for 2024 Primary Election, never received notice or confirmation that his ballot was received, and later received notice by the American Civil Liberties Union (ACLU) of Pennsylvania that his ballot had **an incorrect date** and would not be counted); PFR ¶ 76(i) & Ex. 10 (Sprague Decl.), ¶¶ 9-15 (80-year-old retired administrative assistant in aerospace industry and Bucks County voter who submitted mail ballot for 2024 Primary Election and received email and letter from Bucks County BOE that her ballot would not be counted due to **an incorrect date** on ballot envelope and instructions to cure; however, she was unable to go to polling place due to recovery from spine surgery).

[57] *See* PFR ¶ 76(g) & Ex. 8 (Novick Decl.), ¶¶ 9-15 (80-year-old retired schoolteacher and former small business owner and Bucks County voter who submitted mail ballot for 2024 Primary Election, along with her husband, and later received voicemail and email from Bucks County BOE that they had **incorrect dates**, i.e., she included her **birthdate** before "2024, on their ballots and that the ballots would not be counted if the errors were not fixed).

[58] *See* PFR ¶ 76(d) & Ex. 5 (Wiley Decl.), ¶¶ 6-11 (71-year-old retired truck driver and Philadelphia County voter whose mail ballot for 2024 Primary Election was not counted because he **forgot to write the date** on the envelope and was later informed about the date issue by the ACLU of Pennsylvania)

*See also* PFR ¶ 76(h) & Ex. 9 (Sommar Decl.), ¶¶ 10-18 & Ex. A (71-year-old retired computer service technician, electrician, and union representative and Chester County voter who **(Footnote continued on next page…)**

80

correct or full year, and another may include the date on which they filled out the declaration. *Oughton v. Black*, 61 A. 346, 349 (Pa. 1905) (Dean, J., dissenting). Other voters' ballots may not be counted for unknown reasons.[59] This fact is strikingly evident from the undisputed facts underlying this matter, which again establish that voters are **still** being disenfranchised on account of the Secretary's inconsistent and ever-changing guidance following *Ball*'s apparently unequivocal holding that the dating provisions are mandatory, and that at least the two most populous counties in the Commonwealth (i.e., the Philadelphia and Allegheny County BOEs) continue to reject timely received mail ballots for failure to fully or substantially comply with a meaningless date requirement. We highlight that the Secretary has **thrice changed his guidance following *Ball***, most recently directing county boards to utilize the full year on mail ballot outer envelope declarations.

While this Court is fully cognizant that the General Assembly is the entity tasked with effectuating "free and equal" elections vis-à-vis reasonable regulations directing the manner and method of voting, "when the effect of a restriction or a regulation is to debar a large section of intelli[gent] voters from exercising their choice, the Constitution is certainly violated in spirit, if not in letter." *See Oughton*,

---

submitted mail ballot for 2024 Primary Election, received a 4/19/2024 email from Chester County BOE of error on ballot and how to fix it, and later learned he **forgot to include a date** on outer envelope; he did not follow up with the County BOE to fix his ballot); and PFR ¶ 76(j) & Ex. 11 (Stout Decl.), ¶¶ 9-15 (77-year-old retired nurse and Berks County voter who submitted mail ballot for 2024 Primary Election who received notice in mail from Berks County BOE that her ballot was **missing a date** and she would have to go in person to fix it; however, she could not go because of mobility issues).

[59] Lorine Walker (Dauphin County) (PFR ¶ 76(k) & Ex. 12 (Walker Decl.), ¶¶ 9-15 & Ex. A (74-year-old retired school librarian and media specialist and Dauphin County voter who submitted mail ballot for 2024 Primary Election who received notice from Dauphin County BOE that her ballot was received on 4/18/2024 and that if any issues were identified with the ballot, she may or may not receive further notice; however, she did not receive further notice, but later learned her ballot was not counted, which she would have corrected if given an opportunity to do so).

81

61 A. at 349-50 (Dean, J., dissenting); *see also Ball*, 289 A.3d at 25 (opining[60] that "invalidating ballots received in return envelopes that do not comply with the [dating provisions] denies an individual the right of 'having such ballot counted and included in the appropriate totals of votes cast,' and therefore [] 'den[ies] the right of an individual to vote in any election'"); *see also In re Canvass*, 241 A.3d at 1076-77, 1079 (opining, in Opinion Announcing the Judgment of the Court, that the Election Code did not require county boards to disqualify signed but undated absentee or mail-in ballot declarations; and noting the Court found that such defects, "while constituting technical violations of the Election Code, do not warrant the wholesale disenfranchisement of thousands of Pennsylvania voters" and that "[h]aving found no compelling reasons to do so, [the Court] decline[d] to intercede in the counting of the votes at issue in th[o]se appeals").

Simply put, the refusal to count undated or incorrectly dated but timely received mail ballots submitted by otherwise eligible voters because of meaningless and inconsequential paperwork errors violates the fundamental right to vote recognized in and guaranteed by the free and equal elections clause of the Pennsylvania Constitution. Accordingly, concluding that Petitioners have shown they have a clear right to the relief requested in Count I of the Petition for Review, we grant Petitioners' requested relief, in part,[61] and declare that the Secretary's and

---

[60] Although this opinion was expressed by only a handful of Justices with respect to federal Materiality Provision, it nevertheless rings true under the undisputed facts presented here.

[61] Considering our conclusion that the dating provisions' strict application to reject timely received absentee and mail-in ballots that fail to comply with the meaningless date requirement violates the free and equal elections clause, it is unnecessary to address Petitioners' alternative request in Count II that the dating provisions be read as directory instead of mandatory. We also recognize that our Supreme Court has already settled this question, concluding that the dating provisions are mandatory, in *Ball*.

**(Footnote continued on next page…)**

82

However, we observe that our Supreme Court's jurisprudence has been less than clear on "whether [] information is made mandatory by the Election Code or whether the inclusion of information is directory, i.e., a directive from the Legislature that should be followed but the failure to provide the information does not result in invalidation of the ballot." ***Compare* cases concluding directives of Election Code are mandatory:** *In re Canvass*, 241 A.3d at 1062; *id.* at 1071 (disagreeing with notion "that because the General Assembly used the word 'shall' in this context [(i.e., in Sections 1306 and 1306-D of the Election Code)], it is of necessity that the directive is a mandatory one, such that a failure to comply with any part of it requires a board of elections to declare the ballot void and that it cannot be counted"); *id.* at 1079 (Wecht, J., concurring and dissenting) ("[the date] requirement is stated in unambiguously mandatory terms, and nothing in the Election Code suggests that the legislature intended that courts should construe its mandatory language as directory"); *id.* at 1090 (Dougherty, J., concurring and dissenting) ("the meaning of the terms 'date' and 'sign' . . . are self-evident, they are not subject to interpretation, and the statutory language expressly requires that the elector provide them"); *Ball*, 289 A.3d at 20-23 (holding Election Code's dating provision are mandatory); *Pa. Democratic Party*, 238 A.3d at 378 (holding the secrecy envelope requirement of the Election Code is mandatory); *In re Canvass of Absentee Ballots of Nov. 4, 2003 (Appeal of Pierce)*, 843 A.2d 1223, 1231 (Pa. 2004) (holding Election Code's in-person ballot delivery requirement was mandatory and that votes delivered by third persons must not be counted), ***with* cases deeming mandatory language merely directory and without consequence:** *Shambach v. Bickhart*, 845 A.2d 793, 795 (Pa. 2004) (declining to invalidate a write-in vote cast for a candidate who was named on the ballot proper, observing that ballots containing mere minor irregularities should only be stricken for compelling reasons); *id.* at 806 (Saylor, J., concurring) (construing requirement of Section 1112-A(b) of Election Code, added by the Act of July 11, 1980, P.L. 600, 25 P.S. § 3031.12(b) (regarding write-in votes), consistent with precedent, as directory, not mandatory, in the aftermath of an election, and observing that "the matter of distinguishing between certain mandatory and directory provisions of election laws is a sufficiently subjective undertaking"); *In re Luzerne Cnty. Return Bd. (In re Weiskerger Appeal)*, 290 A.2d 108, 109 (Pa. 1972) (declining to invalidate electors' ballots marked in red ink despite Election Code's requirement that only certain colors of ink may be used).

The Supreme Court's precedent in this regard appears to distinguish between those cases in which minor irregularities are at issue, in which cases a mandatory directive may be read as directory, and those other cases implicating "weighty interests[,]" *see In re Canvass*, 241 A.3d at 1073 (including, for example, fraud prevention or ballot secrecy), in which cases Election Code directives are construed as mandatory. Considering this distinction, even if we did consider Count II of Petitioners' Petition for Review, we would urge that the dating provisions should nevertheless be reinterpreted as directory rather than mandatory in light of our overall holding under the free and equal elections clause that strict application of the dating provisions operates to disenfranchise voters and effectively denies the franchise, as a voter's failure to include the date or inclusion of the wrong date may be considered a minor irregularity at this point in light of the Election Code's failure to keep up with new technology (county boards' date timestamping and scanning of unique barcodes on mail ballots).

the Philadelphia and Allegheny County BOEs' strict application of the Election Code's meaningless dating provisions at the expense of disenfranchising voters is unconstitutional.[62]

### 2. *Permanent Injunction*

As noted above, to justify the award of a permanent injunction, the party seeking relief "must establish that his right to relief is clear, that an injunction is necessary to avoid an injury that cannot be compensated by damages, and that greater injury will result from refusing rather than granting the relief requested." *Kuznik*, 902 A.2d at 489 (quoting *Harding*, 823 A.2d at 1111). "However, unlike a claim for a preliminary injunction, the party need not establish either irreparable harm or immediate relief and a court 'may issue a final injunction if such relief is necessary to prevent a legal wrong for which there is no adequate redress at law.'" *Buffalo Township v. Jones*, 813 A.2d at 663 (citation omitted).

Regarding the first criterion, we have already determined that Petitioners established their right to relief is clear on Count I of the Petition for Review. Specifically, they have established that strict application of the meaningless dating provisions to reject undated or incorrectly dated but timely received mail ballots at the expense of disenfranchising voters who submit such ballots treats those voters

---

[62] Even if this Court were to apply an intermediate level of scrutiny here and view the dating provisions as imposing "reasonable, nondiscriminatory restrictions" on mail voters, thus resulting in the state's important regulatory interests in enacting a comprehensive absentee and mail-in voting scheme generally being sufficient to justify the restriction, *see Pa. Democratic Party*, 238 A.3d at 384-85, **strict application** of the dating provisions to reject undated and/or incorrectly dated but timely received mail ballots still would not pass constitutional muster, as voters' mail ballots will likely continue to be rejected for such minor irregularities stemming from the meaningless date requirement, which goes against the well-established principles that "[t]echnicalities should not be used to make the right of the voter insecure[,]" and that a regulation of the elective franchise "should, when and where possible, be so construed as to insure rather than defeat the exercise of the right of suffrage." *Appeal of James*, 105 A.2d at 65-66.

unequally and violates the fundamental right to vote under the free and equal elections clause. For this reason, Petitioners have established a clear right to the permanent injunctive relief they seek.

As for the second criterion, i.e., that an injunction is necessary to avoid an injury that cannot be compensated by damages, Petitioners argue that a permanent injunction is necessary to avoid the injury of disenfranchisement to thousands of Pennsylvanians, including Petitioners' members, which cannot be compensated by damages. Although not required to be shown for a permanent injunction, Petitioners also argue that they, as organizations, will be irreparably harmed by unconstitutional enforcement of the dating provisions, which will force them to waste the resources that they need to carry out their respective missions. Absent an injunction, they assert, their resources will be diverted to helping mitigate mass disenfranchisement due to strict enforcement of the dating provisions. Because "[t]he disfranchisement of even one person validly exercising his right to vote is an extremely serious matter[,]" *see Perles*, 202 A.2d at 540, and given that these organization Petitioners may **waste** scarce resources to mitigate mass disenfranchisement, both of which clearly cannot be compensated by damages, we conclude that Petitioners have satisfied the second criterion for the grant of a permanent injunction. *See Applewhite*, slip op. at 26 (observing that "[d]eprivation of the franchise is neither compensable nor reparable by after-the-fact legal remedies").

Finally, Petitioners argue that greater injury would result from denying the injunction than from granting it, as refusing to enforce a rule that has no purpose harms no one and certainly does not harm elections officials who are tasked with administering elections moving forward. They claim there is no countervailing public interest to support enforcement of a meaningless technical requirement that

85

no Respondent here (or any other of the county boards) relies upon for any purpose. Because denying the injunction will almost certainly result in disenfranchisement of voters in the upcoming November 2024 General Election, we believe that greater injury would result from denying the injunction than from granting it. Accordingly, Petitioners have also satisfied this third criterion for the grant of a permanent injunction.

Accordingly, for the above reasons, the Court permanently enjoins strict enforcement of the dating provisions to disenfranchise voters who timely submit to the their respective Philadelphia or Allegheny County BOE undated or incorrectly dated absentee or mail-in ballots, as further set forth in the attached Order.

### 3. *Act 77's Nonseverability Provision*

As a final matter, we must address the parties' arguments on whether our holding triggers Act 77's nonseverability provision. In this regard, Petitioners remind us that they seek a declaration that **enforcement** of the dating provisions in a manner that excludes qualified voters' timely received mail ballots based on their failure to comply the meaningless dating provisions is unconstitutional under the free and equal elections clause, and that they are **not** asking the Court to rewrite, amend, or strike any portion of Act 77. We also clarified this above in our discussion. Petitioners, the Secretary, and Democratic Party Intervenors all agree that *Stilp*, 905 A.2d 918, among other cases, is on point with respect to nonseverability, and they argue that Act 77's nonseverability provision is not triggered here. Conversely, Republican Party Intervenors submit that our holding of unconstitutionality with respect to the dating provisions' strict enforcement would trigger Act's 77's nonseverability provision found in Section 11 of that Act, thus requiring that the

entirety of Act 77 be stricken at this late stage in the game on the eve of the November 2024 General Election.

Act 77's nonseverability provision is found in Section 11 of the Act, which provides, in relevant part: "Sections 1, 2, 3, 3.2, 4, 5, 5.1, 6, 7, 8, 9 and 12 of this act are nonseverable. If any provision of this act **or its application to any person or circumstance is held invalid**, the remaining provisions or applications of this act are void." (Emphasis added.) For our purposes, we are concerned only with Sections 6 (which amended Section 1306 of the Election Code) and 8 (which added Section 1306-D to the Election Code) of Section 11 of Act 77, which comprise the dating provisions.

In *Stilp*, 905 A.2d at 970, our Supreme Court recognized that Section 1925 of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa.C.S. § 1925, established a presumption of severability applicable to all statutes which "is not merely boilerplate." It provides:

> The provisions of every statute shall be severable. **If any provision of any statute or the application thereof to** any person **or circumstance is held invalid, the remainder of the statute, and the application of such provision to other persons or circumstances, shall not be affected thereby**, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

1 Pa.C.S. § 1925 (emphasis added). The Supreme Court stated that this section, "[t]hus, . . . does not mandate severance in all instances, but only in those circumstances where a statute can stand alone absent the invalid provision." *Stilp*, 905 A.2d at 970. It also "sets forth a specific, cogent standard, one which both

emphasizes the logical and essential interrelationship of the void and valid provisions, and also recognizes the essential role of the Judiciary in undertaking the required analysis." *Id.* Furthermore, because severability "has its roots in a jurisprudential doctrine . . . , the courts have not treated legislative declarations that a statute is severable, or nonseverable, as 'inexorable commands,' but rather have viewed such statements as providing a rule of construction." *Id.* at 972.

Considering the substantive standard in Section 1925 of the Statutory Construction Act and the above principles, we decline to treat Act 77's nonseverability as an "inexorable command" requiring that the entirety of Act 77 be declared void. Stated differently, **we do not strike Act 77 in its entirety and decline Republican Party Intervenors' suggestion that we do so**. Rather, we find that the remainder of Act 77, which enacted a comprehensive scheme of no-excuse mail-in voting that has since been upheld in full as a constitutional exercise of our General Assembly's legislative authority to create universal mail-in voting in *McLinko v. Department of State*, 279 A.3d 539, 582 (Pa. 2022), will not be affected by our ultimate conclusion with respect to the unconstitutionality of strict enforcement of the dating provisions at the expense of disenfranchising voters. *See Stilp*, 905 A.2d at 973 (holding that the legislative unvouchered expense provision determined to plainly and palpably violate the Constitution was severable from the otherwise constitutionality valid remainder of the act at issue); *see also Pa. Fed'n of Teachers*, 484 A.2d at 754 (holding that nonseverability provision inapplicable where act is unconstitutional only as applied to persons who were members of retirement system at time of the enactment, but constitutional as applied to those who became members of the retirement system subsequent to the effective date of

88

the act at issue). Specifically, we observe that nothing in the otherwise valid provisions of Act 77 is "so essentially and inseparably connected with" the dating provisions, nor can we say that the remaining valid provisions of Act 77, "standing alone, are incomplete [or] are incapable of being executed in accordance with the legislative intent" of that Act. *See* 1 Pa.C.S. § 1925. We therefore see no reason to interfere with this comprehensive scheme enacted and amended multiple times by our Legislature since its inception in 2019, which allows voters of this Commonwealth to confidently vote from the comfort of their own homes. For these reasons, we find in our judicial discretion that the nonseverability clause is ineffective, and, accordingly, we will not enforce it under the circumstances of this case. *See Stilp*, 905 A.2d at 977-81 (holding that nearly identical nonseverability provision was "ineffective and cannot be permitted to dictate [the Court's] analysis" and that "enforcement of the clause would intrude upon the independence of the Judiciary and impair the judicial function").

As a final matter, we believe that our decision on nonseverability **preserves** our Supreme Court's decision in *Ball*, 289 A.3d 1, by still technically requiring voters to "fill out, **date** and sign" their absentee and mail-in ballots, and with respect to its statement in that case that county boards retain authority to evaluate absentee and mail-in ballots they receive in all elections for compliance with the Election Code, "including those that fall within the date ranges derived from statutes indicating when it is possible to send out mail-in and absentee ballots[.]" *Ball*, 289 A.3d at 23. In this regard, we observe that this case makes abundantly clear that neither the Election Code nor the Legislature have kept up with all the new technology affecting our manner and method of voting by absentee or mail-in ballots, including the county boards' use of unique barcodes and their scanning of

89

those barcodes into the SURE System, particularly for the past four years and despite the myriad litigation surrounding the dating provisions to date. We believe this new technology renders the dating provisions meaningless, in that it ensures that absentee and mail-in ballots are timely received by qualified electors' county boards, thus negating the need for voters to handwrite the date on their ballots at the expense of possible disenfranchisement. Nevertheless, our narrow holding of unconstitutionality in this case ensures that the county boards retain the discretion to discard ballots that are fraudulent or otherwise determined to be improper for reasons, such as voting outside the deadlines imposed by the Election Code, as contemplated by our Supreme Court's decision in *Ball*.

Because Republican Party Intervenors have not shown they are entitled to relief on this claim as a matter of law, we deny their application and grant Petitioners' application.

## VIII. CONCLUSION

A substantial threat of disenfranchisement based on strict enforcement of the dating provisions still exists today notwithstanding our Supreme Court's decision in *Ball*, and the Secretary's and county boards' continued efforts at making absentee and mail-in voting easier for voters. Petitioners have established a clear right to relief from strict enforcement of the Election Code's dating provisions. "The right to vote, [regarded as] fundamental in Pennsylvania, is irreplaceable, necessitating its protection before any deprivation occurs. Deprivation of the franchise is neither compensable nor reparable by after-the-fact legal remedies, necessitating injunctive and declaratory relief." *See Applewhite*, slip op. at 26. Petitioners also established "greater injury will result from refusing rather than from granting the relief requested." *Kuznik*, 902 A.2d at 504. Moreover, enjoining the dating provisions

90

that are almost incapable of being enforced without resulting in disenfranchisement preserves integrity of elections; contrarily, denying the requested relief would add to the chaos and inconsistent guidance issued by the Secretary, and enforced by the county boards, since Act 77's enactment. *Applewhite*, slip op. at 26.

Accordingly, Petitioners' application for summary relief is granted, in part, to the extent it requests declaratory and permanent injunctive relief as to Count I of the Petition for Review, and dismissed as to Count II, to the extent it seeks alternative relief. Republican Party Intervenors' cross-application for summary relief is denied.

Based on our reasoning set forth above, we declare that strict enforcement of the dating provisions to reject timely submitted but undated or incorrectly dated absentee and mail-in ballots is unconstitutional under the free and equal elections clause and enjoin their strict enforcement to prevent against further disenfranchisement. We also decline to strike Act 77 in its entirety as a consequence of our holding.

Petitioners' Preliminary Injunction Application and Republican Party Intervenors' POs are dismissed as moot.

_____
ELLEN CEISLER, Judge

91

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Black Political Empowerment : 
Project, POWER Interfaith, Make the : 
Road Pennsylvania, OnePA Activists : 
United, New PA Project Education : 
Fund, Casa San José, Pittsburgh : 
United, League of Women Voters of : 
Pennsylvania, and Common Cause : 
Pennsylvania, : 
                         Petitioners : 
                     : 
          v. :      No. 283 M.D. 2024
                     : 
Al Schmidt, in his official capacity as : 
Secretary of the Commonwealth, : 
Philadelphia County Board of : 
Elections, and Allegheny County : 
Board of Elections, : 
                     Respondents :

# **O R D E R**

AND NOW, this 30th day of August, 2024, following oral argument of the parties before an en banc panel of this Court, and upon consideration of parties' filings and arguments contained therein, it is hereby **ORDERED** as follows:

1.    Petitioners' application for summary relief, seeking declaratory and permanent injunctive relief with respect to Count I of their Petition for Review Addressed to the Court's Original Jurisdiction (Petition for Review) is **GRANTED, in part,** to the extent it seeks declaratory and injunctive relief regarding Sections 1306 and 1306-D of the Pennsylvania Election Code,[1] 25 P.S. §§ 3146.6(a) and 3150.16(a)

---

[1] Act of June 3, 1937, P.L. 1333, *as amended*, added by the Act of March 6, 1951, P.L. 3, and the Act of October 31, 2019, P.L. 552, 25 P.S. §§ 2600-3591.

(dating provisions) under the free and equal elections clause set forth in article I, section 5 of the Pennsylvania Constitution, Pa. Const. art. I, § 5. Petitioners' application for summary relief is otherwise **DISMISSED** as to Count II of the Petition for Review, to the extent it seeks alternative relief with respect to interpretation of the dating provisions.

2. The Republican National Committee's and the Republican Party of Pennsylvania's (collectively, Republican Party Intervenors) cross-application for summary relief is **DENIED**.

3. It is hereby **DECLARED** that the Election Code's dating provisions are invalid and unconstitutional as applied to qualified voters who timely submit undated or incorrectly dated absentee and mail-in ballots to their respective county boards, as the dating provisions strict enforcement to reject such ballots burdens the fundamental right to vote guaranteed by the free and equal elections clause set forth in article I, section 5 of the Pennsylvania Constitution, Pa. Const. art. I, § 5.

4. It is further **ORDERED** that Respondents Al Schmidt, in his official capacity as Secretary of the Commonwealth, the Philadelphia County Board of Elections, and the Allegheny County Board of Elections are **PERMANENTLY ENJOINED** from strictly enforcing the dating provisions of the Election Code, which require that electors of the Commonwealth of Pennsylvania date the declaration of the elector printed on the second, or outer, envelope of absentee and mail-in ballots. However, nothing in this Order permanently enjoining strict enforcement of the dating provisions to disenfranchise voters shall

2

preclude the enforcement of the remaining provisions contained within the dating provisions in Sections 1306 and 1306-D of the Election Code that are unrelated to the handwritten date requirement.

5. As prescribed by the Pennsylvania Supreme Court in *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023), county boards of elections retain authority to evaluate absentee and mail-in ballots for compliance with the Election Code, including the dating provisions to ensure that the absentee and mail-in ballots are timely submitted by qualified electors, and thus prevent fraud.

6. Petitioners' Application for Special Relief in the Nature of a Preliminary Injunction, and Republican Party Intervenors' Preliminary Objections, are **DISMISSED AS MOOT**.

ELLEN CEISLER, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Black Political Empowerment Project, :
POWER Interfaith, Make the Road :
Pennsylvania, OnePA Activists United, :
League of Women Voters of :
Pennsylvania, and Common Cause :
Pennsylvania, :
                 Petitioners :
  :
          v. :       No. 283 M.D. 2024
  :       Argued: August 1, 2024
Al Schmidt, in his official capacity as :
Secretary of the Commonwealth, :
Philadelphia County Board of Elections, :
and Allegheny County Board of Elections :
                Respondents :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE MATTHEW S. WOLF, Judge

OPINION NOT REPORTED

DISSENTING OPINION
BY JUDGE McCULLOUGH                FILED: August 30, 2024

Today a majority of a truncated special *en banc* panel of this Court, in untethered and unprecedented fashion, declares unconstitutional the enforcement of innocuous and universally-applicable voter declaration requirements that do not burden the fundamental voting franchise of a single Pennsylvania voter. These voter declaration requirements, which have until now rightfully withstood challenges in both Pennsylvania and Federal courts, fall squarely within the purview of the General Assembly's authority to establish neutral ballot-casting rules for the very

voting processes it has created. Indeed, although there is in Pennsylvania a constitutional right to vote by absentee ballot in some form, there is no constitutional right to vote by mail without excuse, which process was unknown in the Commonwealth for well over two centuries and is wholly a creature of recent, bipartisan legislative grace. Our constitution and our Supreme Court's precedent soundly reserve the authority for establishing neutral procedures to govern both voting mechanisms to the General Assembly. That is, until today.

We are tasked in this original jurisdiction case with determining, quite simply, whether enforcement of the voter declaration requirements clearly, palpably, and plainly violate the Free and Equal Elections Clause[1] of the Pennsylvania Constitution. In other words, we must determine whether they render voting so difficult that they effectively deny the franchise altogether. To thus properly and precisely state the question is to answer it.

In no prior case has this Court or our Supreme Court applied the Free and Equal Elections Clause to declare unconstitutional a provision that regulates the manner and method of casting ballots. Nor has any Pennsylvania court ever applied "strict scrutiny" in considering whether neutral, generally-applicable manner-of-voting regulations enacted by the General Assembly violate the Free and Equal Elections Clause. And yet, to reach its desired end, the Majority today (1) finds jurisdiction where it does not exist, (2) ignores more than a century of sound Pennsylvania Supreme Court precedent interpreting the Free and Equal Elections Clause, (3) applies strict scrutiny without any authority for doing so, (4) accepts Petitioners' invitation to usurp the role of the General Assembly and re-write Act 77

---

[1] Pa. Const. art. I, § 5 ("Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.").

of 2019[2] (Act 77), and, in a twist of tragic irony, (5) voids altogether absentee and mail-in voting in Pennsylvania.

Because I am convinced that the Majority's pronouncements in this case misapply the law and involve a wholesale abandonment of common sense, I respectfully, but vigorously, dissent.

I.     **THIS COURT LACKS SUBJECT MATTER JURISDICTION**

A.     **Respondent Secretary Al Schmidt, the only Commonwealth party, is not indispensable.**

The Majority preliminarily errs by concluding that this Court has subject matter jurisdiction over this action. It does not, for several interrelated reasons. First, this Court lacks subject matter jurisdiction because Secretary Al Schmidt (Secretary) is not an indispensable party. Our original jurisdiction is conferred by Section 761(a)(1) of the Judicial Code, which, relevant here, grants this Court original jurisdiction over civil actions "[a]gainst the Commonwealth government, including any officer thereof, acting in his official capacity." 42 Pa.C.S. § 761(a)(1). "Commonwealth government" is defined as:

> The government of the Commonwealth, including the courts and other officers or agencies of the unified judicial systems, the General Assembly, and its officers and agencies, the Governor, and the departments, boards, commissions, authorities and officers and agencies of the Commonwealth, **but the term does not include any political subdivision, municipal or other local authority, or any agency of any such political subdivision or local authority.**

*Id.* § 102 (emphasis added). To properly exercise jurisdiction under Section 761(a)(1), more is required than merely naming the Commonwealth or one of its

---

[2] Act of October 31, 2019, P.L. 552, No. 77.

officers in a lawsuit. Instead, the Commonwealth or one of its officers must be *indispensable* to the action. *Stedman v. Lancaster County Board of Commissioners*, 221 A.3d 747, 756-57 (Pa. Cmwlth. 2019). A party is indispensable when his or her rights are so intertwined with the claims in the litigation that relief cannot be granted without affecting those rights; in other words, justice cannot be accomplished without the party's participation. *Id.* at 757-58. By contrast, where the Commonwealth party's involvement in the suit is minimal and no relief can be afforded against it, it is not indispensable. *Id.* at 758. The question of indispensability is decided by examining the nature of the claims asserted and the relief sought to determine whether the party has a right or interest related to the claims and essential to their merits such that due process requires the party's participation in the litigation. *Rachel Carson Trails Conservancy, Inc. v. Department of Conservation and Natural Resources*, 201 A.3d 273, 279 (Pa. Cmwlth. 2018).

This Court very recently applied this indispensability standard in *Republican National Committee v. Schmidt* (Pa. Cmwlth., No. 447 M.D. 2022, filed March 23, 2023) (Ceisler, J.) (single-judge op.) (*RNC II*), where the petitioners, who included the Republican Intervenors here, filed a petition for review in the Court's original jurisdiction against then-Acting Secretary Al Schmidt, the Director of the Pennsylvania Bureau of Election Services and Notaries, and all 67 county boards of elections. The petitioners challenged certain "notice and cure" procedures that various county boards of elections had developed to pre-canvass mail-in and absentee ballots to check for voter errors in completing the signature and secrecy envelope requirements set forth in the Pennsylvania Election Code[3] (Election Code).

---

[3] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§ 2600-3591.

*Id.*, slip op. at 2.  The respondents preliminarily objected to this Court's exercise of subject matter jurisdiction, and, in a single-judge opinion, we agreed and dismissed the petition.  Although the petitioners in *RNC II* challenged certain guidance issued by the Secretary regarding election procedures, this Court nevertheless concluded that such guidance did not sufficiently relate to the claims in the case, which centered on procedures developed by county boards.  *Id.* at 20.  This Court concluded:

> [The p]etitioners have not made any claims implicating the duties and responsibilities of the [ ] Secretary under the Election Code . . . .  Although the [ ] Secretary may have a generalized interest in issues surrounding the administration of elections in the Commonwealth and the enfranchisement of voters, generally, the [ ] Secretary's interests in this regard are not essential to a determination of whether some [c]ounty [b]oards are unlawfully implementing notice and cure procedures with respect to absentee and mail-in ballots that are defective under the Election Code.  Further, the [ ] Secretary does not have control over the [c]ounty [b]oards' administration of elections, as the General Assembly conferred such authority solely upon the [c]ounty [b]oards . . . .  Because [the p]etitioners could conceivably obtain meaningful relief with respect to the [c]ounty [b]oards' purportedly unlawful actions without the [ ] Secretary's involvement in this case, the [ ] Secretary is not an indispensable party.

*Id.*, slip op. at 20.

The same rationale applies here. The Secretary's only challenged conduct is the issuance of non-binding guidance that is not mandatory and does not determine whether, or in what circumstances, any county boards of elections count or reject absentee and mail-in ballots that contain an incomplete voter declaration. Indeed, pursuant to the Supreme Court's decision in *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023), the Secretary *may not* issue guidance to county boards instructing them to count such ballots.  Thus, the relief Petitioners seek, namely, a state-wide ban on

enforcement of the voter declaration requirements, can *only* be afforded against county boards of elections. For that reason, the Secretary is not an indispensable party. Because the Secretary is the only Commonwealth officer named as a Respondent, this Court lacks subject matter jurisdiction and should dismiss the Petition for Review.

The Majority's attempt to distinguish *RNC II*'s holding in this regard is wanting. The Majority concludes that *RNC II* is distinguishable because, here, (1) Petitioners name the Secretary as a party with regard to his duties to develop the format of absentee and mail-in ballots and their voter declarations; (2) Petitioners allege that the Secretary has issued inconsistent guidance to county boards in the wake of *Ball*; (3) Petitioners seek relief against the Secretary; and (4) the Secretary will be impacted by our decision. *Black Political Empowerment Project v. Schmidt* (Pa. Cmwlth., No. 283 M.D. 2024, filed August 30, 2024) (MO), slip op. at 46-48. None of these factors establishes the Secretary as an indispensable party.

First, the mere naming of the Secretary as a party avails nothing. Second, the format of mail-in ballots and the required, completed declaration are not at issue in this litigation. Whatever allegations Petitioners may make regarding them are irrelevant. Third, the Secretary's guidance is not binding on county boards of elections and, following *Ball*, any guidance may not as a matter of law direct county boards to count noncompliant ballots. Fourth, the only form of "relief" sought against the Secretary in the Petition for Review is his nominal inclusion in the Prayer for Relief. (Petition for Review, at p. 67.) No specific relief is sought against the Secretary because, as *RNC II* aptly recognized, none can be had. The rationale and holding in *RNC II* therefore is applicable and should be controlling here. Indeed, the

PAM - 6

only meaningful difference between this case and *RNC II* in this regard is the identity of the petitioners.

> **B.  Petitioners cannot maintain an original jurisdiction action against the county boards only.**

By implication, the Court also lacks subject matter jurisdiction over any claims against Respondents Philadelphia County Board of Elections and Allegheny County Board of Elections (County Boards).  This Court addressed this issue in *RNC II*, concluding that county boards of elections are local agencies over which the Court may not independently exercise original jurisdiction.  (*RNC II*, slip op. at 28.) Simply put, without the participation of an indispensable Commonwealth party, there is no case in this Court.

> **C.  Given the Commonwealth-wide relief that Petitioners seek (and that the Majority affords), Petitioners have failed to join 65 indispensable county boards of elections.**

Lastly, even assuming that this Court had original jurisdiction over the County Boards, Petitioners fatally have failed to join all 67 county boards of elections against which they undoubtedly seek relief.  At the core of this case, Petitioners ask this Court to require all county boards of elections across the Commonwealth to count ballots that include an incomplete voter declaration that *Ball*, at least until now, forbade them from counting.  However, and notwithstanding the many allegations in the Petition for Review that reference allegedly aggrieved voters in many other counties, *see, e.g.*, Petition for Review, ¶¶ 4 & n.1, 64, and 76, Petitioners have failed to name any other county boards as Respondents.  Without those boards' participation, the sought relief cannot be had.  Moreover, any injunction granted against only the named County Boards (like the one the Majority enters today) would (and does) create varying standards for determining the legality

of votes across the Commonwealth and potentially subjects all 67 county boards of elections to an Equal Protection Clause[4] challenge. *See, e.g.*, *Bush v. Gore*, 531 U.S. 98, 106-07 (2000).

For all of these reasons, this Court lacks subject matter jurisdiction over Petitioners' claims, which defect mandates dismissal of the Petition for Review.[5]

## II. ENFORCEMENT OF THE VOTER DECLARATION REQUIREMENTS DOES NOT VIOLATE THE FREE AND EQUAL ELECTIONS CLAUSE

Even assuming this Court had jurisdiction to hear this matter, which it does not, Petitioners' claims fail as a matter of law.

### A. The Constitutionality of Legislation is Strongly Presumed.

A party seeking to strike down a statute as unconstitutional must meet an extremely high burden. The starting point is the presumption that "all legislative enactments" are constitutional and "[a]ny doubts are to be resolved in favor of a finding of constitutionality." *Mixon v. Commonwealth*, 759 A.2d 442, 447 (Pa. Cmwlth. 2000); *League of Women Voters v. Commonwealth*, 178 A.3d 737, 801 (Pa. 2018). This presumption of constitutionality is strong. *Mixon*, 759 A.2d at 447. To overcome it, Petitioners **must prove** that the voter declaration requirements "**clearly, palpably, and plainly** violate the [c]onstitution." *League of Women Voters*, 178 A.3d at 801. Pennsylvania legislators are also, of course, charged with knowledge of the Pennsylvania Constitution. As United States Chief Justice John Marshall pointed out in *Marbury v. Madison*, 5 U.S. 137, 179-80 (1803), legislators,

---

[4] U.S. Const. amend. XIV, § 1.

[5] I acknowledge that Petitioners' standing to bring this action originally was challenged by preliminary objection. For purposes of this dissent, I assume without concluding that Petitioners' standing is established.

having taken the same oath as we take, surely are as committed to fidelity to the constitution as are we. Accordingly, we must, without reservation, assume that the drafters of Sections 1306(a) and 1306-D(a) of the Election Code,[6] 25 P.S. §§ 3146.6(a), 3150.16(a), were aware of the Free and Equal Elections Clause.

B. **The Free and Equal Elections Clause guarantees voters equal opportunity and power to elect their representatives; it does not guarantee the counting of ballots that do not comply with neutral and objective ballot-casting rules.**

Originally adopted in 1790, the Free and Equal Elections Clause provides:

> **Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage**.

Pa. Const. art. I, § 5 (emphasis added). Elaborating on the meaning of the Clause, our Supreme Court has opined that

> elections are free and equal within the meaning of the Constitution when they are public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise does not deny the franchise itself[;] and when no constitutional right of the qualified elector is subverted or denied him.

*Shankey v. Staisey*, 257 A.2d 897, 899 (Pa. 1969) (quoting *Winston v. Moore*, 91 A. 520, 523 (Pa. 1914)).

Pennsylvania precedent does not permit regulation of the right to vote in a fashion that denies the franchise, or "**make[s] it so difficult as to amount to a denial.**" *Winston*, 91 A. at 523 (emphasis added). The spirit of the Free and Equal

---

[6] Relevant here, Sections 6 and 8 of Act 77 amended Section 1306, added by Section 11 of the Act of March 6, 1951, P.L. 3, and added Section 1306-D to the Election Code.

Elections Clause "requires that each voter shall be permitted to cast a free and unintimidated ballot." *DeWalt v. Bartley*, 24 A. 185, 186 (Pa. 1892). The framers of the Clause chiefly sought to remedy the "dilution of the right of the people of this Commonwealth to select representatives to govern their affairs based on considerations of the region of the state in which they lived, and the religious and political beliefs to which they adhered." *League of Women Voters*, 178 A.3d at 808-09. Thus, our Supreme Court noted long ago that "free and equal" election laws enacted by the General Assembly must "arrange all the qualified electors into suitable districts[] and make their votes equally potent in the election[] so that some shall not have more votes than others . . . ." *Id.* at 809 (quoting *Patterson v. Barlow*, 60 Pa. 54, 75 (1869)). Laws that "dilut[e] the potency" of an individual's vote relative to other voters therefore will violate the Clause. *Id.*

In keeping with these principles, our courts have applied the Free and Equal Elections Clause to invalidate voting laws only in those instances where the law denied voters the right to cast their vote and have their vote counted. For example, in *Applewhite v. Commonwealth*, 54 A.3d 1 (Pa. 2012), at issue was the initial implementation of a prior version of the voter photo identification (ID) law. *See* Former Section 1210 of the Election Code, *formerly* 25 P.S. § 3050. Various low-income and homeless petitioners sought an injunction against a recently implemented voter identification law, arguing that it would prevent qualified and eligible electors from voting in violation of the Free and Equal Elections Clause because the voters would not have enough time to learn about the law's requirements and obtain the necessary identification. *Applewhite*, 54 A.3d at 4-5. In particular, the question was whether the voters had adequate access to the free ID that the law provided to those who did not have any other qualifying ID. *Id.* The plaintiffs

argued that the voter ID law was being implemented in a manner that denied Pennsylvanians their fundamental right of suffrage under the Free and Equal Elections Clause. *Id.* The Pennsylvania Department of Transportation was requiring an original or certified copy of a birth certificate or its equivalent, along with a social security card and two forms of documentation showing current residency. It was clear that some qualified, low-income and homeless voters would be unable to meet these requirements because they either did not have an adequate opportunity to become educated about the requirements and navigate the process or, because of age, disability, and/or poverty, they would be unable to meet the requirements in time for the upcoming election. The petitioners argued that it was being implemented in a manner that denied Pennsylvanians their fundamental right of suffrage under the Clause. *Id.* This Court denied the injunction, but the Supreme Court reversed the denial and remanded the case so we could consider the issue further. In doing so, the Supreme Court

> agree[d] with [the petitioners'] essential position that if a statute violates constitutional norms [viz., the Free and Equal Elections Clause] in the short term, a facial challenge may be sustainable even though the statute might validly be enforced at some time in the future. Indeed, the most judicious remedy, in such a circumstance, is the entry of a preliminary injunction, which may moot further controversy as the constitutional impediments dissipate.

*Id.* at 5.

On remand, this Court was tasked with considering whether the flaws in the implementation of the voter photo ID law could be cured prior to the election. *Applewhite v. Commonwealth* (Pa. Cmwlth., No. 330 M.D. 2012, filed Jan. 17, 2014) (McGinley, J.) (single-judge op.). Finding that it could not, we enjoined under the

Free and Equal Elections Clause the implementation of the voter ID law because the legislation did not provide for a "non-burdensome provision of a compliant photo ID to all qualified electors." *Id.*, slip op. at 34. We concluded that the law could not stand because the law's identification requirements disproportionately burdened low-income and homeless voters, who were less likely to have a compliant ID and would face difficulty obtaining compliant identification. *Id.*, slip op. Appendix A, at 32-34. Thus, in that situation, this Court held that the voter ID law renders Pennsylvania's fundamental right to vote so difficult to exercise as to cause a *de facto* disenfranchisement. *Id.*, slip op. at 44-45.

Similarly, in *In re New Britain Borough School District,* 145 A. 597 (Pa. 1929), a law was struck down because it, in substance, granted the right to vote to a group of voters while denying it to another group. There, the Supreme Court struck down a legislative act that created voting districts for elective office that had the inadvertent effect of depriving voters in a new borough of their right to vote for school directors. In that case, the legislature created a new borough from parts of two existing townships and created a school district which overlapped the boundaries of the new borough. The law at issue directed that, "when a new school district is hereafter formed by the creation of a new city, borough, or township, the court of common pleas having jurisdiction shall determine and enter in its decree the class of school districts to which such new district shall belong, and shall appoint a board of school directors." *Id.* at 597 (additional quotations omitted). The trial court declared a new school district of the fourth class and appointed a board of school directors in the county in which the district was situated. *Id.* Residents of each of the former townships challenged the constitutionality of the effect of the combination of their former respective school districts under the Free and Equal

Elections Clause, arguing that they had been deprived of their right to select school directors.

The Supreme Court agreed and found that the residents of the two former school districts were effectively denied their right to elect representatives of their choosing to represent them on a body which would decide how their tax monies were spent. The Court noted that the residents of the newly-created school district could not lawfully vote for representatives on the school boards of their prior districts, given that they were no longer legally residents thereof, and they also could not lawfully vote for school directors in the newly created school district, given that the ballot for every voter was required to be the same, and, because the new school district had not been approved, the two groups of borough residents would each have to be given separate ballots for their former districts. *Id.* at 599. In the Court's discussion of the Free and Equal Elections Clause, it noted that the law's effect was to bar the voters in the new district from participating in the election of school directors, when taxpayers in fourth class school districts had that right. *Id.* The Court emphasized that the rights protected by the Free and Equal Elections Clause may not be taken away by an act of the legislature, and that that body is prohibited by this Clause from interfering with the exercise of those rights, even if the interference occurs by inadvertence. *Id*.

The circumstances in *Applewhite* and *In re New Britain*, which impacted the **right** to vote, simply are not present here. Section 1306(a) of the Election Code relates to voting by absentee electors and provides, in relevant part, that an absentee "elector shall . . . **fill out, date and sign the declaration** printed on" the second, or outer, envelope "on which is printed the form of declaration of the elector," among other things. 25 P.S. § 3146.6(a). Section 1306-D(a) similarly

provides, in relevant part, that a mail-in "elector shall . . . **fill out, date and sign the declaration** printed on" the second, or outer, envelope "on which is printed the form of declaration of the elector," among other things. 25 P.S. § 3150.16(a). Petitioners' challenge to the nuts-and-bolts of election administration cannot be equated with state laws that deny equality of voting power, which are the principal types of state actions that the Supreme Court has declared to violate the Free and Equal Elections Clause. The voter declaration requirements are neutral ballot-casting rules governing **how** voters complete their voter declaration and cast their mailed ballots. On their face, the voter declaration requirements, which require the voter to date and sign the declaration, comport with the Free and Equal Elections Clause by granting to every Pennsylvania voter "the same free and equal opportunity" to either vote by mail in compliance with the Election Code **or** vote in person. The Election Code thus carries out the Clause's mandate that all Pennsylvania voters wield "equally effective power to select [their] representative[s,]" so long as they "follow the requisite voting procedures." *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 373 (Pa. 2020) (quoting *League of Women Voters*, 178 A.3d at 809).

Yet, without any legal analysis whatsoever, the Majority summarily posits that applying the voter declaration requirements to exclude undated or misdated ballots restricts the right to vote **to only those voters who correctly handwrite the date** on their declaration and **denies the *right* to vote to those who do not**. In other words, the Majority reckons that the voter declaration requirements **restrict the right to vote to only those voters who comply with the instructions to date their declarations**. This holding is wholly conclusory and contrary to sound reasoning. First, as correctly understood, the Free and Equal Elections Clause does not apply here because Petitioners have not challenged a law that, *de jure* or *de facto*,

**grants the right to vote** to some while **denying the vote to others**. The voter declaration requirements on their face make no distinctions whatsoever and do not grant or deny anyone's right to vote. The analysis can, and should, end here.

To get around this, though, the Majority creates two illusory classes: those who correctly complete their voter declarations and those who do not. The Majority then hastily concludes that the voter declaration requirements make voting so difficult for those who do not properly complete their ballot declarations that they are denied the right altogether, all without conducting any analysis of the **actual difficulty** relative to every other generic and neutral ballot-casting requirement of the Election Code, a comparison that is part of any Free and Equal Elections Clause analysis. To be sure, aside from the simple requirement to complete the declaration itself by adding the date, the Majority identifies no obstacle that blocks or seriously hinders voting.

The Majority likewise fails to consider Pennsylvania's voting system as a whole and the other voting methods made available to voters, a comparison with which is essential to assessing any alleged difficulty imposed on voting. As I explain below, to properly assess the difficulty imposed by the voter declaration requirements, we must consider the totality of the circumstances to determine if the requirements' **objective** difficulty denies the franchise. As I will demonstrate, the only sound conclusion in this respect is that voters who **choose** to vote by mail and fail to date their voter declarations labor under no unconstitutional difficulty and have the same right to vote as every other voter.

C. **The voter declaration requirements do not make voting so difficult that they effectively deny the franchise.**

1. **The totality of the circumstances should be considered.**

To reiterate: disenfranchisement under the Free and Equal Elections Clause means the denial of an **equal opportunity to participate in the electoral process** that thereby precludes an individual from exercising his or her **rights** to vote and have the vote counted. Judged by **this** test, enforcement of the voter declaration requirements cannot be invalidated on the grounds that they offend the Free and Equal Elections Clause.

First, the voter declaration requirements do not deny any qualified electors the right to vote. **By operation** they treat alike all voters who choose to vote by mail, and in **substance** impose no classifications. Any purported classification between those who comply with the requirements and those who do not has been created out of whole cloth. The requirements are facially neutral because they require **all** mail-in and absentee voters, regardless of their age, race, sex, religion, or creed, to place a date next to the signature on their ballot declaration. In my view, also critical to the analysis is the fact that Pennsylvania provides multiple ways to vote—not just by mail. Our citizens are free to cast their vote for their candidate of choice by mail-in, absentee, **or** in-person vote. Where a voter fails to comply with a ballot-casting rule that applies to only a subset of these methods, discounting that voter's ballot does not constitute an abridgment of the right to vote when the voter could have easily avoided the requirement.

In *Brnovich v. Democratic National Committee*, 594 U.S. 647 (2021), the United States Supreme Court considered a challenge to the Democratic National Committee (DNC)'s challenges to two of three methods of voting in Arizona under the Voting Rights Act of 1965 (VRA)[7]: precinct-voting on election day and early

---

[7] 42 U.S.C. §§ 10101-10702.

PAM - 16

mail-in voting.[8]  In Arizona, if a voter votes in the wrong precinct, the vote is not counted.  For Arizonans who vote early by mail, Arizona makes it a crime for any person other than a postal worker, an elections official, or a voter's caregiver, family member, or household member to knowingly collect an early ballot—either before or after it has been completed.  *Id.* at 661-62.  The DNC and certain affiliates filed suit, alleging, *inter alia*, that Arizona's refusal to count ballots cast in the wrong precinct and its ballot-collection restriction had an adverse and disparate effect on Arizona's American Indian, Hispanic, and African American citizens in violation of Section 2(a) of the VRA, 52 U.S.C. § 10301(a).[9]  *Id.* at 662.

---

[8] Arizona also permits voters to vote at a "voting center" in their county of residence. That aspect of voting was not challenged.

[9] The VRA provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in [S]ection 10303(f)(2) of this title, as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this [S]ection establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

The U.S. Supreme Court, looking at the "the totality of circumstances," identified certain guideposts that can help courts decide Section 2 cases. I believe those may be helpful here because both Section 2 of the VRA and our Free and Equal Elections Clause (1) concern counting votes, (2) require a showing that the political processes leading to an election are not equally open to all voters, and (3) require a showing that that some voters have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. *See* 52 U.S.C. § 10301(b). One of the guideposts identified as useful by the U.S. Supreme Court in deciding Section 2 equal openness cases (which I submit is applicable to other time, place, or manner-of-casting-ballots vote denial cases) was to examine "the opportunities provided by the State's entire system of voting." *Id.* at 671. Justice Alito, delivering the opinion of the Court, explained that

> courts must consider the opportunities provided by a State's **entire system of voting when assessing the burden imposed by a challenged provision**. This follows from [Section] 2(b)'s reference to the collective concept of a State's "political processes" and its "political process" **as a whole**. Thus, **where a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means**.

*Id.* (emphasis provided).

With regard to Arizona's out-of-precinct policy, the *Brnovich* Court concluded that even if it is marginally harder for Arizona voters to find their assigned polling places, the State offers other easy ways to vote:

> Any voter can request an early ballot without excuse. Any voter can ask to be placed on the permanent early voter list so that an early ballot will be mailed automatically. Voters may drop off their early ballots at any polling place, even one to which they are not assigned. And for nearly a month

before election day, any voter can vote in person at an early voting location in his or her county.

*Id.* at 680. Regarding the alleged burden caused by Arizona's ballot-collection restriction, the Court considered that there were other means of voting:

Arizonans who receive early ballots can submit them by going to a mailbox, a post office, an early ballot drop box, or an authorized election official's office within the 27-day early voting period. They can also drop off their ballots at any polling place or voting center on election day, and in order to do so, they can skip the line of voters waiting to vote in person.

*Id.* at 683.

In the end, the Court, considering several other guideposts, *see infra*, upheld Arizona's rules. Taking instruction from *Brnovich*, I believe we must consider the totality of the circumstances by looking at our political process as a whole, when deciding if the voter declaration requirements of the Election Code are so difficult so as to amount to the denial to vote under the Free and Equal Elections Clause. Like Arizona, Pennsylvania makes it very easy to vote and provides multiple ways to do so. Voters may cast their votes on Election Day in person. All qualified voters can vote by mail without providing a specific reason for not being able to vote in person on Election Day.[10] Voters who are unable to be present in their election district on Election Day due to duties, business, occupation, or physical incapacity can vote via absentee ballots.[11] An elector may legally receive assistance in filling out the absentee ballot if the elector has a physical disability that "renders

---

[10] Section 1301-D(a) of the Election Code, added by Act 77, 25 P.S. § 3150.11(a).

[11] Section 1306-D(a) of the Election Code, 25 P.S. § 3150.16(a).

him unable to see or mark . . . the ballot."[12] These methods provide Pennsylvania voters with multiple options to exercise their right to vote, accommodating varying needs and circumstances. The "difficulty" of the mail-in vote procedures must be considered in light of these other options. Any voter may **avoid** the voter declaration requirements by selecting in-person voting. The voter declaration requirements affect only one method of voting among several. All electors are **not** subject to the requirement to sign and date a voter declaration. The voter declaration requirements cannot violate the Free and Equal Elections Clause **merely because a voter chooses not to take advantage of the other avenues available to cast his or her ballot that do not involve having to sign and date a declaration.**

Every electoral law and regulation necessarily has some impact on the right to vote. The U.S. Supreme Court recognized as much in *Burdick v. Takushi*, 504 U.S. 428 (1992), observing that "[e]lection laws will invariably impose some burden upon individual voters." *Id.* at 433. However, not every election requirement rises to the level of a burden that seriously blocks or hinders the right to vote. Indeed, our Supreme Court has already resolved that the voter declaration requirements do not "make it . . . difficult" to vote, let alone "so difficult as to amount to a denial" of "the franchise." *See Pennsylvania Democratic Party* (rejecting as invalid a claim under the Free and Equal Elections Clause based exclusively on any "difficulty" created by a voter's noncompliance with minor and neutral ballot-casting rules specifically with regard to absentee and mail-in voting) (discussed more fully *infra*).

In *Brnovich*, the U.S. Supreme Court identified another "guidepost" that is useful in considering the measure of the burden imposed which involves

---

[12] Section 1306.1 of the Election Code, added by the Act of August 13, 1963, P.L. 707, 25 P.S. § 3146.6a.

comparison between the challenged law's burden and the "usual burdens of voting." It explained that

> the concepts of 'open[ness]' and 'opportunity' connote the absence of obstacles and burdens that block or seriously hinder voting, and therefore the size of the burden imposed by a voting rule is important. After all, **every voting rule imposes a burden of some sort. Voting takes time and, for almost everyone, some travel, even if only to a nearby mailbox. Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules. But because voting necessarily requires some effort and compliance with some rules, the concept of a voting system that is "equally open" and that furnishes an equal "opportunity" to cast a ballot must tolerate the "usual burdens of voting."** *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 198 . . . (2008) (opinion of Stevens, J.).

594 U.S. at 669 (emphasis added).

The *Brnovich* Court concluded that neither Arizona's out-of-precinct rule nor its ballot-collection law exceed the usual burdens of voting. With regard to the out-of-precinct law, it concluded that "[h]aving to identify one's own polling place and then travel there to vote does not exceed the 'usual burdens of voting.'" *Id.* at 678. It found those tasks to be the "quintessential examples of the usual burdens of voting" and "unremarkable burdens." *Id.* at 678. With regard to the ballot-collection law, it reasoned,

> Arizonans who receive early ballots can submit them by going to a mailbox, a post office, an early ballot drop box, or an authorized election official's office within the 27-day early voting period. They can also drop off their ballots at any polling place or voting center on election day, and in order to do so, they can skip the line of voters

waiting to vote in person. **Making any of these trips— much like traveling to an assigned polling place—falls squarely within the heartland of the "usual burdens of voting**."

*Id.* at 683.

Here, when compared to the usual burdens of voting, the unremarkable requirement to date one's voter declaration **in the space provided** when using the mailed ballot option cannot conceivably be deemed to exceed the "usual burdens of voting." In fact, this mundane task **is a quintessential example** of the "usual burdens of voting." All voting procedures place some burdens on voting. Voting in person is itself burdensome to many; it requires voters to be at the polling place by 8:00 p.m. on Election Day—which is a workday and not a national holiday. The burdens of voting in person include finding a method to transport oneself to a polling place during the voter's off hours on Election Day and waiting in line to vote, by a deadline set by statute. *League of Women Voters of Delaware v. Department of Elections*, 250 A.3d 922 (Del. 2020) (requirement that absentee and mail-in ballots be received by Election Day did not violate Delaware's free and equal elections clause). Based on my evaluation of these relevant factors in context of the totality of the circumstances, I conclude that the voter declaration requirements of the Election Code are not even remotely in violation of our Free and Equal Elections Clause.

**2. The Voter Declaration Requirements are ballot-casting requirements that do not affect voter eligibility.**

Without question, the legislature has the power to provide a standard for completing the voter declaration. The requirement to complete an attestation or declaration to accompany mailed ballots is a statutory question for policymakers, rather than a constitutional question for the judiciary. The Commonwealth "may

enact substantial regulation containing reasonable, non-discriminatory restrictions to ensure honest and fair elections that proceed in an orderly and efficient manner." *Banfield v. Cortes*, 110 A.3d 155, 176-77 (Pa. 2015). Indeed, "[t]he right to vote is the right to participate in an electoral process that is **necessarily structured to maintain the integrity of the democratic system**." *Burdick*, 504 U.S. at 441 (emphasis added).

It is also axiomatic that "[t]he judiciary may not sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceeds along suspect lines." *Mercurio v. Allegheny County Redevelopment Authority*, 839 A.2d 1196, 1203 (Pa. Cmwlth. 2003) (internal citations omitted); *see also Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963) ("Courts do not substitute their social and economic beliefs for the judgment of legislative bodies, [which] are elected to pass laws."). Indeed, courts should be cautious before: "**swoop[ing] in and alter[ing]** carefully considered and democratically enacted state election rules when an election is imminent. That important principle of judicial restraint not only prevents voter confusion but also prevents election administrator confusion—and thereby protects the State's interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election." *Democratic National Committee v. Wisconsin State Legislature*, 141 S. Ct. 28, 31 (2020) (Roberts, C.J., concurring) (emphasis added).

Like the U.S. Supreme Court, our Supreme Court has faithfully adhered to the rule of legislative primacy to set ballot-casting rules. It has never used the Free and Equal Elections Clause to strike down a neutral ballot-casting rule governing how voters complete and cast their ballots. In *Pennsylvania Democratic*

PAM - 23

*Party*, 238 A.3d at 372-80, our Supreme Court expressly upheld against Free and Equal Elections Clause challenges to the declaration mandate—of which the date requirement is part—and the secrecy-envelope rule. In so doing, our Supreme Court recognized that "[w]hile the Pennsylvania Constitution mandates that elections be 'free and equal,' it leaves the task of effectuating that mandate to the [l]egislature." *Id.* at 374.

Long ago, in *Winston*, the Supreme Court warned against undue judicial encroachment upon the General Assembly's prerogative to establish election procedures:

> The power to regulate elections is a legislative one, and has been exercised by the General Assembly since the foundation of the government. Legislation may be enacted which regulates the exercise of the elective franchise, and does not amount to a denial of the franchise itself. . . . [B]allot and election laws have always been regarded as peculiarly within the province of the legislative branch of government, and should never be stricken down by the courts unless in plain violation of the fundamental law.

91 A. at 455 (citations omitted). The *Winston* Court also reminded Pennsylvania jurists that separation of powers principles are of particular import in election matters:

> [i]f it were our duty to make the law, no doubt some of its provisions would be written differently; but we cannot declare an act void because in some respects it may not meet the approval of our judgment, or because there may be difference of opinion as to its wisdom upon grounds of public policy. Questions of this character are for the [General Assembly] and not for the courts. If the restrictions complained of in this proceeding are found to be onerous or burdensome, the [General Assembly] may be appealed to for such relief, or for such amendments, as the people may think proper to demand.

PAM - 24

*Id.* at 462-63.   Further,

> [t]he legislature has from time to time passed various laws to regulate elections. The object has always been to protect the purity of the ballot. It is too late to question the constitutionality of such legislation, so long as it merely regulates the exercise of the elective franchise, and does not 'deny the franchise itself.' *See, also Patterson v. Barlow*, 60 Pa. 54. Abundance of authority might be cited, were it necessary. **The test is whether such legislation denies the franchise, or renders its exercise so difficult and inconvenient as to amount to a denial.**

*DeWalt*, 24 A. at 186 (emphasis added).

Our Supreme Court has routinely declined to find a constitutional violation where the law at issue merely **regulates the exercise of** the elective franchise and does not deny or dilute the franchise itself.  Justice Todd emphasized this recently in *League of Women Voters*, 178 A.3d at 809, noting that the Court has "infrequently relied on this provision to strike down acts of the legislature pertaining to the conduct of elections."

For example, in *Working Families Party v. Commonwealth*, 209 A.3d 270, 271 (Pa. 2019), our Supreme Court rejected a Free and Equal Elections Clause challenge specifically because certain election rules, which in some sense **impacted** elections, nevertheless did not deprive any voters of either the *right* to vote or equal **power** to elect the representatives of their choice.  In *Working Families Party*, the Court considered the constitutionality of provisions of the Election Code that prohibit fusion, the process by which two or more political organizations place the same candidate on the ballot in a general election for the same office.  In rejecting the Free and Equal Elections Clause challenge to the anti-fusion provisions, the Court determined:

The overarching objective of [the Free and Equal Elections Clause] of our constitution is to prevent dilution of an individual's vote by mandating that the power of his or her **vote** in the selection of representatives be equalized to the greatest degree possible with all other Pennsylvania citizens. Viewed from this perspective, [the a]**ppellants have not established that their votes were diluted by the ban against cross-nomination.** Here, Appellants had the **opportunity to support and vote for the candidate of their choice** in the 2016 general election. In no sense were their votes diluted by the fact that Rabb appeared on the ballot only as the candidate of the Democratic Party. **Here, [the a]ppellants had "the same right as every other voter," and thus the foundational principle underlying Article I, [s]ection 5 is not offended.** *See Winston,* 91 A. at 523.

*Id.* at 282 (emphasis added). *Working Families Party* makes clear, then, that procedural voting rules violate the Free and Equal Elections Clause only when they, in effect, offend its central purpose to prohibit (1) the outright denial of the **opportunity** or **right** to vote and (2) the inequitable dilution of particular voters' power to vote for the candidate of their choice.

I also find *Scribner v. Sachs*, 164 N.E.2d 481 (Ill. Sup. 1960) to be instructive on this point. There, a statutory election provision expressly stated that voters must mark their paper ballots by making a cross (x) in the space next to the candidate of their choice. In concluding that the requirement did not violate the state's free and equal elections clause, the court noted that the state constitution left to the legislature the manner of holding an election. It reasoned that

millions of electors cast their votes on proposed amendments and the possible symbols or words that could be used to express their intent is numberless. There are thousands of election officials who must interpret such symbols and words, and what may be clear to one official

may be ambiguous to another. Therefore, it is necessary as well as usual and ordinary for the legislature to provide some standard for marking the ballot in order to prevent fraud and to [e]nsure uniformity as to which ballots are to be counted. We cannot, therefore, accept contestants' argument that the legislature has no power . . . to provide for the method of marking a ballot when a proposed amendment is submitted to the electors.

It is also argued that to require a [(x)] in voting on a proposed constitutional amendment violates section 18 of article II of the Illinois constitution which provides for free and equal elections, that it creates an unreasonable interference with a citizen's privileges and immunities . . . . This argument is based on the premise that the legislature, by giving effect to a ballot marked only with a [(xx)], is discriminating against and giving less influence to the ballot marked with a check or 'yes.'

As we have indicated the legislature has the power to provide a standard for marking a ballot. The standard set by the legislature is to mark the ballot with a [(x)]. **This requirement is applicable to all voters. There is no question of equal protection, due process, greater influence, et cetera, until a voter has failed to follow the standard set by the legislature. At this point it is not the statute that produces the result of which the contestants complain but the act of the voter in not following the definite and unambiguous standard set by the legislature**.

*Id.* at 491.

Here, the voter declaration requirements simply require a voter to sign and date his/her voter's declaration. This **requirement** is **applicable equally** to all voters. There is no question of the denial of the franchise, inequality, greater influence, or difficulty, etc., **until a voter has failed to follow the standard set by the legislature**. All voters have **the same opportunity** to vote by mail and to

comply with the simple rule to date the declaration. At this point it is not the Election Code provisions that produce the result of which Petitioners complain, but, rather, it is the act of the voter in not following the definite and unambiguous standard set by the legislature.

**3. A voter does not suffer constitutional harm when his or her ballot is rejected because he failed to follow ballot-casting rules enacted by the General Assembly.**

The Majority merely assumes, without elaboration, that a voter necessarily suffers constitutional harm when his/her ballot is rejected because he/she failed to follow the regulation for whatever reason. Unlike the Majority, I do not equate a voter's failure to comply with a simple ballot-casting rule with a deprivation of that voter's free and equal **opportunity** to select his or her representatives. Our Supreme Court has held that a voter does not suffer constitutional harm when his ballot is rejected because he failed to follow the rules the General Assembly enacted for completing or casting it. In *Pennsylvania Democratic Party*, our Supreme Court already upheld the mandatory application of the **entire** declaration mandate for mail ballots—which encompasses the "fill out, date, and sign" requirements—without requiring an opportunity to cure. 238 A.3d at 372-74 (quoting 25 P.S. §§ 3146.6(a), 3150.16(a) (emphasis added). As Justice Baer, speaking for the Court explained, **the Free and Equal Elections Clause does not require counting mail ballots that "voters have filled out incompletely or incorrectly,"** even where voters have committed only "minor errors" on the declaration. *Id.* at 374 (emphasis added). Justice Baer went on to explain that

> **so long as a voter follows the requisite voting procedures, he or she will have an equally effective power to select the representative[s] of his or her choice,**

which is all the Free and Equal Election Clause guarantees. *Id.* at 373 (emphasis added).

In *Pennsylvania Democratic Party*, the Supreme Court rejected the petitioner's argument that minor technical errors, such as not completing the voter declaration or using an incorrect ink color to complete the ballot should not be used to disenfranchise voters. There, petitioner argued, *inter alia*, that the lack of an opportunity to cure such facial defects impeded the right to vote. The petitioner relied upon the Free and Equal Elections Clause to contend that "[t]echnicalities should not be used to make the right of the voter insecure." 238 A.3d at 372. The Supreme Court rejected the argument, concluding that "the [e]lection [b]oards are not required to implement a 'notice and opportunity to cure' procedure for mail-in and absentee ballots that voters have filled out incompletely or incorrectly." *Id.* at 374. The Supreme Court reasoned that the Free and Equal Elections Clause is violated where "application of the statutory language to the facts of [an] unprecedented situation results in an as-applied infringement of electors' right to vote," **but not where "a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of [Election Code] requirements[.]"** *Id.* at 362, 374 (emphasis added). In making this determination, and heeding its own cautionary admonitions from *Winston*, the Court explained:

> **While the Pennsylvania Constitution mandates that elections be "free and equal," it leaves the task of effectuating that mandate to the [l]egislature**. As noted herein, although the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the notice and opportunity to cure procedure sought by [the p]etitioner. **To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a**

PAM - 29

**notice and opportunity to cure procedure to alleviate that risk is one best suited for the [l]egislature.**

*Id.* (emphasis added) (some internal quotations and citations omitted). Thus, the Pennsylvania Supreme Court already has rejected as invalid any claim under the Free and Equal Elections Clause based exclusively on any "difficulty" created by a voter's noncompliance with minor and neutral ballot-casting rules specifically with regard to absentee and mail-in voting. This portion of *Pennsylvania Democratic Party* is controlling here and should have concluded the Majority's analysis. But the Majority does not mention, let alone apply, the Pennsylvania Supreme Court's rationale in this respect.

4. **The Voter Declaration Requirements do not implicate voting eligibility—the "right" to vote.**

Contrary to the Majority's assessment, Petitioners' constitutional challenge implicates only the opportunity to vote **by mail**–not the more fundamental eligibility to vote. As Intervenors correctly point out, the right to vote in any particular manner is not absolute. *See Burdick.* The voters' **choice** not to participate in the opportunities Pennsylvania provides, other than by mail, is, at least in part, the cause of their inability to vote – not the voter declaration requirements themselves.

In derogation of all of the above, the Majority has somehow resolved that requiring the voter **to complete his attestation/declaration** and discounting his/her ballot if he/she fails to do so implicates the Free and Equal Elections Clause because it significantly interferes with the fundamental right to vote. However, I am not persuaded that the requirement to date one's voter declaration is unconstitutional because I disagree that the Free and Equal Elections Clause confers a constitutionally protected right to cast an incomplete ballot. The precedent is clear that it does not.

A full consideration of the challenged voter declaration requirements of the Election Code in context demonstrates that counting an incomplete ballot was not intended by the legislature.

As to the validity of the ballot, the Election Code requires that the voter's declaration be in a particular form, which includes that it be dated and signed. The requirement to date the declaration is an integral part of the voter's attestation, *i.e.*, his/her affirmation that he/she is qualified to vote, and that the ballot inside the envelope represents his/her election choices. It is *prima facie* evidence that the declaration was properly executed on the date stated. In *In re Nov. 3, 2020 General Election*, 240 A.3d 591 (Pa. 2020), our Supreme Court described the voter's declaration as a necessary confirmation that the voter who votes by mail is qualified to vote, and that he/she has not already voted in the election. The voter's declaration accompanies the mailed-in vote as a type of attestation, or oath. Justice Todd recognized that signing and dating one's voter declaration is comprised of both the signature and date:

> The **voter's declaration** is a pre-printed statement required to appear on the ballot return envelope containing a voter's absentee or mail-in ballot declaring: that **the voter is qualified to vote the ballot enclosed in the envelope, and that the voter did not already vote in the election for which the ballot was issued**. 25 P.S. § 3146.2. **The declaration also contains lines for the voter to print his or her name and address, a space for the voter to sign his or her name or make a mark if unable to sign, and a space for the voter to enter the date on which he or she executed the declaration.** *Id.* § 3146.6.

240 A.3d at 595 n.4 (emphasis added).

In *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 General Election*, 241 A.3d 1058, 1065 (Pa. 2020), the Supreme Court again regarded the declaration as an oath or affirmation, explaining that a signed voter declaration, attests, on pain of criminal penalty,[13] that the elector, *inter alia*, (1) is qualified to vote from the stated address; (2) has not already voted in the election; and (3) is qualified to vote the enclosed ballot.

The requirement to sign and date documents is deeply rooted in legal traditions that prioritize clear and consensual agreements, ensuring that all parties are aware of and agree to the terms at a specific time. The purpose of signing a document is to authenticate it, which means to verify that it comes from the person whose name is signed and to confirm that the signer agrees to the contents or obligations stated within the document. It is part of the authentication process. Including the date next to one's signature confirms the act of subscription and is as important as the signature itself in the declaration. It is all part of the same transaction, *i.e.*, declaring that the ballot cast by the particular voter is valid. When we strip the date from the signature and consider it in isolation, we distort the significance of the declaration itself. For that reason, I take issue with the Majority's focus on whether the date, divorced from the rest of the voter declaration requirements, has any purpose **to the election boards**. The Majority accepts

---

[13] *See* Section 1853 of the Election Code, added by the Act of January 8, 1860, 25 P.S. § 3553 ("If any person shall sign an application for absentee ballot, mail-in ballot or declaration of elector on the forms prescribed **knowing any matter declared therein to be false, or shall vote any ballot other than one properly issued to the person, or vote or attempt to vote more than once in any election for which an absentee ballot or mail-in ballot** shall have been issued to the person, or shall violate any other provisions of Article XIII or Article XIII-D of this act, the person **shall be guilty of a misdemeanor of the third degree,** and, upon conviction, shall be sentenced to pay a fine not exceeding two thousand five hundred dollars ($2,500), or be imprisoned for a term not exceeding (2) years, or both, at the discretion of the court.") (emphasis added).

PAM - 32

Petitioners' contention that the date aspect of the voter declaration requirements serves no purpose. By couching it in such terms (no need to **date "the ballot"** because timeliness of mail ballots is established through the county board's scanning of a unique barcode), it allows Petitioners to steer the focus on the usefulness or uselessness of the **date of the ballot to the election boards,** when that really is not the issue at all. Asking and answering the question of whether the date "of the ballot" is useful to the **election boards** is misguided. The date is an integral part of the voter's attestation, *i.e.*, his/her declaration that he/she is qualified to vote, and that the ballot inside the envelope represents his/her choices. The date requirement must be considered in that context, not in isolation or in a vacuum, which is exactly what Petitioners and the Majority do when they conclude that "the date of the ballot," by itself, is meaningless to the election boards. **The question is not whether "the date of the ballot," by itself, is meaningless to the election boards, rather, the question in a Free and Equal Elections Clause analysis is whether the requirement to complete a voter declaration, which, of necessity, includes both the signature and date, is "so difficult as to amount to a denial."** *League of Women Voters*, 178 A.3d at 810. Because the date of one's signature is integral to, and part and parcel of, the voter's declaration, the only way to determine its purpose is to consider it in that proper context.

Signing and dating a voter declaration that must accompany a mailed vote is a commonsense procedural necessity, and it amounts to nothing more than a normal and usual step required to vote in Pennsylvania. As I stated above, this familiar task is no more of an imposition than is the exercise of the franchise itself, which can involve waiting in long lines and traveling distances in order to personally cast a ballot on Election Day. The responsibility of the voter is simply to fill out

his/her declaration correctly. It is neither a restraint nor a restriction. It is just one step, of several, that a voter must take in order to vote by mail. The evidence shows that the vast majority of Pennsylvania voters have met that burden and cast their ballots in our elections.

I cannot fathom how it could be considered unconstitutional to discount a ballot **that has an incomplete voter attestation**. No reasonable person would find the obligation to sign and date a declaration to be difficult or hard or challenging. Just like placing the ballot in a secrecy envelope, requiring a completed declaration does not translate into a constitutional violation. *See Pennsylvania Democratic Party*, 238 A.3d at 372-80. Unlike a vote made in person, mail-in and absentee ballots are not face-to-face; no identification is required. The only way to establish the authenticity of one's mailed ballot is to complete the voter declaration by signing and dating it. To say that requiring the voter to complete his/her declaration by including a date is so difficult as to deny one the right to vote, is to find that there can be no reasonable procedures for verification of any vote cast not in person whatsoever.

In order to function properly, elections must have rules, including ballot-casting rules. "The right to vote is the right to participate in an electoral process that is **necessarily structured to maintain the integrity of the democratic system**." *Burdick*, 504 U.S. at 441. As our Supreme Court recognized long ago, the right of suffrage may not be impaired or infringed upon in any way except through fault of the voter himself. *Appeal of Norwood*, 116 A.2d 552 (Pa. 1955). That is precisely what happened here. A subset of voters simply failed to follow the requisite voting procedures. That does not amount to a violation of the Free and Equal Elections Clause. Our Supreme Court has made clear time and again, the

judiciary may not disregard those rules, rewrite them, or declare them unconstitutional simply because a voter failed to follow them and, accordingly, had his or her ballot rejected. Justice Wecht wrote in *2020 Canvass*, "[a] court's only 'goal' should be to remain faithful to the terms of the statute that the General Assembly enacted, employing only one juridical presumption when faced with unambiguous language: that the legislature meant what it said." 241 A.3d at 1082 (Wecht, J., concurring and dissenting) (emphasis in original). We must adhere to that precept.

Nevertheless, in an effort to portray voter declaration requirements as being "so difficult as to amount to a denial," Petitioners point to **the number** of ballots discounted for lack of a date. However, Petitioners' argument is incomplete because they fail to support these figures with any relativeness. They provide no meaningful comparison that I believe is necessary to assess the burden or difficulty posed by the rule.

According to the figures relied upon by Petitioners, "10,657" mail ballots were not counted in the 2022 general election due to noncompliance with the date requirement. *See* Pet. Ex. 1 ¶¶ 8-9 (relying on data analysis by a lawyer advocating for invalidation of date requirement in parallel federal challenge). But that represents only 0.85% of the 1,258,336 mail ballots returned statewide in the 2022 general election.[14] **That is not even 1%. A requirement that over 99% of mail voters complied with cannot be "so difficult as to amount to a denial" of the "franchise."** *League of Women Voters*, 178 A.3d at 810.

___

[14] *See* U.S. Election Administration Commission, Election Administration and Voting Survey 2022 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 118th Congress at 45, 47, https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_Report_508c.pdf (last visited August 22, 2024).

Moreover, this 0.85% noncompliance rate is actually lower than the historic noncompliance rate under the secrecy-envelope requirement.[15] Thus, because the secrecy envelope requirement does not violate the Free and Equal Elections Clause, *see Pennsylvania Democratic Party*, 238 A.3d at 376-80, the Majority is hard-pressed to conclude that the date requirement alone does.

Notably, the figures Petitioners rely on also show that the rate of noncompliance with the date requirement decreased in the 2024 primary elections. According to those figures, only 0.21% (4,000 out of 1,900,000) of all ballots submitted and only **0.56%** of all mail ballots submitted (4,000 out of 714,315) in those elections were rejected due to an incorrect or missing date. *See* Pet. ¶¶ 70, 73 and Exhibit A. Based on Petitioners' own figures, the vast majority of Pennsylvania mail voters therefore again complied with the date requirement. So, I am loath to conclude, as the Majority has, that the raw numbers establish a *per se* burden for purposes of the Free and Equal Elections Clause, especially here where the number of ballots discounted represented less than 1% of the total votes.

Additionally, pointing to the 10,000 ballots that were discounted for lack of a date on the declaration as *per se* evidence of the difficulty of complying with voter declaration requirements, without knowing the number of ballots discounted because they were not **signed**, is an unfair assumption. If the number of ballots discounted as unsigned equals or exceeds the number of ballots discounted for a lack of a date, then, the number of ballots discounted as undated cannot be proof that the dating requirement "make[s] it so difficult [to vote] as to amount to a

---

[15] *See* MIT Election & Science Lab, How Many Naked Ballots Were Cast in Pennsylvania's 2020 General Election? (statewide rejection rate for noncompliance with secrecy-envelope requirement around 1%), https://electionlab.mit.edu/articles/how-many-nakedballots-were-cast-Pennsylvanias-2020-general-election. (last visited August 24, 2024).

denial" of "the franchise" under the Free and Elections Clause. Without that data we cannot possibly conclude that the number of ballots discounted for a lack of a date is disproportionate to the number of ballots discounted for lack of a signature – which **no one** contends is so difficult so as to amount to a denial of the right to vote.

Rather, the standard under the Free and Equal Clause requires Petitioners to demonstrate objectively how the voter declaration requirements interfere with the right to vote. Petitioners offer no evidence or argument as to why or how adding a date to one's voter declaration is difficult let alone "so difficult as to amount to a denial" of "the franchise." Instead, they argue that unconstitutional difficulty is **impliedly** demonstrated by the raw numbers of ballots that were not counted in the past election **due to noncompliance** with the date requirement, which they characterize as a "large section of intelligent voters." *Black Political Empowerment v. Schmidt*, __ A.3d __, at __ (Pa. Cmwlth., No. 283 M.D. 2024, filed ___) slip op. at 81. They ask us to conclude that because this subset of voters' ballots were discounted because their declaration was undated, then the requirement **must,** consequently, be difficult. The Majority adopts Petitioners' unique "if then" analysis as the standard for evaluating a law's burdens, but it fails to articulate a coherent constitutional threshold—a point at which such a likelihood renders state voting practices unconstitutional. The Majority provides no framework whatsoever for determining when the numerical differences that are unavoidable in the election setting become constitutionally problematic. It seems to me that the Majority was swayed by the **raw numbers** and avoided applying the true test for evaluating a Free and Equal Elections Clause claim. However, as I just pointed out, the raw numbers do not tell the whole story. Clearly, **the raw numbers** were the whole impetus of, and basis for, this lawsuit. In my view, Petitioners have failed to meet their

PAM - 37

extremely high burden of demonstrating that the voter declaration requirements "clearly, palpably, and plainly violate[] the Constitution." *League of Women Voters*, 178 A.3d at 801.

In *Brnovich*, the U.S. Supreme Court, analyzing Section 2 of the VRA, (the objectives of which are similar to the Free and Equal Elections Clause), cautioned against relying on the **mere** fact that there is some difference in impact, without conducting any meaningful comparison. It explained that

> the mere fact there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote. The size of any disparity matters. And in assessing the size of any disparity, **a meaningful comparison is essential**. What are at bottom very small differences should not be artificially magnified.

594 U.S. at 671 (emphasis added). **"A policy that appears to work for 98% or more of voters to whom it applies—minority and non-minority alike—is unlikely to render a system unequally open."** *Id.* at 680 (emphasis added).

Moreover, as one court, engaged in a burden measuring analysis (albeit in context of a Fourteenth Amendment Equal Protection Clause analysis), explained, "[z]eroing in on the abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst." *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016). Yet, this is exactly what the Majority has done here. It is contrary to the Supreme Court's Free and Equal Elections Clause jurisprudence, which turns on the objective burden imposed on **all** voters by the challenged rule—*i.e.*, whether the challenged rule "make[s] [voting] so difficult as to amount to a denial" of "the franchise"—not the number of voters who fail to comply with it. *League of Women Voters*, 178 A.3d at 810. Here **all**

**voters**, regardless of any affiliation or personal characteristic, **are treated the same** – when they choose to vote by mail, they all must complete the voter declaration by signing and **dating** it. The date requirement applies non-discriminately to all voters.

In *Crawford*, 553 U.S. 181, the U.S. Supreme Court upheld an Indiana voter ID law. In support of their Fourteenth Amendment equal protection challenge to a voter ID law that applied non-discriminately to all voters, the plaintiffs urged the Court to consider the burden imposed on the "narrow class of voters" who could not afford or obtain a birth certification and had to return to the circuit court clerk's office after voting. *Id.* at 200 (opinion of Stevens, J.). The lead opinion refrained from weighing the "special burden" faced by "a small number of voters" because the evidence on the record gave "no indication of how common the problem is," which made it impossible "to quantify . . . the magnitude of the burden." *Id.* at 200. In a concurrence, Justice Scalia rejected outright the idea of measuring the burden on a subset of voters. "The Indiana law affects different voters differently, . . . but what petitioners view as the law's several light and heavy burdens," he reasoned, "are no more than the different **impacts** of the single burden that the law uniformly imposes on all voters." *Id.* at 205 (Scalia, J., concurring in the judgment) (emphasis in original). Justice Scalia went on to explain: "To vote in person in Indiana, everyone must have and present a photo ID that can be obtained for free. . . . The Indiana photo-ID law is a generally applicable, nondiscriminatory voting regulation, and our precedents refute the view that individual impacts are relevant to determining the severity of the burden it imposes." *Id.*

Although *Crawford* involved rule challenges in an equal protection context, there is no reason why the rationale of measuring the burden on voting rights imposed by the rule is not equally applicable in this instance, where Petitioners are

claiming that the dating provisions are so difficult so as to amount to a denial of the right to vote. Burden-measuring is necessary under the Free and Equal Elections Clause to determine whether a rule dilutes or entirely deprives someone of the right or opportunity to vote. That is the whole analysis under that Clause, and it ends there.

I would, however, reject the urge to consider the individual impacts to determine the difficulty in complying with the voter declaration requirements.[16] I believe the Majority has been led astray by Petitioners' raw data, which is highly misleading. In so doing, the Majority, in essence, has concluded that requiring the voter to properly complete his attestation or declaration and discounting his ballot if he fails to do so must be difficult because a subset of voters failed to comply with it. However, a distorted picture can be created by relying on the raw data alone. Properly understood, Petitioners' statistics show only a small disparity that provides little support for concluding that Pennsylvania's political processes are not equally open. *Brnovich*, 594 U.S. at 681.

In summary, I believe the mistake the Majority makes is to confuse its role in this matter by rewriting the Election Code in an attempt to guarantee an errorless election. The failure to complete one's declaration by including the date should invalidate the ballot. I would follow Supreme Court precedent faithfully and leave the sign and date requirement intact and discount ballots that lack a complete attestation or affirmation. Even if that means .85% of the ballots are discounted.

---

[16] As one court pointed out, individual impacts from the perspective of the affected voters **may** be relevant where the court is evaluating a **non-uniform rule** under a statute that effects "disparate treatment" on various classes of voters. *See e.g.*; *Mays v. LaRose*, 951 F.3d 775, 784-85 (6th Cir. 2020). In other words, the evaluation of a law's impact on certain subgroups of affected voters may be appropriate when a law directly distinguishes between those subgroups and accords them different voting rights. However, that analysis is not applicable here because there is no claim that the dating provision effects "disparate" treatment on various classes of voters.

**D.** **The Majority Incorrectly Applies "Strict Scrutiny".**

**1.** **"Strict Scrutiny" does not apply to Free and Equal Elections Clause Challenges; it applies in the Equal Protection context.**

The Majority's adoption of "strict scrutiny" to invalidate the enforcement of the voter declaration requirements under the Free and Equal Elections Clause is incorrect and reaches the wrong result accordingly. The traditional "scrutiny" analysis has never been utilized to determine whether neutral, objective, universally-applicable ballot-casting rules like the voter declaration requirements violate the Free and Equal Elections Clause. As I already have shown, that Clause guards against unequal voting power, the dilution of one vote compared with another, and the deprivation of the voting franchise altogether by burdensome and prohibitive procedural rules. In contrast, and as discussed below, "scrutiny" analysis is reserved for constitutional challenges, chiefly under the Equal Protection Clause, to distinction-making legislation. Pursuant to such analysis, we apply, as appropriate, varying degrees of scrutiny to determine whether legislative distinctions are precisely drawn to serve government interests of varying levels of importance.

In *League of Women Voters*, the Pennsylvania Supreme Court emphasized the unique analysis that applies to Free and Equal Elections Clause challenges as compared with other types of constitutional claims:

> Moreover, and importantly, when properly presented with the argument, our Court entertains as distinct claims brought under the Free and Equal Elections Clause . . . and the federal Equal Protection Clause, and we adjudicate them separately, utilizing the relevant Pennsylvania and federal standards. In *Shankey* . . . , a group of third-party voters challenged a Pennsylvania election statute which specified that, in order for an individual's vote for a third-party candidate for a particular office in the primary election to be counted, the total number of aggregate votes by third-party voters for that office had to equal or exceed

PAM - 41

the number of signatures required on a nominating petition to be listed on the ballot as a candidate for that office. The voters' challenge, which was brought under both the Free and Equal Elections Clause of the Pennsylvania Constitution and the Equal Protection Clause of the United States Constitution, alleged that these requirements wrongfully equated public petitions with ballots, thereby imposing a more stringent standard for their vote to be counted than that which voters casting ballots for major party candidates had to meet.

Our Court applied different constitutional standards in deciding these claims. **In considering and rejecting the Article I, Section 5 claim—that the third-party candidates' right to vote was diminished because of these special requirements—our Court applied the interpretation of the Free and Equal Elections Clause set forth in *Winston*, *supra*, and ruled that, because the statute required major party candidates and third party candidates to demonstrate *the same numerical level of voter support* for their votes to be counted, the fact that this demonstration was made by ballot as opposed to by petition *did not render the election process unequal.*** By contrast, in adjudicating the equal protection claim, our Court utilized the test for an equal protection clause violation articulated by the United States Supreme Court and examined ***whether the statute served to impermissibly classify voters without a reasonable basis to do so.***

*League of Women Voters*, 178 A.3d at 812 (emphasis provided). *See also Shankey*, 257 A.2d at 897. Here, Petitioners challenge the voter declaration requirements under the Free and Equal Elections Clause and not the federal Constitution. Moreover, the voter declaration requirements impose no **actual** classifications, create no **actual** distinctions, and cause no **impermissible** disparate treatment among voters. Thus, "strict" or any other level of traditional scrutiny simply does not apply here.

PAM - 42

The Majority's citation to *Pennsylvania Democratic Party* to support its invocation of strict scrutiny analysis is inapposite. There, and in conformity with *League of Women Voters*, the Pennsylvania Supreme Court conducted a "scrutiny" analysis **only** with regard to a poll watcher residency requirement that was challenged under the First[17] and Fourteenth Amendments of the federal Constitution. 238 A.3d at 353, 380. That Court concluded, **analyzing and applying only federal cases**, that the poll watcher requirement "imposes no burden on one's constitutional **right** to vote and, accordingly, requires only a showing that a rational basis exists to be upheld." *Id.* at 385 (emphasis added). Although the petitioners in *Pennsylvania Democratic Party* also challenged the poll watcher residency requirement under the Free and Equal Elections Clause, *see id.* at 353, the Supreme Court conducted no independent analysis under the Clause because, at least in this respect, it afforded no more protection than the federal Constitution. *Id.* at 386 n.35.

In contrast, in the relevant and controlling portion of *Pennsylvania Democratic Party*, which the Majority here sidesteps entirely, the Court considered whether the Free and Equal Elections Clause required county boards of elections to notify voters of "minor facial defects" in cast mail-in ballots and afford them an opportunity to cure. *Id.* at 372. We quote from the Court's analysis at length because it is controlling on this point:

> [The p]etitioner bases this claim on its assertion that the multi-stepped process for voting by mail-in or absentee ballot inevitably leads to what it describes as minor errors, such as not completing the voter declaration or using an incorrect ink color to complete the ballot. According to [the p]etitioner, these minor oversights result in many ballots being rejected and disenfranchising voters who believe they have exercised their right to vote.

---

[17] U.S. Const. amend. I.

[The p]etitioner submits that voters should not be disenfranchised by technical errors or incomplete ballots, and that the "notice and opportunity to cure" procedure ensures that all electors who desire to cast a ballot have the opportunity to do so, and for their ballot to be counted. [The p]etitioner further claims there is no governmental interest in either: (1) requiring the formalities for the completion of the outside of the mailing envelope to be finalized prior to mailing as opposed to prior to counting, or (2) rejecting the counting of a ballot so long as ballots continue to arrive under federal law, which is the [Uniformed and Overseas Citizens Absentee Voting Act (52 U.S.C. §§ 20301-20311 UOCAVA)] deadline of seven days after Election Day.

As legal support for its position, [the p]etitioner relies upon the Free and Equal Elections Clause. It further emphasizes that election laws should be construed liberally in favor of voters, and that technicalities should not be used to make the right of the voter insecure. [The p]etitioner also asserts that ballots with minor irregularities should not be rejected, except for compelling reasons and in rare circumstances. Based on these legal principles, as well as this Court's broad authority to craft meaningful remedies when necessary, [the p]etitioner claims that the Pennsylvania Constitution and spirit of the Election Code require the [b]oards to provide a "notice and opportunity to cure" procedure, and that this Court has the authority to afford the relief it seeks.

. . . .

Upon review, we conclude that the [b]oards are not required to implement a "notice and opportunity to cure" procedure for mail-in and absentee ballots that voters have filled out incompletely or incorrectly. Put simply, as argued by the parties in opposition to the requested relief, the [p]etitioner has cited no constitutional or statutory basis that would countenance imposing the procedure [the p]etitioner seeks to require (*i.e.*, having the [b]oards contact those individuals whose ballots the [b]oards have reviewed and identified as including "minor" or "facial"

defects—and for whom the [b]oards have contact information—and then afford those individuals the opportunity to cure defects until the UOCAVA deadline).

While the Pennsylvania Constitution mandates that elections be "free and equal," it leaves the task of effectuating that mandate to the legislature. As noted herein, although the Election Code provides the procedures for casting and counting a vote by mail, it does not provide for the "notice and opportunity to cure" procedure sought by [the p]etitioner. To the extent that a voter is at risk for having his or her ballot rejected due to minor errors made in contravention of those requirements, we agree that the decision to provide a "notice and opportunity to cure" procedure to alleviate that risk is one best suited for the Legislature. We express this agreement particularly in light of the open policy questions attendant to that decision, including what the precise contours of the procedure would be, how the concomitant burdens would be addressed, and how the procedure would impact the confidentiality and counting of ballots, all of which are best left to the legislative branch of Pennsylvania's government.

*Id.* at 372-74. Entirely absent from the Court's analysis is any "scrutiny" in the traditional sense, and certainly not "strict" scrutiny.

**2.    Even if I used the Majority's own test, "strict scrutiny" still would not apply.**

Even if strict scrutiny could apply here, which it cannot, the voter declaration requirements in any event are not subject to such scrutiny according to the Majority's own standard. The Majority holds that strict scrutiny applies because the date requirements make voting so difficult for some voters that it denies them the franchise altogether. (Majority, slip op. at 75.) The Majority in this respect has unfortunately begun  its "strict scrutiny" analysis with a wrong conclusion that it never would or should have reached after the correct analysis.  As I note above,

merely because certain ballots are not counted because they are mailed in envelopes with undated or misdated voter declarations does not mean that the voters who failed to follow the rules have been subjected to an unconstitutionally burdensome difficulty in voting. Thus, even under the Majority's test, strict scrutiny would not apply here.

To illustrate, although the Court in *Pennsylvania Democratic Party* did not consider whether the procedural requirements for mail-in voting, if enforced, were unconstitutional under the Free and Equal Elections Clause, tacit to the Court's analysis is the principle that ballot-casting rules are not subject to judicial scrutiny under the Free and Equal Elections Clause where they do not burden the franchise but, rather, only result in the disqualification of objectively noncompliant ballots. That is the very principle that the Majority here refuses to countenance and that controls the outcome of this case. Justice Wecht emphasized this point in his concurring opinion in *Pennsylvania Democratic Party*, in which he stated his belief that the Court's holding under the Free and Equal Elections Clause extended to permit rejection of ballots based on "defects that are capable of objective assessment pursuant to uniform standards." *Id.* at 389 (Wecht, J., concurring). Pertinent here, Justice Wecht went on to illustrate:

> For example, the failure to "fill out, date and sign the declaration printed on" the ballot return envelope, as required by 25 P.S. § 3150.16(a), is a deficiency that can be readily observed. Absent some proof that the enforcement of such a uniform, neutrally applicable election regulation will result in a constitutionally intolerable ratio of rejected ballots, I detect no offense to the Free and Equal Elections Clause.

*Id.* at 389.

This same principle was enunciated, albeit in a slightly different legal context, in *Pennsylvania State Conference of NAACP Branches v. Secretary*, 97 F.4th 120 (3d Cir. 2024), where the Third Circuit Court of Appeals ruled that the "Materiality Provision" of the federal Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(b),[18] required the counting of undated or incorrectly-dated mail-in ballots notwithstanding that the Pennsylvania Supreme Court held in *Ball* that the dating requirement is mandatory and non-compliant ballots must not be counted. *Pennsylvania State Conference*, 97 F.4th at 125. The Third Circuit concluded that the materiality provision categorically does not apply to ballot-casting rules that determine **how** a qualified voter casts a ballot, regardless of whether they serve any valid state purpose. *Id.* at 125, 131. The Third Circuit noted that ballot-casting rules govern **how** a person votes and do not impact **whether** a person is qualified to vote, *i.e.*, his or her "right" to vote. *Id.* at 130, 135. Rather, the Court recognized that, "[t]o cast a ballot that is valid and will be counted, all qualified voters must abide by certain requirements, just like those authorized to drive must obey the State's traffic laws like everybody else." *Id.* at 130. Necessarily, then,

> individuals are not "denied" the "right to vote" if non-compliant ballots are not counted. Suppose a county board of elections excludes a voter's ballot from the vote tally because he cast more than the permissible number of votes. Or it sets aside a ballot because the voter revealed his identity by improperly marking the secrecy envelope containing the ballot. Is that person denied the right to vote? In both instances, the voter failed to follow a rule—

---

[18] As stated by the Third Circuit, the materiality provision "prohibits denial of the right to vote because of an 'error or omission' on paperwork 'related to any application, registration, or other act requisite to voting,' if the mistake is 'not material in determining whether [an] individual is qualified' to vote." 97 F.4th at 125 (quoting 52 U.S.C. § 10101(a)(2)(B)) (brackets in original).

like the dat[ing] [provisions]—that renders his ballot defective under state law.

*Id.* at 135. *See also id.* (quoting *Ritter v. Migliori*, 142 S.Ct. 1824 (2022) (Alito, J.) ("Even the most permissive voting rules must contain some requirements, and the failure to follow those rules constitutes the forfeiture of the right to vote, not the denial of that right.")).

**E.**     <u>**The Majority Effectively Re-Writes the Elections Code and Sustains What is, in Actuality, a Facial Challenge to the Voter Declaration Requirements.**</u>

In analyzing Petitioners' constitutional challenge, the Majority has incorrectly framed their claim as an "as-applied" challenge, when it is, at its core, a **facial** challenge to the voter declaration requirement. We have explained that "an as-applied attack . . . does not contend that a law is unconstitutional as written but that its application to a *particular person* under *particular circumstances* deprived *that person* of a constitutional right." *Nigro v. City of Philadelphia*, 174 A.3d 693, 699 (Pa. Cmwlth. 2017) (emphasis added). As such, "an as-applied challenge will not necessarily invalidate a law given that a law may operate in an unconstitutional way as to *one particular individual or company*, as to which it may be declared void, and yet may, as to others still be effective." *Id.* (emphasis added).

The Majority has stretched this concept to the absolute limit by declaring the voter declaration requirements of the Election Code— applicable to all 67 counties of this Commonwealth— "unconstitutional as applied to qualified voters who timely submit undated or incorrectly dated absentee and mail-in ballots" in Philadelphia and Allegheny Counties. (Order, ¶ 3.) This vague, overly-broad category of potential future voters flies in the face of, and is fundamentally inconsistent with, the limited nature of a true as-applied challenge to the validity of

a statute. Although the Majority intimates that the voter declaration requirements disparately impact the elderly, an intimation that I find insulting to that group of voters, among others, it has identified no "particular individual or company" allegedly deprived of a constitutional right. *Nigro*, 174 A.3d at 699.

Additionally, the relief the Majority affords for Petitioners' "as-applied" challenge is permanent, rather than temporary, and has not been implemented as a result of any unique or challenging circumstances, unlike that issued by our Supreme Court during the COVID-19 pandemic. *See Pennsylvania Democratic Party*, 238 A.3d at 371 (finding in context of as-applied Free and Equal Elections Clause challenge to statutory received-by timeline for absentee and mail-in ballots to unprecedented facts caused by COVID-19 pandemic resulted in infringement of electors' right to vote and adopting, under its extraordinary jurisdiction, three-day extension of deadline to allow for tabulation of ballots postmarked by 8:00 p.m. on Election Day). In sharp contrast, the relief ordered by the Majority here is neither temporary nor emergency-driven.

Given that Petitioners' challenge is in actuality a facial challenge to the voter declaration requirements of the Election Code, the Majority has proceeded to effectively re-write the statute in crafting its remedy.

### III. THE RELIEF AFFORDED BY THE MAJORITY IS UNEQUAL, INCONSISTENT, AND PERMITS INVALIDATION OF BALLOTS IN 65 PENNSYLVANIA COUNTIES

With respect to the relief crafted by the Majority, I reemphasize that, under long-standing Pennsylvania Supreme Court precedent, "elections are free and equal within the meaning of the Constitution . . . *when every voter has the same right as any other voter*[.]" *Winston*, 91 A. at 523 (emphasis added). "[T]he *overarching objective* of [article I, section 5] of our constitution is to prevent dilution of an

individual's vote by mandating that the power of his or her vote in the selection of representatives be *equalized to the greatest degree possible with all other Pennsylvania citizens*." *League of Women Voters*, 178 A.3d at 817 (emphasis added).

Despite this clear directive, the relief ordered by the Majority accomplishes **the direct opposite**, in that it permits only **two** counties of this Commonwealth to ignore the voter declaration requirements, leaving the remaining 65 counties bound to follow the law as written. Thus, under the guise of promoting free and equal elections, the Majority has instead created a new system of inequality wherein voters who write an incorrect date on a mail-in or absentee ballot in Philadelphia County have their votes counted despite non-compliance with Election Code requirements, while the votes of those who make this same error in Lehigh County must be invalidated as prescribed by our General Assembly and, until today, our Supreme Court. I fail to see how equality is accomplished when the validity of a mail-in or absentee ballot with the same facial error turns upon the county in which that voter resides.

Additionally, the relief ordered by the Majority reveals the internal inconsistency of its logic, in that it includes a carve out specifying that the Philadelphia and Allegheny County Boards retain the authority to evaluate mail-in and absentee ballots for compliance with the voter declaration requirements to ensure timely submission "and thus prevent fraud." (Order, ¶ 6.) This carve out tacitly concedes that the dating provisions mandated by the legislature **do serve a purpose** and directly undercuts the Majority's repeated declarations that "the dating provisions are virtually meaningless" and are "not used to determine the timeliness of a ballot, a voter's qualifications/eligibility to vote, or fraud." (Majority Op. at 75-76.)

## IV. ACT 77 IS NOW VOID IN ITS ENTIRETY

In his concurring and dissenting opinion in *McLinko v. Department of State*, 270 A.3d 1243 (Pa. Cmwlth.) (*McLinko I*), *aff'd in part and rev'd in part*, 279 A.3d 539 (Pa. 2022) (*McLinko II*), Judge Wojcik of this Court, joined by Judge Ceisler, aptly noted that

> Section 11 of Act 77 contains a "poison pill" that would invalidate all of Act 77's provisions if this Court determines that any of its provisions are invalid. . . . Thus, if the no-excuse mail-in provisions of Act 77 are found to be unconstitutional, all of Act 77's provisions are void.

*McLinko I*, 270 A.3d at 1278 (Wojcik, J., concurring in part and dissenting in part). *See also McLinko II*, 279 A.3d at 609-10 (Brobson, J., dissenting) (noting that the DNC "advance[d] the nonseverability provision [of Act 77] as a reason why [the Supreme Court] should reject the constitutional challenge to Act 77's mail-in ballot provisions . . . , because doing otherwise would trigger the nonseverability provision and render the entirety of Act 77 invalid). I agree. The nonseverability clause of Act 77 is straightforward and provides that "Sections 1, 2, 3, 3.2, 4, 5, 5.1, 6, 7, 8, 9 and 12 of this act are nonseverable. If any provision of this act **or its application to any person or circumstance** is held invalid, the remaining provisions or applications to this act are void." Section 11 of Act 77 (emphasis added). Sections 6 and 8 of Act 77 govern absentee and mail-in voting and contain the voter declaration requirements. It would seem to obviously follow, then, that this Court's forbidding of the enforcement of the voter declaration requirements, which our Supreme Court has held to be mandatory, renders all of Act 77 void and, resultantly, voids all absentee and mail-in voting in Pennsylvania. The Majority nevertheless

sidesteps Section 11 and ignores the intent of the General Assembly to save the remainder of Act 77 which, according to the Majority's keeping-up-with-the times wisdom, can function perfectly well as the Majority has now interpreted it. *See BPE*, ___ A.3d at ___, slip op. at 88-89. With this I cannot agree.

It is true that, generally speaking, statutes are presumed to contain severable provisions that each will remain in effect notwithstanding that one or more of the others are held to be invalid. *See* Section 1925(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1925(a). Where, however, a court determines that the (1) **General Assembly would not have enacted** the valid provisions without the invalid ones, or (2) the valid provisions, standing alone, cannot function **in accordance with legislative intent** without the invalid ones, the statute's provisions will not be severable. *Stilp v. Commonwealth*, 905 A.2d 918, 970 (Pa. 2006) (citing 1 Pa.C.S. § 1925(a)).

In line with these principles, nonseverability provisions in statutes are constitutionally proper. *Stilp*, 905 A.2d at 978. Although courts will decline to enforce such provisions where they constitute boilerplate attempts by the General Assembly to coerce the judiciary and thwart judicial review, *id.* at 978-79, our Supreme Court nonetheless has recognized that

> [t]here may be reasons why the provisions of a particular statute essentially inter-relate, but in ways which are not apparent from a consideration of the bare language of the statute as governed by the settled severance standard set forth in Section 1925 of the Statutory Construction Act[]. In such an instance, the General Assembly may determine that it is necessary to make clear that a taint in any part of the statute ruins the whole. Or, there may be purely political reasons for such an interpretive directive, arising from the concerns and compromises which animate the legislative process. In an instance involving such

compromise, the General Assembly may determine[] the court's application of the logical standard of essential interconnection set forth in Section 1925 might undo the compromise; a nonseverability provision, in such an instance, may be essential to securing the support necessary to enact the legislation in the first place. Once again, this is a concern that would not necessarily be apparent to a court analyzing the bare language of the statute.

*Id.* at 978. Thus, where a nonseverabilty clause effectuates these legitimate purposes, it does not implicate separation of powers concerns and is enforceable. *Id.* at 978-79.

Here, there is clear evidence that Section 11 of Act 77 was an important component of the democratically-reached political compromises that brought about the Act's passage. The Democratic sponsor of Act 77, as well as the Republican Senate Majority Leader, acknowledged that Act 77 was a politically difficult compromise. *See Pennsylvania Legislative Journal-Senate*, October 29, 2019, 1000, 1002. Further, the nonseverability provision helped to reassure the General Assembly that all of the interworking component parts of the bipartisan bargain would not be discarded by the courts. For example, House of Representatives State Government Committee Chair Garth Everett commented as follows on the House floor:

Mr. EVERETT. Thank you, Mr. Speaker.

**There is a nonseverability clause**, and there is also the section that you mentioned that gives the Supreme Court of Pennsylvania jurisdiction, **because the intent of this is that this bill works together, that it not be divided up into parts**, and there is also a provision that the desire is, and of course, that could be probably gotten around legally, but that suits be brought within 180 days so that we can settle everything before this would take effect. So those are the provisions that have to do with severability.

PAM - 53

Mrs. DAVIDSON.  So in effect, if a suit was brought to the Supreme Court of Pennsylvania and they found it to be unconstitutional, it would eliminate the entire bill because it cannot be severed.

Mr. EVERETT.  Yes; that would be just in those sections that have been designated as nonseverable.

*Pennsylvania Legislative Journal-House*, October 29, 2019, 1740-41 (emphases added).  Section 11 of Act 77 thus is not a generic, boilerplate nonseverability provision included by the General Assembly as a judicial hamstringing measure unrelated to the careful and laborious political compromises weaved throughout the statute.  The General Assembly specifically listed certain non-negotiable sections of Act 77 that were essential to those compromises and, accordingly, are not severable.  Both Sections 6 and 8 are included in that list.  Section 11 therefore must be enforced by this Court.

The Majority appears to acknowledge, as it must, that its broad pronouncements here trigger the applicability of Section 11 of Act 77, which applies anytime the **application** of Act 77's provisions are declared to be invalid.  Nevertheless, the Majority circumvents this by deciding that it will not enforce Section 11 because, in the Majority's view, the rest of Act 77 can function without the voter declaration requirements.  The Majority conducts no analysis at all concerning the General Assembly's intent, but, rather, in its "discretion," decides not to enforce Section 11 because the **Majority's intent** is that the rest of Act 77 function without the voter declaration requirements.  That decision simply is not the Majority's to make.

Finally, I hasten to reiterate my conclusion that the voter declaration requirements are valid and, accordingly, Act 77 can remain on the books and its provisions may be enforced.  That is the most rationale, commonsense, and honest

application of the Free and Equal Elections Clause and our Supreme Court's precedent interpreting it. It is the Majority's **misapplication** of the Clause that necessitates an end run around the General Assembly's intent, all so the Majority can avoid being ascribed with exactly what it has done here: invalidate Act 77 and, with it, absentee and mail-in voting in Pennsylvania.

## V.    CONCLUSION

The members of the Majority have discarded their judicial robes and donned legislative hats to re-write both the Free and Equal Elections Clause and Act 77, all so that they might invalidate the simplest and perhaps **least** burdensome of all ballot-casting requirements. Today the Majority says that requiring the date on the voter declaration on a mail-in or absentee ballot envelope is subject to strict judicial scrutiny and cannot be enforced because doing so unconstitutionally denies the voting franchise altogether. I must wonder whether walking into a polling place, signing your name, licking an envelope, or going to the mailbox can now withstand the Majority's newly minted standard. Of course, those everyday ballot-casting requirements are all more burdensome and prohibitive than the voter declaration requirements, but they implicitly remain part of the Election Code. For now.

I would follow Supreme Court precedent faithfully, leave the voter declaration requirements intact, and not upend that Court's directive in *Ball* that ballots that contain undated or misdated voter declaration must not be counted. Changing, eliminating, or rendering directory the voter declaration requirements are all viable options for the General Assembly, but not for this Court. We must exercise judicial review with great care so as to not usurp the General Assembly's role in regulating the manner and method of voting. Adherence to this long-standing rule of jurisprudence and preservation of the separation of powers is especially important

PAM - 55

in the politically-charged and highly partisan atmosphere in which we now live and work. Exceeding our function as impartial arbiters of the constitution and rewriting legislation to keep up with the times does little to reinforce trust and respect for the Commonwealth's system of justice. I fear that the Majority has neglected this important consideration today.

For all of the foregoing reasons, I dissent.

_____
PATRICIA A. McCULLOUGH, Judge